
RECEIVED
OFFICE OF THE CLERK
U.S. COURT OF APPEALS
PUBLIC INFORMATION UNIT

2015 APR -2 PM 4: 02

FILED
DOCKETED _____
DATE   INITIAL

MISCELLANEOUS DOCKET NO. _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE APPLICATION FOR EXEMPTION FROM ELECTRONIC PUBLIC ACCESS FEES BY PUBLIC.RESOURCE.ORG, A 501(C)(3) NONPROFIT ORGANIZATION

**MOTION OF PUBLIC.RESOURCE.ORG FOR EXEMPTION FROM PACER FEES; DECLARATIONS OF BREWSTER KAHLE, BRIAN CARVER, TAMI GIERLOFF, LAURA ORR, MATTHEW SAG, DANIEL MARTIN KATZ, ROBERT J. ROSENTHAL, AND CARL MALAMUD WITH EXHIBITS A-P**

THOMAS R. BURKE (SBN 141930)
thomasburke@dwt.com
DAN LAIDMAN (SBN 274482)
danlaidman@dwt.com
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone: (415) 276-6500    Facsimile: (415) 276-6599

Attorneys for Applicant
PUBLIC.RESOURCE.ORG

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 1 of 165

MISCELLANEOUS DOCKET NO. _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE APPLICATION FOR EXEMPTION FROM ELECTRONIC PUBLIC
ACCESS FEES BY PUBLIC.RESOURCE.ORG, A 501(C)(3) NONPROFIT
ORGANIZATION

**MOTION OF PUBLIC.RESOURCE.ORG FOR EXEMPTION FROM
PACER FEES; DECLARATIONS OF BREWSTER KAHLE, BRIAN
CARVER, TAMI GIERLOFF, LAURA ORR, MATTHEW SAG, DANIEL
MARTIN KATZ, ROBERT J. ROSENTHAL, AND CARL MALAMUD
WITH EXHIBITS A-P**

THOMAS R. BURKE (SBN 141930)
thomasburke@dwt.com
DAN LAIDMAN (SBN 274482)
danlaidman@dwt.com
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone: (415) 276-6500     Facsimile: (415) 276-6599

Attorneys for Applicant
PUBLIC.RESOURCE.ORG

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 3 of 165

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................1

II.  PUBLIC RESOURCE IS A QUALIFIED NONPROFIT
     CONDUCTING PUBLIC INTEREST RESEARCH......................................5

III. PUBLIC RESOURCE SEEKS A FEE EXEMPTION FOR A NON-
     COMMERCIAL PUBLIC INTEREST RESEARCH PROJECT...................7

IV.  GRANTING PUBLIC RESOURCE'S REQUEST WOULD
     BENEFIT THE PUBLIC AND THE COURT SYSTEM............................13

V.   CONCLUSION..................................................................................16

# TABLE OF AUTHORITIES

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 4 of 165

**Pages**

**Cases**

*Courthouse News Serv. v. Planet,*
  750 F.3d 776 (9th Cir. 2014) ..............................................................................13

*Cox Broadcasting Corp. v. Cohn,*
  420 U.S. 469 (1975).............................................................................................13

*Oregonian Publishing Co. v. United States Dist. Court,*
  920 F.2d 1462 (9th Cir. 1990) ............................................................................13

**Statutes**

28 U.S.C. § 1913 .....................................................................................................1, 14

E-Government Act of 2001 ..........................................................................................14

Judiciary Appropriations Act of 1992, Public Law 102–140, Title III,
  § 303(a) (Oct. 28, 1991).....................................................................................14

Rules Enabling Act of 1934 .........................................................................................14

**Rules**

Federal Rule of Appellate Procedure 25(a)(5)................................................................8

Federal Rule of Civil Procedure 5.2(a) ..........................................................................8

Federal Rule of Criminal Procedure 49.1 ......................................................................8

D. Oregon  Local Civil Rule 5.2 .....................................................................................8

W.D. Wash. Local Civil Rule 5.2(a)...............................................................................8

D. Idaho Local Civil Rule 5.5 ........................................................................................8

**Other Authorities**

History of Cameras in the Federal Courts,
  http://www.uscourts.gov/Multimedia/Cameras/history.aspx .............................15

DWT 26501708v4 0050033-000045

http://www.uscourts.gov/FormsAndFees/Fees/ElectronicPublic
    AccessFee.aspx ..................................................................................1, 2

https://public.resource.org/about/ ..........................................................6

John Schwartz, Rule Invites Cameras Into Federal Civil Cases, N.Y.
    Times (Dec. 18, 2009) .......................................................................15

Letter from Carl Malamud to the Hon. Lee H. Rosenthal, March 30,
    2015,
    https://law.resource.org/pacer/pacer.uscourts.gov.20150330.pdf ........................2

Long Range Plan for Information Technology in the Federal
    Judiciary, Fiscal Year 2014 Update at p. 8, *available at*
    http://www.uscourts.gov/uscourts/FederalCourts/Publications/
    2014-IT-long-range-plan.pdf ...............................................................5

Senate Report No. 174 (June 24, 2002), S. REP. 107-174 ......................................14

Stephen Subrin, *Federal Rules, Local Rules, and State Rules:
    Uniformity, Divergence, and Emerging Procedural Patterns*, 137
    U. Pa. L. Rev. 1999, 2008 (1989) .........................................................15

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 6 of 165

Public.Resource.Org ("Public Resource") a 501(c)(3) nonprofit organization, respectfully submits the following Motion requesting that this Court grant it an exemption from user access fees for the Public Access to Court Electronic Records system ("PACER"), which is necessary for it to carry out a non-commercial research project designed to promote public access to information. It specifically requests an exemption providing for unlimited access for 12 months to all documents within this Court, the District of Idaho, District of Nevada, District of Oregon, and the Western District of Washington, for the purpose of conducting an audit of privacy violations in public court filings, and that the Court also permit it to transfer the files it accesses pursuant to the exemption to a non-commercial Internet site where they would be freely accessible to the public.

## I.    INTRODUCTION

Pursuant to 28 U.S.C. § 1913, the Electronic Public Access Fee Schedule of the Judicial Conference of the United States ("Fee Schedule") provides this Court with the discretion to "exempt certain persons or classes of persons from payment of the user access fee" for the PACER system. *See* Fee Schedule ¶ 9, available at http://www.uscourts.gov/FormsAndFees/Fees/ElectronicPublicAccessFee.aspx.

"Examples of individuals and groups that a court may consider exempting include ... Section 501(c)(3) not-for-profit organizations." *Id.* The Court must find "that an exemption is necessary in order to avoid unreasonable burdens and to

1

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 7 of 165

promote public access to information," and the exemption should be granted for a non-commercial use that is limited in time and scope. *Id.*

Public Resource is a 501(c)(3) nonprofit organization dedicated to improving public access to government records and the law. It seeks an exemption that would provide it with unlimited access to PACER within this Court and four District Courts within the Ninth Circuit, for a period of 12 months, so that it can conduct a comprehensive analysis of privacy violations in court records made available to the public via the PACER system. Public Resource will submit the results of its privacy audit to this Court and notify attorneys of any violations so that they can take corrective action.

The project is designed to balance the goals of increasing public access to information about the courts and protecting individual privacy. In prior audits examining smaller subsets of court records, Public Resource has found frequent violations of the rules requiring redaction of sensitive personal information from filings and orders.[1] A comprehensive analysis based on all filings and orders from this Court and the selected District Courts would provide invaluable information

---

[1] Public Resource recently learned that the results of a privacy audit that it performed of judicial filings in 2008 has been posted on the U.S. Courts web site in a manner that revealed and republished anew, hundreds of individuals' Social Security Numbers (SSNs). In addition, Public Resource has learned that a large number of SSNs that were the subject of the 2008 audits are still live on the PACER system. *See* Declaration of Carl Malamud ¶ 27, Exhibit P.

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 8 of 165

about the scope of the problem and how it can best be addressed by policymakers, courts, attorneys, and other interested parties. Public Resource would only be able to conduct this court-wide research with an exemption from PACER user fees.

Public Resource also requests that once the audit is complete, the Court permit it to transfer the files that it accesses pursuant to the exemption to the Internet Archive, a non-profit organization, where the information would be available to the general public and could be used by other nonprofit groups, academics, and journalists to conduct research about the federal court system. Public Resource would monitor how these files are accessed and would report back to the Court about the usage of this public repository. It would also encourage the Administrative Office of the Courts to monitor and report on trends in PACER access over the same period of time to determine what effect, if any, the posting of Public Resource's source materials to a public archive has on the public's use of PACER.

This aspect of Public Resource's request is designed to broaden access to PACER for non-commercial research purposes while at the same time helping the Court to collect valuable data about the effect of such free public access. The privacy audit proposed by Public Resource is emblematic of the type of large-scale research that requires broad access to electronic court records. As described in more detail below and in the attached affidavits, other nonprofit groups,

3

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 9 of 165

academics, and journalists have done commendable work documenting and analyzing trends and patterns in the courts by using electronic filings and orders as source material. However, PACER user fees are preventing these public interest researchers from conducting comprehensive (e.g., access to all case files), long-term analyses of information across entire court systems.

Public Resource understands that some courts have been reluctant to permit broad fee exemptions for such purposes because of concerns about the potential financial effect allowing such broad access may have on the revenue that supports the operation of the PACER system. Therefore, a key component of this project is that it would provide the Court with information to help determine the actual effects of providing broader public access to PACER for such non-commercial purposes.

Public Resource currently has the capability to carry out this project using the records of this Court and as many as four District Courts. Having access to the records of multiple courts would be helpful for purposes of comparing compliance with privacy restrictions across jurisdictions, and it would also provide for a larger pool of resource materials for academics, journalists, and the general public to use. Therefore, Public Resource requests that this Court authorize as much access as possible. But in the spirit of innovation and experimentation that underlies this request, Public Resource would also welcome the opportunity to work with this

Court to adjust the scope of the proposal, including the number of courts involved and the particular districts.

Courts have always had substantial discretion to experiment with different ways to achieve policy goals favoring public access to information, and the Judicial Conference has specifically recognized that the "innovations of individual courts are essential to the success of the Judiciary's IT program."[2] This proposal would enable such innovation while reasonably balancing the public's interest in broader access to information about the courts, the privacy interests of individuals involved in federal litigation, and practical considerations about the funding and operation of the PACER system. Therefore, Public Resource respectfully requests that the Court grant its Motion and provide the requested fee exemption.

## II. PUBLIC RESOURCE IS A QUALIFIED NONPROFIT CONDUCTING PUBLIC INTEREST RESEARCH.

Public Resource is a 501(c)(3) nonprofit organization that was granted tax exempt status in 2007, and which operates solely for educational and charitable purposes. *See* Declaration of Carl Malamud ¶ 1. It works to facilitate greater

---

[2] *See* Long Range Plan for Information Technology in the Federal Judiciary, Fiscal Year 2014 Update at p. 8, *available at* http://www.uscourts.gov/uscourts/FederalCourts/Publications/2014-IT-long-range-plan.pdf.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 11 of 165

public access to government information, including information about the courts, while also ensuring that individual privacy is protected. *Id.* ¶¶ 2-12.[3]

Public Resource has a long history of working collaboratively with the different branches of government to find innovative ways of broadening public access to information. Among other activities, the group has worked with the Speaker of the House to make available a complete archive of video from select committees of the House of Representative, *id.* ¶ 2; posted online a complete historical archive of opinions of the U.S. Courts of Appeals, *id.* ¶¶ 4-5; and assembled and posted an archive of over 6,000 government videos and made them available online, *id.* ¶ 2. Public Resource's president, Carl Malamud, previously headed the nonprofit Internet Multicasting Service, where he was responsible for placing the U.S. Securities & Exchange Commission's EDGAR database and the U.S. Patent Database online. *Id.* ¶ 3.

More recently, Public Resource has focused its efforts on ensuring that individual privacy is protected as more information becomes available to the public online. To this end, Public Resource has performed audits of privacy violations in the PACER system and in court opinions, a service that received gratitude from the Judicial Conference and from several judges. *Id.* ¶¶ 6-12. Public Resource has

---

[3] Information about Public Resource's nonprofit status, including its Articles of Incorporation, Bylaws, IRS Determination, and Financial Statements, are available on the organization's website at https://public.resource.org/about/.

DWT 26501708v4 0050033-000045

also conducted privacy audits of the Internal Revenue Service's Exempt Organizations database which have found extensive evidence of privacy breaches in publicly-released tax records. *Id.* ¶ 16. These efforts led more than 40 members of Congress to request an explanation from the IRS, which took corrective action in response. *Id.* ¶¶ 18-21.

Given its nonprofit status and established record in carrying out large-scale projects that have furthered the public's access to information, Public Resource falls easily within the categories of organizations which may properly be considered for a discretionary exemption from the PACER user fees. *See* Fee Schedule ¶ 9.

## III. PUBLIC RESOURCE SEEKS A FEE EXEMPTION FOR A NON-COMMERCIAL PUBLIC INTEREST RESEARCH PROJECT.

Public Resource requests a PACER user fee exemption for a 12-month period that would provide unlimited access to all documents publicly filed using PACER in this Court, the District of Idaho, District of Nevada, District of Oregon, and Western District of Washington.[4] Public Resource would use this access to

---

[4] Public Resource will agree that all information, reports, documents and other data obtained using a fee-exempt PACER account will not be sold for profit or otherwise exchanged for value. It further agrees to establish a separate fee-based PACER account for activities which are not exemption related. Public Resource is also willing to agree to any other reasonable terms necessary to carry out this project.

7

perform a comprehensive privacy audit, along the lines of the prior audits that it has conducted based on court opinions and a smaller subset of PACER filings.

The federal rules generally require that certain information be redacted in court filings, including "an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, or a financial-account number." Federal Rule of Civil Procedure 5.2(a). *See also* Federal Rule of Criminal Procedure 49.1 (same); Federal Rule of Appellate Procedure 25(a)(5) (same privacy rules applicable on appeal). Many district courts have local rules expressly incorporating and elaborating on these privacy protections. *See*, *e.g.*, D. Idaho Local Civil Rule 5.5; D. Oregon Local Rule 5.2; W.D. Wash. Local Civil Rule 5.2(a).

Public Resource's prior audits suggest that these privacy restrictions are being routinely violated. In 2008, Public Resource examined more than 19 million pages of materials available through the PACER system, and found 1,669 documents containing un-redacted Social Security numbers and other privacy issues, such as individuals' birth dates, driver license numbers, Alien IDs, and bank account numbers. *See* Malamud Decl. ¶ 8. That same year, Public Resource audited federal appellate decisions and found a large number of Social Security Numbers included in the opinions. *Id.* ¶ 6.

DWT 26501708v4 0050033-000045

Public Resource shared its findings with the Administrative Office of the

Courts and representatives of the Judicial Conference, and Judge Lee Rosenthal,

then Chair of the Committee on Rules of Practice and Procedure of the Judicial

Conference, thanked Public Resource for its "commitment to improving the court

system" and urged it to keep the judiciary informed of its ongoing work. *Id.* ¶ 7.

Chief Judge Royce Lamberth of the United States District Court for the District of

Columbia thanked Public Resource for bringing the issue to the court's attention,

and indicated that corrective action had been taken in response. *Id.* ¶ 9. The

Chairman of the Senate Committee on Governmental Affairs and Homeland

Security cited Public Resource's work in calling on the Judicial Conference to do

more to make PACER records freely available to the public while ensuring that

individual privacy protections are enforced. *Id.* ¶ 10.

Public Resource proposes conducting a similar audit to search for Social

Security Numbers and other protected personal information that has been included

in public court filings and orders in violation of the applicable rules. *Id.* ¶¶ 22-27.

However, in contrast to its earlier analyses which have examined smaller subsets of

court records, the proposed audit would involve a comprehensive analysis of all

PACER filings in this Court, and/or one or more District Courts, which would

provide invaluable insight into the actual scope of the privacy problem. *Id.* An all-

inclusive, court-wide audit would assist this Court and other policymakers in

9

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 15 of 165

determining how best to address the privacy issue, whether through new regulations, stepped up enforcement of existing rules, or other measures. Without a fee exemption, it would be prohibitively expensive and unreasonably burdensome for Public Resource, a nonprofit organization with limited resources, to obtain access to the large pool of records necessary for such an exhaustive study.

Under this proposal, Public Resource would submit to this Court (and any District Courts involved in the project) an interim report mid-way through the exemption period and a final report after the period is complete with the results of the privacy audit. *Id.* ¶ 27. It would also undertake to notify attorneys responsible for any privacy violations so that they could take corrective actions. *Id.* ¶ 26.

Public Resource also requests that after redactions are performed, the Court permit it to transfer the files that it accesses pursuant to the exemption to the Internet Archive (with any restricted personal information redacted), so that the documents could be freely accessible to the public through that organization's non-commercial online collection. *Id.* ¶ 28. The Internet Archive is a 501(c)(3) nonprofit that oversees a free Internet library offering access for researchers, academics, and the general public to historical collections in digital format. *See* Declaration of Brewster Kahle at ¶¶ 1-7. It maintains a collection of federal court records in partnership with RECAP, a joint project of the Center for Information Technology Policy at Princeton University and the Free Law Project, which

10

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 16 of 165

facilitates the uploading of documents purchased through PACER to a free and open online repository. *Id.* at ¶¶ 8-14; Declaration of Brian W. Carver at ¶¶ 8-13.

Once the documents have been uploaded to the Internet Archive, Public Resource will keep track of which types of documents are accessed and how often, and it will prepare a follow-up report to this Court. *See* Malamud Decl. ¶ 32; Kahle Decl. ¶ 15. Public Resource will also encourage other nonprofit organizations, academics, and journalists to work with the records for non-commercial research purposes, and will provide a report to this Court about any such projects. *See* Malamud Decl. ¶¶ 30-32.

Considerable beneficial public interest research has already been done using these sorts of court records as source material, albeit on smaller scales. For example, Professor Matthew James Sag of the Loyola University Chicago School of Law has conducted several empirical studies of trends in copyright litigation using databases that he created from federal court records. *See* Declaration of Matthew James Sag at ¶¶ 4-9. Professor Daniel Martin Katz of Michigan State University College of Law has also conducted numerous empirical studies of federal court records, focusing on subjects such as the Tax Code, judicial decision-making, and the evolution over time of different fields of law and the use of legal terms of art. *See* Declaration of Daniel Martin Katz at ¶¶ 2-11.

11

Similarly, the Center for Investigative Reporting, a nonprofit journalism organization, used large numbers of federal court records for an investigative series about judicial conflicts of interest. *See* Declaration of Robert J. Rosenthal at ¶ 4. The organization has also relied on records from PACER for its reporting on subjects such as problems at the Department of Veterans Affairs, health effects of chemical plants, farmworker sexual abuse, and the abuse of developmentally disabled adults in the care of the state. *Id* at ¶¶ 5-11.

Unfortunately, PACER's fee structure prevents researchers like these from conducting more ambitious empirical projects examining patterns and trends across entire courts over longer periods of time. *See, e.g.,* Sag Decl. at ¶¶ 13-14; Katz Decl. at ¶¶ 12-14; Rosenthal Decl. at ¶¶ 13-14; Declaration of Tami Gierloff at ¶¶ 5-7; Declaration of Laura Orr at ¶ 7. Public Resource's proposal would enable them to embark on some these worthwhile projects by using the same materials accessed by Public Resource for its privacy audit. Not only would this help to produce important academic scholarship, policy research, and journalism, but Public Resource's follow-up analysis on how the public repository is used (and hopefully the Judicial Conference's reciprocal analysis of any changes in PACER usage) would provide the Court and policymakers with important data to use in

12

evaluating future fee exemption requests, as well as the broader policies governing PACER access and fees.[5]

## IV. GRANTING PUBLIC RESOURCE'S REQUEST WOULD BENEFIT THE PUBLIC AND THE COURT SYSTEM.

Public access to court records is an issue with profound constitutional implications. "Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents." *Oregonian Publishing Co. v. United States Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990). The Supreme Court has recognized "the beneficial effects of public scrutiny upon the administration of justice," *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975), and this Court has recently reaffirmed that "access to public proceedings and records is an indispensable predicate to free expression about the workings of government," *Courthouse News Serv. v. Planet*, 750 F.3d 776, 785 (9th Cir. 2014).

---

[5] The Fee Schedule directs courts to find that "individual researchers requesting an exemption have shown that the defined research project is intended for scholarly research, that it is limited in scope, and that it is not intended for redistribution on the internet or for commercial purposes." Fee Schedule ¶ 9. By its plain language, this limitation only applies to "individual researchers," not Section 501(c)(3) not-for-profit organizations, which are listed separately where the Fee Schedule identifies the types of individuals and entities that may be considered for fee exemptions. *Id.* Public Resource's request illustrates why a nonprofit organization could warrant different treatment. While its proposal does involve redistributing records obtained with the fee exemption on the Internet (via a non-commercial website), Public Resource will use its proven institutional resources to monitor and analyze how this publicly accessible archive is used, and report the results to the Court.

13

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 18 of 165

Consistent with these principles, Congress has expressed an intention to broaden public access to federal court records through the PACER system. While it has provided that the "Judicial Conference may, only to the extent necessary, prescribe reasonable fees" for accessing court records electronically, Congress has directed that the courts provide exemptions from these user fees "to promote public access to such information." 28 U.S.C. § 1913, Notes on Court Fees for Electronic Access to Information; *see also* Judiciary Appropriations Act of 1992, Public Law 102–140, Title III, § 303(a) (Oct. 28, 1991). And in enacting the E-Government Act of 2001, the Senate Committee on Governmental Affairs stated that it "intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." Senate Report No. 174 (June 24, 2002), S. REP. 107-174, 2002 WL 1425816, at *23.

Public Resource's proposal gives this Court an opportunity to conduct a controlled experiment in expanding public access while also protecting individual privacy and collecting important empirical information about usage patterns that could help shape future policy with respect to PACER access and fees. It is a long-held principle that each court has considerable discretion in framing local rules and orders, subject to the requirements of Judicial Conference policy and federal law. As Senator Thomas Walsh of Montana said during the debates over the Rules

14

Enabling Act of 1934 (which established the modern system of uniform federal court rules), "it is beyond human ingenuity or talent to frame statutes or rules suited to every contingency." Stephen Subrin, *Federal Rules, Local Rules, and State Rules: Uniformity, Divergence, and Emerging Procedural Patterns*, 137 U. Pa. L. Rev. 1999, 2008 (1989).

In a related area of public access, the Judicial Conference has a long history of embarking on successful pilot programs allowing cameras in courtrooms. *See* History of Cameras in the Federal Courts, http://www.uscourts.gov/Multimedia/ Cameras/history.aspx. This Court in particular has been a leader in adopting such innovative programs that have provided greater public access to proceedings before the Court. *See, e.g.*, John Schwartz, Rule Invites Cameras Into Federal Civil Cases, N.Y. Times (Dec. 18, 2009) (quoting Judge Kozinski describing a pilot program to allow cameras in certain civil proceedings as an "experiment … designed to help us find the right balance between the public's right to access to the courts and the parties' right to a fair and dignified proceeding").

Public Resource has previously worked with the Court of Appeals to digitize historical Ninth Circuit opinions and briefs and make them available online for the first time. *See* Malamud Decl. ¶ 4. The Ninth Circuit has invited Public Resource's president, Mr. Malamud, to speak on access to the courts and privacy issues. *Id.* ¶ 12. And the organization's large-scale work in promoting public

15

access to court records and protecting individual privacy has drawn recognition from judges and members of congress and helped guide courts and agencies in changing their policies and practices. *Id.* ¶¶ 6-21. Given its track record in this area, Public Resource believes that it would be a productive partner for the Court in carrying out an important experiment in promoting public access to information while also balancing individual privacy concerns and the practical considerations of the court system.

## V.  CONCLUSION

For all of these reasons, Public Resource respectfully requests that this Court grant it an exemption from user access fees for the PACER system for a period of 12 months that would provide for unlimited access to all documents within this Court, the District of Idaho, District of Nevada, District of Oregon, and the Western District of Washington, and that the Court also permit Public Resource to transfer the files it accesses pursuant to the exemption to a non-commercial Internet site where they would be freely accessible to the public.

RESPECTFULLY SUBMITTED this 2nd day of April, 2015.

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE
DAN LAIDMAN

By _____
Thomas R. Burke

Attorneys for Applicant
PUBLIC.RESOURCE.ORG

16

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 22 of 165

## DECLARATION OF BREWSTER KAHLE

I, Brewster Kahle, declare as follows:

1.      I founded the Internet Archive in 1996, and serve as its leader, the Digital Librarian. Internet Archive is a 501(c)(3) non-profit corporation located in San Francisco, California. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

### Background on the Internet Archive

2.      The Internet Archive is an Internet library whose purposes include offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format. The Internet Archive may be accessed at the following URL: https://archive.org/

3.      The Internet Archive includes text, audio, video, and software, as well as archived web pages since 1996 for a service known as the "Wayback Machine," which allows users to examine what web pages looked like at different points in the past.

4.      As of February, 2015, the Internet Archive had 2,124,622 registered users. Registered users are able to create new objects on the Archive.

DWT 26501708v4 0050033-000045

5. Anybody can access those objects without registration. In February, 2015, we receive access from approximately 3 million unique Internet addresses on any given day.

6. The Internet Archive transmits approximately 20 gigabits per second of data to our users. In order to serve our users and maintain our data, the Internet Archive operates approximately 50 petabytes of storage capacity (a petabyte is a million gigabytes).

7. The Internet Archive provides open and free access to literature and other writings and to the audio and video archives we maintain. We believe this open access policy is essential to education and to the maintenance of an open society.

### Access to U.S. Federal Court Documents

8. Since 2009, the Internet Archive has maintained a collection of U.S. Federal Court documents obtained from the government's Public Access to Court Electronic Records (PACER) system.

9. This collection was initially seeded with almost 20 million pages which Public.Resource.Org (Public Resource) provided after conducting an audit for and redaction of privacy information such as Social Security Numbers.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 24 of 165

10.    Since then, the system has continued to add additional data through the uses of the RECAP extension to the Firefox and Chrome web browsers, which allows PACER users to purchase and then contribute documents to the collection.

11.    As of March, 2015, the Internet Archive collection consisted of documents from 1,126,266 cases.

12.    As of March, 2015, the items in this collection have been accessed over 12 million times.

13.    As of March, 2015, the Internet Archive collection consists of over 13 million files.

14.    The Internet Archive would be delighted to host additional data under the experiment proposed by Public Resource and would make that available for use without restriction or fee to users on the Internet.

15.    The Internet Archive would provide Public Resource with usage information on this collection that is consistent with our policies for usage log retention and the protection of the privacy of our users.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed this _Z_ day of April, 2015 at San Francisco, California.

By _____
                Brewster Kahle

19

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 25 of 165

## DECLARATION OF BRIAN W. CARVER

I, Brian W. Carver, declare as follows:

1.     I am an Assistant Professor at the University of California, Berkeley School of Information, where I have taught since 2008.  I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

### The Free Law Project

2.     As a professor, I teach classes in cyberlaw, and intellectual property in the School of Information.  My primary research interest is in the laws and policies governing technology and information, particularly in understanding the technical, economic, social, and legal frameworks that best promote progress and access to information.

3.     In 2013, I cofounded with Michael Lissner, a former student of mine, the Free Law Project, a 501(c)(3) not-for-profit corporation with a mission to provide free, public, and permanent access to primary legal materials on the Internet for educational, charitable, and scientific purposes to the benefit of the general public and the public interest.  The Free Law Project may be found at the following URL: http://freelawproject.org/

4.     The Free Law Project was founded to provide an institutional home for the Court Listener system, a project Mr. Lissner and I have been working on

DWT 26501708v4 0050033-000045

since 2010. The Court Listener system may be found at the following URL: http://courtlistener.com.

5.  The Court Listener system provides the public, at no charge and with no restriction, access to over 2.5 million opinions going back to 1 U.S. 1 (1754). The system continues to add new opinions added each day by the courts of last resort from all 50 states and the District of Columbia, from all the Federal Appellate courts, and from many other specialized jurisdictions.

6.  Users are not required to register to use the system, but those that do can take advantage of functions such as the real-time alert system, which are triggered within approximately 30 minutes of a document appearing on a court's web site.

7.  The Court Listener system also provides bulk access to all the data so other users may create their own system or conduct research. Court Listener provides an Application Programming Interface (API), which provides developers with programmatic access and advanced query capabilities to create new applications that build on top of our system.

8.  The Free Law Project is also now responsible for the maintenance and development of RECAP, originally developed by researchers at the Center for Information Technology Policy at Princeton University. RECAP is an extension to

the Firefox and Chrome browsers and may be found at the following URL:

https://www.recapthelaw.org/

9.      RECAP provides a layered interface on the PACER system for

registered PACER users.  It builds on an archive of PACER documents that are

located on the Internet Archive (http://archive.org).  When a user is browsing a

PACER docket, RECAP will inform a user if a particular document is already

available on the Internet Archive and may be viewed at no charge.

10.     If a document is not already on the Internet Archive repository, a

RECAP user may click to view the document, incurring the normal PACER

charges.  That document is then placed on the Internet Archive and made available

at no charge for other RECAP users or those simply browsing the Internet Archive

repository and not using PACER at all.

11.     Both the CourtListener system and the RECAP server scan incoming

documents for Social Security Numbers ("SSNs").  On CourtListener, since we

create plain text and HTML versions of incoming PDFs, we are able to create a

display version of the document that has the SSN redacted.  The RECAP server

also searches incoming PDFs for SSNs and when it discovers one, adds the

document to an internally-maintained blacklist.  Blacklisted documents are not

forwarded to the Internet Archive.

22

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 28 of 165

## The Public Resource Fee Exemption Request

12.     The Free Law Project would be delighted to support the Fee
Exemption Request advanced by Public Resource for access to all proceedings of
one or more jurisdictions.  The Free Law Project would incorporate all this data
into the Court Listener system, providing advanced query and search capabilities to
this information.

13.     In addition, the Free Law Project would work with Public Resource to
make sure that data is also incorporated into the RECAP system on the Internet
Archive so that users may access the data using their browser extension.

14.     As a professor teaching access to the law to students in the Law and
Information schools as well as to practitioners attending conferences and
Continuing Legal Education (CLE), it would be a pleasure to instruct lawyers and
non-lawyers alike how to effectively access and use this important data.

I declare under penalty of perjury under the laws of the United States that
the foregoing is true and correct and this declaration was executed this 1 day of
April, 2015 at Berkeley, California.

By _____

Brian W. Carver

23

## DECLARATION OF TAMI GIERLOFF

I, Tami Gierloff, declare as follows:

1.     I am the Associate Dean of Library Services and a Professor of Law at
the Lewis & Clark Law School, a position I have held since 2011. I have personal
knowledge of the matters stated in this declaration and could competently testify to
them if called as a witness.

2.     Lewis & Clark's law school was founded in Portland in 1884 as the
state of Oregon's law school and was reorganized as the private Northwestern
College of Law in 1915. In 1965, the school merged with Lewis & Clark and was
renamed Northwestern School of Law of Lewis & Clark College.

3.     The Lewis & Clark Law School enrolls approximately 700 students
working on a full-time or part-time basis towards a J.D. and for several L.L.M.
programs.

4.     The Paul L. Boley Law Library, which I direct, is the largest law
library in Oregon and the second-largest in the Pacific Northwest. Our collection
has over 500,000 volumes and is used by our students and faculty as well as
visiting scholars and practitioners.

5.     The Paul L. Boley Law Library provides access to the PACER
system, but only with the assistance and supervision of our Reference Librarians.

24

6. The reason for restricted access to the PACER system is because with charges on a per-page basis, we must control access.

7. As a result, our students and faculty are severely limited in their access to current information present in the dockets of our federal courts.

8. My career as a law librarian began in 1990 at the University of Minnesota Law Library and I have been at Lewis & Clark since 1994.

9. It is my firm belief that law students should be actively using the resources that are available in a system such as PACER and that if PACER documents were more broadly available and freely available, it would be of great use to our students in their legal education.

10. Broader access to PACER is important beyond the confines of law schools, it is important for citizens in all walks of life who interact with our system of justice, as participants or as observers. Conducting the proceedings of our courts in the light of day is also an important safeguard on the integrity of those proceedings.

///

///

///

25

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 31 of 165

11.    For these reasons, this affidavit is submitted in support of the Public
Resource fee exemption request, which would make the full proceedings of one or
more courts available for access by the public, and by our students and faculty.

I declare under penalty of perjury under the laws of the United States that
the foregoing is true and correct and this declaration was executed this 1st day of
April, 2015 at Portland, Oregon.

By _____
Tami Gierloff

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 32 of 165

## DECLARATION OF LAURA ORR

I, Laura Orr, declare as follows:

1.      I am an Oregon public law library director in a position I have held since 2002. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

2.      I am a member of the national Self-Represented Litigant Network (SRLN), Law Librarian Working Group and serve with lawyers and law librarians around the country on a wide range of access to justice endeavors.

3.      I am the founder, owner, and content creator of the 9-year old Oregon Legal Research Blog, a popular online service that posts legal research tips and answers to common legal reference questions.   The website and blog may be viewed at the following URL: http://www.oregonlegalresearch.com

4.      My county law library serves a diverse population including self-represented litigants, attorneys, judges, elected officials, state, local and federal government employees, legal researchers and writers, reporters, and students of all ages.

5.      Our law librarians provide legal reference and research training to public library employees and patrons, lawyers, and law and judicial office employees.

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 33 of 165

6.      Access to electronic research tools are the most frequently requested services in our law library.  However, like most public law libraries, we have access to only a fraction of the services that law firm libraries and major law schools are able to provide their patrons.  In 2012, I documented this fact by surveying public, law firm, and law school library database collections around the country and tabulating the results. This survey may be viewed at the following URL:

http://www.co.washington.or.us/LawLibrary/upload/Adapted_Fantasy_Reality_Grid_test.pdf

7.      Access to PACER is the most important federal legal research tool, but access is highly restricted because of the cost of the service.  Our patrons who need PACER access are instructed first to look for other Internet resources that might have federal court documents (however incomplete or out of date those resources may be) and then to go to a federal courthouse (the nearest is in another city) where they can only hope they will find someone to assist them.  As a last resort, patrons may fill out a form and agree to pay all PACER charges, at which point the search will be conducted by a member of our staff, which may compromise the patron's privacy.  The form that patrons must fill out prior to such a search may be found at the following URL:

http://www.co.washington.or.us/lawlibrary/upload/pacer_policy_final.pdf

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 34 of 165

8.     Less restrictive and more affordable access to the PACER system would be of great utility and value to our legal researchers who require access to officially filed federal court documents. Limited access to PACER means we are unable to provide affordable legal research tools to the public and the solo and small law office legal community.

9.     For these reasons, this affidavit is submitted in support of the Public Resource fee exemption request, which would make the full proceedings of one or more courts available for access by the public we serve.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed this _1st_ day of April, 2015 at Hillsboro, Oregon.

By _____

Laura Orr

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 35 of 165

## DECLARATION OF MATTHEW JAMES SAG

I, Matthew James Sag, declare as follows:

1.      I am a Professor at the Loyola University Chicago School of Law in Chicago, Illinois, where I have taught since 2011. I am the Associate Director of the Institute for Consumer Antitrust Studies and a Distinguished Fellow of the Searle Center on Law, Regulation, and Economic Growth at Northwestern University School of Law. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

### My Background in Legal Research

2.      Since 2004, I have had a series of appointments in U.S. law schools, where I have focused on the area of Intellectual Property. My research focuses on the intersection of law and technology, especially as it relates to copyright, trademark, patent and competition law. My work is informed by economic theory, and empirical methods.

3.      My education was at the Australian National University where I completed a Bachelor of Arts and a Bachelor of Laws (with honors) in 1997. Subsequent to that, I served a clerkship with the Honorable Justice Paul Finn at the Federal Court of Australia.

4.      My research often focuses on an empirical of court filings. For example, in my paper "Copyright Trolling, An Empirical Study," 100 Iowa Law

DWT 26501708v4 0050033-000045

Review 1105-1146 (2015), I examined the recent astonishing rate of growth of multi-defendant John Doe litigation in United States district courts over the period of a decade. This paper may be viewed at the following URL: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2404950

5.     To conduct this research, I created a database of all copyright cases filed in the all federal district courts circuits between January 1, 2001 and June 30, 2014, then examined the cases to determine which ones qualified as multi-defendant John Doe (MDJD) litigation and which of those were related to pornography. My research showed that, in 2013, pornography MDJD suits accounted for the majority of copyright suits filed in 11 federal districts: Alabama (SD), District Of Columbia, Illinois (CD), Illinois (ND), Indiana (ND), Maryland, Michigan (ED) Pennsylvania (ED), Tennessee (ED), Tennessee (WD) and Wisconsin (ED), a fact that was not well known and could only be determined by the kind of empirical research I was conducting for this paper.

6.     In order to encourage further research on this topic, I have made available my underlying database for other researchers to use.

7.     My most recent research extends this docket analysis to all federal IP claims, filed in all U.S. courts between 1994 and 2014. In "IP Litigation in United States District Courts: 1994 to 2014", forthcoming in the Iowa Law Review, I undertake a systematic analysis of more than 190,000 individual case dockets and

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 36 of 165

examine the subject matter, geographical and temporal variation within federal IP litigation over the last two decades. This research was made more difficult, more expensive, and ultimately less ambitious in scope because of the current PACER access regime. This paper may be viewed at the following URL: http://ssrn.com/abstract=2570803.

8.      In another paper, "Predicting Fair Use," Ohio State Law Journal, Vol. 73:1 47-91 (2012), I gathered information on 280 fair use cases decided in U.S. District Courts between January 1, 1978 and May 31, 2011. The dataset combined publicly available information from written opinions and court records, as well as data from other sources such as company databases and directories of attorneys and law firms. This paper may be viewed at the following URL: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1769130

9.      My research analyzed the predictability of fair use by investigating the impact of identifiable characteristics on fair use outcomes. I focused directly on the ex ante predictability of fair use and empirically test the significance of the characteristics of disputed uses that would be apparent to potential litigants before their cases go to trial. This approach makes it possible to test a number of doctrinal claims and intuitions that had not previously been subject to empirical scrutiny.

32

## The Importance of Empirical Data For Legal Research

11.     My research in the law attempts to verify prior theoretical work by examining real-world cases as well as to uncover new insights into the operations of our courts through the use of empirical data.

12.     My work is not conducted in isolation; I am part of a growing number of researchers examining the operation of our courts through the use of real-world data.

13.     The lack of availability of the raw materials we need to conduct this research, in particular the opinions, orders, motions, and other materials in U.S. District Court and U.S. Court of Appeals dockets, is a significant impediment in our work.

14.     The cost of obtaining materials is certainly a significant, indeed prohibitive impediment in conducting this form of research. At $0.10/page, it is impossible to systematically examine a large number of documents, particularly during the preliminary stages of research when we are still uncertain precisely which data needs to be collected. For example, due of the cost that would have been involved, I was forced to abandon my aim of developing measures of case intensity by examining individual dockets in my most recent project, "IP Litigation in United States District Courts: 1994 to 2014".

33

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 39 of 165

15. Cost is not the only important factor; the technical structure of the PACER system, its limited search capabilities, its lack of facilities for bulk downloading and sophisticated notification and alerts are also limiting factors.

16. Empirical research should be verifiable and repeatable. Open data is not just a matter of academic integrity; it is also essential so that where one researcher makes a mistake, that error is detectable. Furthermore, open data allows other researchers to build on the work that has been done already without reinventing the wheel. It is thus vital that we are able to redistribute any underlying data that is public, such as the court documents we examine.

17. The experiment that Public.Resource.Org (Public Resource) has outlined and for which this affidavit is submitted, would be an invaluable for researchers like me. In particular, having a full database of all the materials for one or more court would enable us to conduct textual analysis in a way that is simply not possible today.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed this 2nd day of April, 2015, at Chicago, Illinois.

By _____
Matthew James Sag

34

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 40 of 165

## DECLARATION OF DANIEL MARTIN KATZ

I, Daniel Martin Katz, declare:

1.    I am an Associate Professor of Law at the Michigan State University College of Law, where I have taught since 2011. I also serve as the Director & Co-Founder of the Reinvent Law Laboratory. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

### Empirical Research in the Field of Law

2.    I completed my legal education with a J.D. from the University of Michigan Law School, Cum Laude in 2005, then continued on to receive a Ph.D. Political Science and Public Policy from the University of Michigan in 2011, where my dissertation topic was "Modeling the Law as a Complex Adaptive System."

3.    I serve as an editor of the International Journal of Law and Information Technology (Oxford University Press) and am a member of the American Bar Association Task Force on Big Data and the Law.

4.    With my colleagues Michael J. Bommarito II, Julie Seaman, Adam Candeub, and Eugene Agichtein, we published research on the topic of "Legal N-Grams? A Simple Approach to Track the 'Evolution' of Legal Language," Proceedings of JURIX 2011: The 24th International Conference on Legal

35

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 41 of 165

Knowledge and Information Systems, Vienna, 2011. In this paper, we used the full corpus of all Supreme Court opinions to demonstrate the evolution over time of legal terms of art and phrases, such as "Clear and Present Danger." A copy of this paper may be found at this URL:

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1971953

5.      With my colleagues Michael J. Bommarito II and Jillian Bommarito, we published research on the topic of "An Empirical Survey of the Population of United States Tax Court Written Decisions," Virginia Tax Review, Vol. 30, No. 2, 2011. This paper may be viewed at this URL:

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1441007

6.      In this paper, we analyzed the citation practices of the United State Tax Court between 1990 and 2008, analyzing 11,000 decisions and extracting 244,000 statutory citations to uncover patterns in citation practices, concept relationships, and legislative acts. Among our findings were an analysis of which sections of the Tax Code are discussed and invoked over time, highlighting both expected and unexpected ties between provisions of the Internal Revenue Code.

7.      In addition to publishing our summary of findings in a legal journal, we have made our Tax Court data available so that other researchers may continue the analysis without replicating the lengthy data collection process. This practice of making data available for further research has long been a feature in the "hard"

DWT 26501708v4 0050033-000045

sciences, and we believe bringing it into the legal academy is important to encourage further empirical analysis.

8.    With my colleagues Michael J. Bommarito II, Jon Zelner, and James H. Fowler, we published research on the topic of "Distance Measures for Dynamic Citation Networks," Physica A, Vol. 389, pp. 4201-4208, 2010. This paper may be viewed at this URL: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1472037

9.    In this research, we applied advanced mathematical techniques to citations to the first quarter century of decisions of the United States Supreme Court. We have then continued this research in a variety of ways to show the evolution of different fields of law (such as admiralty law) over time, to show the importance of key decisions (such as the relative lack of importance of *Marbury v. Madison* as precedent in the earlier years of the court and the increasing importance of that decision near the end of the 19th century. A visualization of these empirical results may be found at the following URL: http://computationallegalstudies.com/2010/02/the-development-of-structure-in-the-citation-network-of-the-united-states-supreme-court-now-in-hd/

10.    I have written a review essay that summarizes various ongoing efforts to apply prediction science within the delivery of legal services. Among other things, access to high quality and meaningful data represents a significant limitation on such efforts. The paper is entitled *Quantitative Legal Prediction - or*

37

*- How I Learned to Stop Worrying and Start Preparing for the Data Driven Future of the Legal Services Industry* and was published in Volume 62 of Emory Law Journal (2013) available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2187752

11.    Along with my colleague Michael Bommarito and Josh Blackman from South Texas College of Law, I have a published a working paper entitled "*Predicting the Behavior of the United States Supreme Court: A General Approach*" where we use a database of prior voting behavior to forecasting the decisions of the Supreme Court of the United States. Our model achieves roughly 70% accuracy is rigorously backtested over the past sixty years using only information known prior to the decision of the Court. A copy of the paper is currently under review at a major scientific journal and is available at the following URL: http://arxiv.org/abs/1407.6333.

## The Public Resource Fee Exemption Request

12.    Access to the proceedings of a District Court would be an invaluable resource for our own research and for the growing number of scholars who do empirical analysis of the law. Access to the proceedings of two different District Courts would be even more valuable, allowing us to compare decisions in two different jurisdictions.

DWT 26501708v4 0050033-000045

13.    Likewise, full access to the dockets and proceedings at the Appellate level would be a very useful adjunct to our current databases of the U.S. Code, the Tax Court, the Supreme Court, and other related sets of documents.

14.    Access to all 4 requested Districts and the Circuit court would of course be ideal, allowing us and our colleagues around the country to conduct research that is simply not possible today.  This research will help us analyze the operations of our courts and our system of justice in ways that have not been possible due to the current technical structure of the PACER system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on this 2ⁿᵈ day of April, 2015, at Ann Arbor, Michigan.

By _____

Daniel Martin Katz

39

DWT 26501708v4 0050033-000045

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 45 of 165

## DECLARATION OF ROBERT J. ROSENTHAL

I, Robert J. Rosenthal, declare as follows:

1.    I am the Executive Director of the Center for Investigative Reporting, a nonprofit nonpartisan journalism organization, a position I have held since 2008. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

2.    The Center for Investigative Reporting (CIR) was founded in 1977. CIR conducts in-depth investigative reporting. Our staff of 67 people includes highly skilled reporters who know how to cultivate sources and find hidden information; engineers and analysts who create news apps, interactive maps and tools to help the public understand issues from the macro to the micro level; and radio, video and multimedia producers who create engaging documentaries, videos and animated features to demystify complex topics. More than 300 news outlets partner with us or have featured our reporting. Our web site may be viewed at the following URL: http://cironline.org

3.    CIR has received numerous awards for our work, including the 2012 MacArthur Award for Creative and Effective Institutions, the 2011 and 2012 George Polk Awards in Journalism, and was a finalist for the 2012 Pulitzer Prize in local reporting and the 2013 Pulitzer Prize in public service.

40

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 46 of 165

4.     Our reporters make extensive use of court documents in their work. For example, our 2006 series "Conflicts on the Bench," which appeared on Salon.Com, investigated two nominees for the U.S. Court of Appeals and potential violations of federal law and the judicial code of conduct by presiding over multiple cases involving companies in which they owned stock.  Subsequent to these stories, Chief Justice John Roberts ordered a review of ethics policies and the judiciary mandates use of computer software to screen for conflicts of interest. These stories may be viewed at the following URL:

http://cironline.org/reports/conflicts-bench

5.     In our 1999 story, "Justice for Sale," a co-production with "Frontline," examined the fight of Louisiana residents in the courts to thwart the construction of a pollution-producing factory, and subsequent rulings by the California Supreme Court, which would have made future opposition to chemical plants more difficult.  After these stories were published, the Governor of Louisiana announced a change in the previous policy of trying to attract chemical plants to what had become known as Louisiana's "cancer alley."  These stories may be viewed at the following URL:

http://www.pbs.org/wgbh/pages/frontline/shows/justice/

6.     Our 2013 series of stories on farmworker sexual abuse, "Rape in the Fields," relied extensively on court documents to track down and document cases

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 47 of 165

of alleged rape and sexual assault across the country concerning the treatment of farmworkers and the response from agriculture companies. The series was a collaboration with PBS Frontline and the Investigative Reporting Program at UC Berkeley, and lead to the state of California launching a series of hearings and investigations into the treatment of workers. Gov. Jerry Brown of California signed a new law requiring sexual-harassment training for labor contractors, supervisors and farm workers, the direct result of the series. These stories may be viewed at the following URL: http://cironline.org/rapeinthefields

8.    Our 2012 series of stories about the failure to investigate abuse of developmentally disabled adults in the care of the state, "Broken Shield," also relied heavily on court documents to uncover cases of abuse that were not reported by the state. The "Broken Shield" investigation lead to widespread changes within California's developmental centers and the state, including a landmark, unanimous California Supreme Court ruling that forces the state Department of Health Services to release uncensored copies of inspection reports on developmental centers. These stories may be viewed at the following URL: http://californiawatch.org/broken-shield

9.    Court dockets, in particular the dockets for our federal judiciary, are one of our most important research tools. Both the technical structure and the fee

42

structure of the current PACER system preclude the examination of large numbers of documents, a common task we face when investigating a new story.

10.    PACER is an instrumental and daily tool CIR uses in reporting and conducting investigations.  It is a primary way to find sources, to uncover buried documents and find leads.  CIR built a database around corruption within Customs and Border Protection that relied heavily on PACER, which we used to create dossiers on prosecuted law enforcement officials.  Where the government may put out little information in press releases for some cases, CIR could bring misconduct to light with the help of such records. In the interest of public service journalism, unfettered access to public records is paramount.  Where the federal government often ties up public record requests for months or years, access to PACER is often the best way to get information from the government.

11.    Our ongoing and ground breaking coverage of the  Department of Veterans Affairs is often based documents our reporters access using  PACER. The VA is a federally-run health system serving more than 6 million veterans annually. When veterans have problems with that system they seek relief in the federal courts.  In addition, the VA is the second largest government agency in terms of personal, with more than 300,000 employees.  Many CIR's stories have originated with workplace disputes that ended up in the federal judiciary.

12.    Having access to all the filings for a full district would be a very valuable capability, allowing us to tackle new stories that are not possible today. Having access to all the filings for more than one full district would be even more valuable, allowing CIR to look at differences in the administration of justice across different courts.

13.    The cost of PACER access is a significant burden to CIR. Because of the high cost of the system, our reporters are required to get management approval before using the system and their use is tightly constrained to keep control over costs.    Only a handful of our 18 reporters have direct access to the system, because it is so cost-prohibitive to our nonprofit organization.

14.    While there is a fee exemption procedure available for specific stories, the process is cumbersome and because it requires us to specify in great deal the extent of PACER access contemplated, it does not allow our journalists to do the kinds of preliminary, exploratory research that often leads to new stories.

///

///

///

44

15. For these reasons, this affidavit is submitted in support of the Public Resource fee exemption request, which would make the full proceedings of one or more courts available for access by the public.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed this 2nd day of April, 2015.

By _____
Robert J. Rosenthal

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 50 of 165

## DECLARATION OF CARL MALAMUD

I, Carl Malamud, declare as follows:

1.  Since 2007, I have been the President and Founder of Public.Resource.Org ("Public Resource"), a nonprofit corporation incorporated in California which operates solely for educational and charitable purposes and is registered under Section 501(c)(3) of the Internal Revenue Code. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

### Public Resource Efforts to Improve
### Privacy Protection in U.S. Court Documents

2.  Public Resource has a mission of making government information more broadly available on the Internet for use without restriction. We have worked with the Speaker of the House of Representatives to make 14,000 hours of video from congressional hearings available, with the Archivist of the United States to make 6,000 government videos available, and are responsible for the processing and posting of over 8 million Form 990 filings of exempt organizations distributed by the Internal Revenue Service. Our work with the Congress was formally recognized in a January 5, 2011 letter from Speaker John Boehner and Representative Darrell Issa. This letter may be viewed at the following URL: https://law.resource.org/rfcs/gov.house.20110105.pdf.

46

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 52 of 165

3.    From 1993 to 1997, I was the President and Founder of the Internet

Multicasting Service, a 501(c)(3) nonprofit corporation.  As part of that work, I

was responsible for placing the U.S. Securities and Exchange Commission

EDGAR database and the U.S. Patent database on the Internet for the first time.

After the SEC indicated they would be willing to place the EDGAR database

online as a government service, I donated software and hardware to the SEC to

assist them in establishing that service.

4.    A major focus of Public Resource is making the proceedings of our

courts available.  We are responsible for scanning approximately 3.3 million pages

of briefs submitted to the Ninth Circuit of the U.S. Court of Appeals from 1891 to

1970 and making those documents available on the Internet Archive and on our

servers.  We are also responsible for making opinions in the Federal Cases,

McAllister's Reports from California and in the First Series of the Federal Report

available as scans as well as converting all of those opinions to more modern

HTML markup.  These materials may be viewed at the following URL:

https://law.resource.org/pub/us/case/reporter/

5.    On February 11, 2008, Public Resource announced jointly with

Creative Commons that we were making available 50 years of opinions from the

United States Court of Appeals, the first time these opinions were freely available

on the Internet.  Our cost for the purchase of these opinions, $600,000, was made

47

possible by contributions from the Omidyar Network Foundation and by several individuals, including attorney David Boies, Mr. John Gilmore, and the Elbaz Family Foundation. The announcement of this service is attached as Exhibit A.

6. After publication of these opinions on the Internet, Public Resource began to receive reports of Social Security Numbers in the opinion text. We conducted an audit of the opinions, discovered a large number of Social Security Numbers. The audit results were transmitted on May 3, 2008, to the Honorable Lee H. Rosenthal, Chairman of the Judicial Conference Committee on Rules and Procedure and to the Chief Judges of the Second, Fourth, Fifth, Ninth, and Eleventh Circuits of the U.S. Court of Appeals. A redacted copy of the audit document is attached as Exhibit B.

7. On July 16, 2008, the Honorable Lee H. Rosenthal acknowledged receipt of the audit results and stated that it was "enormously helpful to have the benefit of the empirical research that you have done." A copy of that letter is attached as Exhibit C.

8. Subsequently in 2008, an audit was conducted of 19,856,160 pages of docket materials from 32 U.S. District Courts, uncovering 1,669 documents with verified Social Security Numbers and other privacy issues. The interim audit results were sent on October 3, 2008, and the final audit results on October 24, 2008, to the Honorable Lee H. Rosenthal and to the Chief Judges of the 32 U.S.

48

District Courts. A redacted copy of the October 24, 2008, audit results is attached as Exhibit D.

9.　　A number of Chief Judges responded with acknowledgement of the audit results and took actions to remove those documents from public view and to notify the filing attorneys of these violations of the privacy rules in effect in the courts. A copy of the January 28, 2009, acknowledgement from the Honorable Royce C. Lamberth of the United States District Court for the District of Columbia is attached as Exhibit E.

10.　　On February 27, 2009, Senator Joseph I. Lieberman, Chairman of the U.S. Senate Committee on Homeland Security and Governmental Affairs sent an inquiry to the Honorable Lee H. Rosenthal asking for information about compliance with the requirements of the E-Government Act of 2002 (Public Law 107-347). A copy of the letter from Senator Lieberman is attached as Exhibit F.

11.　　On March 26, 2009, the Honorable Lee H. Rosenthal and Mr. James C. Duff of the Administrative Office of the U.S. Courts jointly answered Senator Lieberman, acknowledged the results of the privacy audit, and outlined additional steps that were being taken to improve adherence to privacy rules. A copy of that letter is attached as Exhibit G.

49

12.     On June 23, 2010, Chief Judge Alex Kozinski asked me to brief the Court on issue of access and privacy protection in court dockets. A copy of my prepared statement is attached as Exhibit H.

**Public Resource Efforts to Improve Privacy In Other Government Documents**

13.     The audit and redaction of court documents was one of 3 such privacy audits that Public Resource undertook. The other two efforts uncovered privacy issues in the Government Printing Office and the Internal Revenue Service.

14.     On November 16, 2007, Public Resource downloaded 5,177,003 pages from the servers of the Government Printing Office. In the course of doing so, we discovered a large number of Social Security Numbers in the Congressional Record, published by the U.S. Senate in conjunction with the promotion of military officers. Some of those Social Security Numbers were present on the U.S. Government servers, and private vendors had a larger collection of 308,085 SSNs covering 232,471 officers present on their services.

15.     Public Resource notified the Government Printing Office, U.S. Senate, Department of Defense, and ultimately the Federal Trade Commission to secure the redaction of this sensitive information. After articles in publications such as Stars and Stripes, that information was finally redacted. A copy of the article in Stars and Stripes is attached as Exhibit I. A copy of the October 5, 2008,

50

complaint to the Federal Trade Commission and the Inspector General of the Department of Defense is attached as Exhibit J.

16.    In the course of processing over 8 million Form 990 filings of Exempt Organizations from 2002 to 2014 distributed by the IRS, Public Resource uncovered approximately 600,000 Social Security Numbers present in those filings. Public Resource undertook an intensive program of detection and redaction. The IRS policy was that Social Security Numbers were not supposed to be filed in the Form 990 and therefore this was the responsibility of the filers and that the IRS would not perform any redactions as that would be altering a federal document.

17.    On July 2, 2013, Public Resource reported to the IRS the presence of an estimated 100,000 Social Security Numbers on the government-operated web site providing access to filings of political organizations filing under Section 527 of the Internal Revenue Code. A copy of that audit document is attached as Exhibit K.

18.    On July 15, 2013, 43 members of the U.S. House of Representatives wrote to the IRS to inquire about the privacy audit Public Resource had conducted. A copy of that letter is attached as Exhibit L.

19.    On July 23, 2013, the Chairmen of the U.S. House of Representatives Committee on Ways and Means Subcommittees on Oversight and Social Security

51

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 56 of 165

wrote to the IRS to express additional concerns. A copy of that letter is attached as Exhibit M.

20.    On September 16, 2013, the Acting Commissioner of the Internal Revenue Service acknowledged the audit results in a letter to members of Congress and announced a change in policy that would permit the Internal Revenue Service to begin redacting Social Security Numbers. Those policies were enacted in the January 2014 changes to Section 3.20.12 of the IRS Manual. A copy of that letter is attached as Exhibit N.

21.    On July 7, 2014, Public Resource sent final audit results on the Exempt Organizations filings to the Commissioner of the Internal Revenue Service, as well as detailed suggestions for change to the IRS, their Inspector General, and other government officials. The audit included the redaction of 9,392 Form 990s, and has resulted in a significantly more aggressive program of detection, redaction, and notification by the Internal Revenue Service. A copy of those letters is attached as Exhibit O.

### The Work Public Resource Proposes to Undertake
### Under the Fee Exemption Request

22.    Public Resource proposes to undertake an audit of all documents in one or more courts. This fee exemption request is being sought for 4 U.S. District Courts and for the U.S. Court of Appeals for the 9th Circuit. We would be delighted to undertake this work in all 5 jurisdictions, but if a more limited

DWT 26501708v4 0050033-000045

experiment is granted, the form of the application permits the selection of fewer venues.

23. The work we will do is similar to that undertaken previously. We propose to download all documents for a jurisdiction by systematically exercising calls to the PACER system for that venue. This program is known as a "web crawler" or "spider."

24. Once the full corpus for a jurisdiction has been downloaded, any updates to the database will be periodically downloaded and added to the collection.

25. All the documents downloaded will be run through Optical Character Recognition, then a series of scripts will be run to discover the possible presence of Social Security Numbers. Any documents flagged as such will be manually examined and appropriate redactions performed.

26. The results of such redactions will be logged, and a notification will be sent to the attorneys listed on the dockets. In that notification, we will request acknowledgement of receipt and will outline the steps that the attorneys must take to come back into compliance with the privacy rules required by the courts.

27. The results of the download, redaction, and notifications will be assembled into an interim report (after 6 months) and a final report (at the close of the fee exemption period) and submitted to the court. The report will analyze

53

adherence to the privacy rules and will suggest any corrective measures the court may wish to consider. (As an example of Public Resource's efforts in this area that underscores the need for such scrutiny, attached as Exhibit P is a March 30, 2015 letter regarding ongoing privacy breaches involving U.S. Courts).

### Public Access to Electronic Court Records

28.     The fully redacted documents will then be added to the collection on the Internet Archive, a public repository of court documents which was initially created with the 20 million pages we previously audited and redacted from 32 U.S. District Courts.

29.     As of March 14, 2015, this collection contained some files from over 1,126,000 different U.S. District Court cases. The documents are made available for members of the public who do not have access to the PACER system, or for members of the public who use the RECAP plugin to access the PACER system.

30.     By making the entire proceedings of a court available on the Internet Archive, we believe greatly enhanced access to those proceedings will be made available to the general public, in particular to those that are not currently PACER users.

31.     In addition, we will work with and document the efforts of academic researchers who will be able to use the full proceedings of a court to conduct research that is not possible today.

54

32. Public Resource will provide a detailed report to the Court upon conclusion of the Fee Exemption period, detailing both general public access to these records as well as any research efforts that were undertaken.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed this 2 day of April, 2015 at Sebastopol, California.

By _____

Carl Malamud

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 61 of 165

# EXHIBIT A



A JOINT VENTURE BETWEEN
# CREATIVE COMMONS
AND
# PUBLIC.RESOURCE.ORG



### 1.8 Million Pages of U.S. Case Law Available Now for Developers

### No Restrictions on Reuse

FEBRUARY 11, 2008—Creative Commons and Public.Resource.Org announced today that the first revision of a substantial corpus of U.S. federal case law is available for download by developers. The files are all clearly marked with the new Creative Commons CCØ label, indicating that the contents are Works of the United States Government and are thus free of copyright or other restrictions for their dissemination and reuse.

Developers may access this information at the following URL:

http://bulk.resource.org/courts.gov/

Today's release covers all U.S. Supreme Court decisions and all Courts of Appeals decisions from 1950 on. The release is equivalent to 1,858 volumes of case law in book form, a stack of books 348 feet tall.

The files have all been converted to the XHTML standard and make extensive use of CSS style sheets to allow developers to build new search engines and user interfaces. Since the U.S. Courts do not yet digitally sign their documents, a SHA1 hash is provided on their behalf.

The source of this case law is a transaction previously announced with Fastcase, Inc., a leading provider of American legal research tools. Public.Resource.Org and Creative Commons were represented by the Electronic Frontier Foundation in this transaction.

Purchase of this valuable data was made possible by generous donations from a group that includes the Omidyar Network and several individuals including David Boies, the Elbaz Family Foundation, and John Gilmore.

David Boies, whose distinguished career includes service as Special Trial Counsel for the US Department of Justice in its antitrust suit against Microsoft, and who represented former Vice President Al Gore in connection with litigation relating to the Florida vote count in the 2000 election, had this to say:

> Practical access for all Americans to legal cases and material is
> essential to the rule of law. The Legal Commons is an important step
> in reducing the barriers to effective representation of average citizens
> and public interest advocates.

The data from Fastcase is one of several sources emerging for unrestricted case law. William S. Hein & Co. has contributed high-quality scans of the 30 volumes of the Federal Cases, which are the earliest records of the courts before the Federal Reporter was created. Justia, Inc. has contributed over 50,000 "PACER" documents, which include the current decisions of district courts.

The cases made available to developers today will be used throughout the Internet. For example, the AltLaw service from Columbia and Colorado Law Schools has announced they will incorporate the information in their free service. Creative Commons and Public.Resource.Org are donating a copy of the data to the U.S. Courts and the Government Printing Office for their archives. A number of commercial legal research providers have announced they will also incorporate this data in their services.

Creation of an unencumbered repository of federal case law is a goal announced jointly by Public.Resource.Org and Creative Commons as part of an effort to build a Legal Commons. The Fastcase transaction is the first of a series of initiatives to be announced in the upcoming months with a goal of creating a distributed, sustainable, unencumbered system for accessing the law.

According to Lawrence Lessig, a professor of law at Stanford University and the CEO of Creative Commons:

> Just as markets are premised on the free flow of information, so is our democratic system of government. Creative Commons is proud to be working with Public.Resource.Org to deliver this important governmental and judicial material back into the public domain.

This initial release of the data will undergo a 30-day Request for Comment period, during which the XML format, the CSS markup, the SHA1 signatures, and other aspects of the formatting and packaging will be discussed and tested. Additional enhancements scheduled for subsequent releases including citation identification and resolution and pagination.

According to Carl Malamud of Public.Resource.Org:

> Developers and interested members of the public are invited to join our open discussion group which will evaluate the format of this public domain data. These cases and codes are America's operating system and for the first time Americans can use them with freedom.

—30—

| MEDIA CONTACTS | |
|---|---|
| **For Creative Commons**<br>Mike Linksvayer<br>ml at creativecommons.org<br>415–369–8480 | **For Public.Resource.Org**<br>Carl Malamud<br>carl at media.org<br>707–827–7290 |

**About Creative Commons**

Creative Commons is a not–for–profit organization, founded in 2001, that promotes the creative re–use of intellectual and artistic works, whether owned or in the public domain. Through its free copyright licenses, Creative Commons offers authors, artists, scientists, and educators the choice of a flexible range of protections and freedoms that build upon the "all rights reserved" concept of traditional copyright to enable a voluntary "some rights reserved" approach. Creative Commons was built with and is sustained by the generous support of organizations including the Center for the Public Domain, the Omidyar Network, The Rockefeller Foundation, The John D. and Catherine T. MacArthur Foundation, and The William and Flora Hewlett Foundation, as well as members of the public. For more information about Creative Commons, visit http://creativecommons.org.

**About Public.Resource.Org**

Public.Resource.Org is a 501(c)(3) nonprofit founded in 2007 to create public works projects for the Internet.

**About Fastcase, Inc.**

Fastcase is the leading American provider of next–generation legal research, making the law accessible to more people by providing the national law library at a fraction of the cost of traditional companies. Using patented software that combines the best of legal research with the best of Web search, Fastcase helps busy legal professionals sift through the clutter, ranking the best cases first and enabling users to re–sort results to find answers fast. Founded in 1999, Fastcase has more than 275,000 paid subscribers from around the world. It is an American company based in Washington, D.C. For more information, visit www.fastcase.com.

**About Justia, Inc.**

Justia Inc. is a legal media and technology company focused on making legal information, resources and services easy to find on the Internet. Justia provides Internet users with free case law, codes, regulations, legal articles and legal blog databases, as well as community resources. The company also provides legal blog and Web development services for law firms, educational, public interest and other socially–focused organizations.

**About William S. Hein & Co.**

William S. Hein & Co., Inc. has been serving the library community for more than 80 years as a legal publisher, reprinter, subscription agent, and secondhand book dealer. As the world's largest distributor of legal periodicals, combined with our extensive reprint publishing program which provides access to previously unavailable legal classics and United States Government and United Nations documents, researchers regularly turn to Hein for their secondary legal research needs.

**About EFF**

The Electronic Frontier Foundation is the leading civil liberties organization working to protect rights in the digital world. Founded in 1990, EFF actively encourages and challenges industry and government to support free expression and privacy online. EFF is a member–supported organization and maintains one of the most linked–to websites in the world at http://www.eff.org/

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 65 of 165

# EXHIBIT B



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

Public Works Projects for the Internet

**To:** The Honorable Lee H. Rosenthal, Chairman
Judicial Conference Committee on Rules and Procedure

**Cc:** The Honorable Alex Kozinski, Chief Judge, Ninth Circuit
The Honorable Edith H. Jones, Chief Judge, Fifth Circuit
The Honorable Dennis Jacobs, Chief Judge, Second Circuit
The Honorable J.L. Edmondson, Chief Judge, Eleventh Circuit
The Honorable Karen J. Williams, Chief Judge, Fourth Circuit

**From:** Public.Resource.Org

**Date:** May 3, 2008

**Subj:** **Confidential - 1,718 Personal Identifiers Found in Appellate Opinions**
Examination of appellate decisions reveals 1,718 cases with Alien Numbers or
Social Security Numbers published in the opinions. The issue applies across
all circuits and many of the opinions in question are still available on court
web sites. This memorandum explains the problem and suggests corrective
actions to be taken.

### Background: Personal Identifiers in Court Opinions

The E-Government Act of 2002 and Appellate Rule 25 "require that personal
identification information be redacted from from documents filed with the court."
While the focus of the Privacy Rules are on lawyers, requiring them to redact personal
identification numbers from documents filed with the courts, there is also an
obligation for the courts themselves to do their part, particularly when the appearance
of personal identification materials in court opinions is the result of the opinion
publication process or is inherent in the procedures established by the courts for
submitting appeals.

In a recent Memorandum Describing the Privacy Rules and Judicial Conference Privacy
Policy issued by the Rules Committee, special note was made of immigration and Social
Security cases:

> #### Cases That Are Not Subject to the Redaction Requirement
>
> In addition, the new Civil Rules becoming effective on December 1, 2007, do not
> apply the redaction requirements to certain categories of cases that are
> exempted from remote public access. These categories are immigration cases
> and Social Security cases.
>
> The parties have remote electronic access to filings in these cases, but the
> public has access to the filings only at the courthouse.

It is clear that Alien Numbers and Social Security Numbers are not meant to be made
available for general public access as publication of these numbers poses a substantial
and real threat of identity theft for the individuals involved.

## Opinions Found Containing Personal Identifiers

Public.Resource.Org is a 501(c)(3) nonprofit corporation dedicated to making public information more readily available on the Internet. As part of our mission, we recently obtained 50 years of Courts of Appeals decisions from a commercial vendor, reformatted this data to be compliant with modern Internet standards such as XML markup, SHA1–based document integrity checks, and explicit labels indicating the public domain status of the underlying data.

We then made this data available in bulk, and it is now being used by numerous for-profit and non-profit organizations providing access to the general public and legal professionals.

In April, we were notified by an individual that his Alien Number, the personal identifier used on the Green Card, had been published on the Internet. We investigated the issue and determined that the Immigration and Naturalization Service routinely used the Alien Number as the Docket Number for their cases, and this information is present in 1,499 published opinions, many of which are currently available on court web sites.

In addition, we scanned the corpus for Social Security Numbers and found those present in 219 published opinions. All told, 1,718 published opinions contain these personal identifiers. These opinions are distributed among all the circuits, as detailed in Table 1.

| Court | Number of Cases with Personal Identifiers in the Published Opinion |
|---|---|
| Ninth Circuit | 990 |
| Fifth Circuit | 171 |
| Second Circuit | 93 |
| Eleventh Circuit | 85 |
| Fourth Circuit | 81 |
| Seventh Circuit | 64 |
| Eighth Circuit | 54 |
| Sixth Circuit | 53 |
| Third Circuit | 42 |
| Tenth Circuit | 40 |
| First Circuit | 22 |
| DC Circuit | 16 |
| Federal Circuit | 6 |
| Court of Claims | 1 |

Table 1: Number of Cases by Circuit

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 67 of 165

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 68 of 165

**The Problem Is Ongoing**

Table 2 shows the number of opinions found over time. As can be seen from the continuing high volume of incidents, the problem is ongoing and not just historical.

| Year | Number of Cases with Personal Identifiers in the Published Opinion |
|---|---|
| 1949–1979 | 53 |
| 1980–1989 | 154 |
| 1990–1994 | 210 |
| 1995–1999 | 816 |
| 2000–2004 | 370 |
| 2005 | 60 |
| 2006 | 82 |
| 2007 | 26 |

Table 2: Number of Cases by Year

Appendix A contains a detailed listing of each case found. The table contains the citation in the National Reporter Series, any docket numbers found, the date (which in some cases is date submitted and in others is date filed), and indicators if the case contains an Alien Number or a Social Security Number and if the case appears to be accessible via the court's own web site.

We would be happy to make available additional information from our database of cases found, such as names of judges (or *en banc* status), URLs to access the pages, and the specific patterns and resulting matches.

It is important to note that these identification numbers are present in the opinions delivered by the courts, not just in briefs submitted by the appellants. In many cases, the summary information is embedded in the prefatory information generated by the courts. For example, take the case of ███████████████████████ ████████████████ in the Court of Appeals for the Tenth Circuit:

███████████████████████████████

As can be seen, dire███████████████etitioner and Respondent, the docket number is followed by A73-████████████ Alien Number:

███████████████████████████████████

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 69 of 165

**Corrective Steps**

A series of specific actions have been mandated for all Executive Branch agencies in OMB Memorandum M–07–16, "Safeguarding Against the Breach of Personally Identifiable Information," where breach is defined as "the loss of control, compromise, unauthorized disclosure, unauthorized acquisition, unauthorized access, or any similar term referring to situations where persons other than authorized users and for an other than authorized purpose have access or potential access to personally identifiable information, whether physical or electronic." That policy goes on to state:

> "Safeguarding personally identifiable information in the possession of the government and preventing its breach are essential to ensure the government retains the trust of the American public. ... this memorandum requires agencies to develop and implement a breach notification policy **within 120 days.**" [emphasis in original.]

Upon discovery of a breach of personal identifiers, a series of steps are considered Best Current Practices, both in industry and in government:

1. Mitigate the immediate damage by fixing the breach.

2. Notify upstream sources and downstream users of the data.

3. Investigate the cause and implement corrective steps to prevent reoccurrence.

Upon discovery of breach, Public.Resource.Org took the following steps:

1. We algorithmically scanned all court cases to find Alien Numbers and Social Security Numbers, then individually checked all numbers flagged. We then scrambled the identifiers, substituting random alphabetic characters for the numbers.

2. Bulk users of our data ("downstream users") were notified of the specific cases found. Per this memorandum, we are notifying the courts ("upstream sources").

3. We have implemented a policy of scanning all databases we post for personal identifiers, even if those databases are public records produced by the government. We have also implemented a policy which allows users to notify us if they discover information.

We believe the courts should take a similar set of steps:

1. Active steps should be taken to redact the personal identifiers, particularly the ones found on your web sites, as well as scanning for additional materials such as briefs containing this information.

2. Best Current Practices require the notification of affected parties of the breach. We believe it is incumbent on you to notify all of the individuals who were exposed. In addition you should notify your downstream users, particularly the major legal services such as West, Lexis, and AltLaw.

3. The presence of personal identifiers, particularly in immigration cases, is well known and documented as evidenced by Judicial Conference reports. An investigation as to why that did not translate into concrete actions by the courts and how to prevent further breaches is thus recommended.

We realize that mitigating this breach will require time and money, but this is essential to "ensure the government retains the trust of the American Public," a principle that applies equally to all three branches of our government.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 70 of 165

Pages 5-38 of this document, which consisted of an Appendix listing redacted personal identifying information, have been removed from the Exhibit.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 71 of 165

# EXHIBIT C

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 72 of 165

COMMITTEE ON RULES OF PRACTICE AND PROCEDURE
OF THE
JUDICIAL CONFERENCE OF THE UNITED STATES
WASHINGTON, D.C. 20544

**LEE H. ROSENTHAL**
CHAIR

**PETER G. McCABE**
SECRETARY

July 16, 2008

CHAIRS OF ADVISORY COMMITTEES

**CARL. E. STEWART**
APPELLATE RULES

**LAURA TAYLOR SWAIN**
BANKRUPTCY RULES

**MARK R. KRAVITZ**
CIVIL RULES

**RICHARD C. TALLMAN**
CRIMINAL RULES

**ROBERT L. HINKLE**
EVIDENCE RULES

Mr. Carl Malamud
Public.Resource.Org, Inc.
1005 Gravenstein Highway North
Sebastopol, CA 95472

Dear Mr. Malamud:

Thank you for the materials you provided on personal identifiers in appellate opinions. It is enormously helpful to have the benefit of the empirical research that you have done. As you know, the Judicial Conference Rules Committees and the Committee on Court Administration and Case Management have implemented the E-Government Act requirements by developing rules and procedures to protect personal identifiers from being included in court filings, particularly those that are remotely accessible electronically. We are continuing to work to ensure that this implementation is effective and efficient. I hope you will keep us informed about your ongoing work.

I am sending a copy of your materials to Judge Carl Stewart, Chair of the Appellate Rules Committee, as well. Thank you for your commitment to improving the court system.

Very truly yours,

Lee H. Rosenthal

cc:   The Hon. Carl Stewart
      Peter McCabe, Esq.
      John Rabiej, Esq.

# EXHIBIT D



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

## Open Source America's Operating System
"It's Not Just A Good Idea—It's The Law!"

October 24, 2008

The Honorable Lee H. Rosenthal
Chair, Committee on Rules of Practice and Procedure
Judicial Conference of the United States
Washington, D.C. 20544

Dear Judge Rosenthal:

Pursuant to my previous letter of October 3, 2008, I am pleased to present to you the audit results for the 32 district courts for which we have been able to examine data. Of the 2,282 suspect files we reported to you in the preliminary findings, we were able to eliminate 613 of the documents as "false positives," leaving 1,669 documents with verified Social Security numbers and other issues.

However, just as our primitive scanning tool yielded false positives, we believe that there are probably a large number of false negatives in the 2,706,431 PDF files we examined. Indeed, often when our tool reported a Social Security number violation, when we looked around the document we also picked up many other Social Security numbers, birth dates, driver license numbers, Alien IDs, and bank account numbers.

We thus consider our work to date to be preliminary, both in thoroughness and scope. In subsequent stages, we hope to be able to use more comprehensive tools to perform a more thorough scan. In terms of scope, of the 32 district courts for we which we have data, we do not have the full collection of cases for many of the districts and we thus hope to expand our work to provide more definitive results over the full database.

You will find attached a DVD that has all 1,669 problem files, with both the original document and a redacted version. You may use the "audited.html" summary file to compare the two versions of these documents. Our detailed results are also attached as Appendix A. We have also provided you with this data in spreadsheet format should you wish to perform further statistical analysis.

In Table 1, you will find summary statistics for each of the 32 district courts. We provide the total number of PDF files, HTML files, size of the collection in gigabytes, and the total number of pages. In addition, we list the total number of documents with Social Security numbers and calculate a Privacy Problem Index, which is the number of problem documents found per gigabyte of data. The Privacy Problem Index takes into account the fact that larger district courts will be expected to have a larger number of problems. As an aid to interpretation, we have taken the liberty of assigning letter grades on a curve. Needless to say, the curve might change if we had complete data for all the districts.

On a personal note, in the course of redacting the 1,669 documents in the attached DVD, I was quite struck by how damaging these privacy violations can be. A few of the horror stories I encountered that have kept me up nights include:

- In the District of Massachusetts, a 54-page list filed in June 2008 contains the names, birth dates, Social Security numbers, and medical problems of 353 patients of a doctor.

- In the District of the District of Columbia, an attorney who was not paid in what he considered to be a timely fashion by the District of Columbia schools decided to raise his rate to $405/hour and bill the schools for the difference. To support his claim, he listed page after page of the names, home addresses, birth dates, and psychological issues for countless minors he saw.

- In the District of Alabama, lawyers seem to feel a need to sign briefs with their Social Security numbers, and the court consistently exposes the Social Security numbers and birth dates of police officers, state employees, and even court administrators.

- In the Central District of Illinois, litigants involving pension funds representing labor unions frequently attach the unredacted list of all union members and their Social Security numbers.

- In a huge number of IRS actions, unredacted tax returns are filed, including a large number where the redaction was performed incorrectly by simply placing a black box on top of the taxpayer ID, leaving the numbers untouched underneath the graphic.

To assist in the analysis and interpretation of this information, we have prepared a set of summary figures:

- In Figure 1, 30 of the districts (excluding Oregon and Northern Mariana Islands) are plotted with the Privacy Problem Index on one access and the size of the archive on the other. As you can see, the District of Delaware has a very large archive, but a low rate of problems. On the other hand, the Central District of Illinois has a large archive but a very high problem rate.

- In Figure 2, a map is presented that shows color-coding for letter grades by geographic distribution. Needless to say, we were able to only provide this information for 31 of the 94 districts so the map is incomplete.

- In Figure 3, we plot the number of incidents over time, demonstrating that this problem is still ongoing.

- In Figures 4 and 5, we analyze two individual district courts to show that the distribution of privacy issues varies quite a bit by Judge. We realize different judges have different case loads and different kinds of cases, so further analysis of this data would be needed before drawing any conclusions.

On a technical note, a large number of the PDF files we encountered were not valid PDF files. A variety of "tricks" such as redistilling the files were performed to enable us to open them in Adobe Acrobat Professional, the tool we use for redaction. However, the fact that we had issues opening the files means that a large number of users will have similar issues. We would thus recommend a scan for PDF validity be performed. The open source Ghostscript package, in particular the PDF2PS utility, is quite useful for validating PDF content. In addition, there are commercial packages such as Apago's PDF Appraiser for validation and automatic correction of PDF/A compatibility.

The biggest obstacles we have encountered have not been technical, but appear to be administrative barriers imposed to restrict public access. Although the PACER data we have been examining has been online for several years, neither the computer staff of the PACER system nor the commercial retailers such as LexisNexis or Westlaw have taken any steps to either report or redact this sensitive personal information. Indeed, in the case of the commercial sector, the Social Security numbers are considered to be a feature not a bug, enabling the vendors to sell sophisticated personal data mining products.

We bring this point up not to criticize either our commercial cousins or the well-respected staff who operate the computer systems for the courts. They have different objectives and time pressures. However, public interest groups and the public in general, when given access to these public records, are able to provide the kind of feedback that leads to the correction of these privacy issues. As Justice Brandeis said, "sunlight is said to be the best of disinfectants; electric light the most efficient policeman." If we want to be serious about personal privacy, we can only do so if we are also serious about public access.

Public access is a fundamental, enabling characteristic of our judicial system. As the Massachusetts Supreme Court so eloquently put the matter in Nash v. Lathrop, 6 N.E. 559 (1886), "every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices."

Unfortunately, it appears that public access is an afterthought on the PACER system. Despite $60 million/year in revenue with direct expenses of only $11m (a very healthy 59% gross margin), and an "unobligated balance" of $146.6 million in the Judiciary Information Technology Fund, the only way members of the public may access PACER is to petition a judge or pay $0.08/page, a rate that quickly leads to large bills and is a prohibitive barrier for most people. Only this year did the PACER system decide to run a public trial in 17 libraries to "discover if a segment of the public desires access to information contained in the PACER system." That trial was run with no written or oral guidelines on appropriate use, and was then abruptly cancelled.

Public access goes to the heart of the role of the judiciary in our modern society and is an important matter of public policy for the Judicial Conference to consider. As you have seen, when public access is provided, the result is that we are able to take seriously issues such as the protection of privacy, the accountability of our system of justice to the people, and the right of citizens to know the law.

Please let me know if I can provide further information on this report and I look forward to providing you with a full audit of all the data for all 94 district courts.

Respectfully yours,


Carl Malamud
Public.Resource.Org

cc: Mr. Peter G. McCabe, Esq.
   The Honorable Mr. Duff

**Table 1**
Summary of Privacy Issues Found

| District | # PDF Files Examined | # HTML Files | Total # Pages | # Gbytes Examined | # Docs With SSNs | Privacy Problem Index | |
|---|---|---|---|---|---|---|---|
| akd | 54,434 | 15,976 | 293,045 | 10.0 | 58 | 5.80 | D– |
| almd | 139,471 | 26,719 | 956,991 | 39.0 | 171 | 4.38 | D |
| azd | 67,181 | 95,927 | 532,604 | 16.0 | 33 | 2.06 | C |
| cand | 192,607 | 38,105 | 1,486,510 | 55.0 | 30 | 0.55 | A– |
| casd | 90,346 | 57,666 | 620,522 | 21.0 | 14 | 0.67 | B+ |
| cod | 87,134 | 66,779 | 609,624 | 18.0 | 26 | 1.44 | C+ |
| cofc | 85,686 | 79,216 | 613,040 | 27.0 | 228 | 8.44 | F |
| ctd | 78,158 | 59,159 | 546,083 | 16.0 | 16 | 1.00 | B– |
| dcd | 220,340 | 50,460 | 1,423,178 | 69.0 | 145 | 2.10 | C |
| ded | 183,618 | 81,669 | 1,225,609 | 68.0 | 40 | 0.59 | A– |
| flsd | 36,632 | 3,081 | 231,298 | 5.6 | 10 | 1.79 | C |
| gud | 32,889 | 14,223 | 164,855 | 6.7 | 11 | 1.64 | C |
| hid | 47,448 | 45,977 | 324,971 | 12.0 | 4 | 0.33 | A– |
| ilcd | 193,049 | 95,843 | 1,530,197 | 52.0 | 299 | 5.75 | D– |
| ilnd | 159,562 | 25,589 | 828,186 | 31.0 | 26 | 0.84 | B |
| laed | 6,590 | 12,365 | 41,097 | 1.1 | 2 | 1.82 | C |
| mad | 217,701 | 32,139 | 1,643,126 | 54.0 | 124 | 2.30 | C– |
| mdd | 62,038 | 166,907 | 553,404 | 15.0 | 68 | 4.53 | D– |
| mnd | 43,896 | 26,118 | 299,590 | 8.4 | 6 | 0.71 | B+ |
| njd | 141,041 | 139,365 | 1,018,050 | 46.0 | 48 | 1.04 | B |
| nmid | 8,556 | 5,760 | 59,064 | 1.7 | 34 | 20.00 | F |
| nysd | 238,404 | 59,001 | 2,154,572 | 73.0 | 82 | 1.12 | B– |
| ohsd | 19,220 | 11,511 | 152,009 | 4.8 | 29 | 6.04 | D– |
| ord | 0 | 112,762 | 112,762 | 1.2 | 0 | na | S |
| paed | 20,901 | 7,714 | 200,630 | 3.4 | 8 | 2.35 | C– |
| pamd | 13,423 | 6,174 | 118,659 | 4.2 | 3 | 0.71 | B+ |
| pawd | 18,482 | 24,706 | 173,301 | 5.3 | 21 | 3.96 | D |
| prd | 19,776 | 44,713 | 106,216 | 2.6 | 12 | 4.62 | D |
| rid | 90,187 | 60,890 | 622,755 | 20.0 | 104 | 5.20 | D |
| txsd | 35,279 | 9,878 | 239,544 | 11.0 | 0 | 0.00 | A+ |
| vaed | 2,367 | 267111 | 281,857 | 3.9 | 12 | 3.08 | D+ |
| vtd | 100,015 | 69,718 | 692,811 | 34.0 | 5 | 0.15 | A |
| **Total** | 2,706,431 | 1,813,221 | 19,856,160 | 735.9 | 1,669 | | |

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 77 of 165

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 78 of 165



**Figure 1**
Rate of Incidents v. Size of Archive

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 79 of 165

**Figure 2**
Distribution of Privacy Violations By Geographic Area



**Figure 3**

Number of Documents With Social Security Numbers Found By Month Of Filing



### Figure 4
### Number of Documents With Social Security Numbers
District Court of the Middle District of Alabama



| Initials | Judge | # of Docs | Percent |
|---|---|---|---|
| BGC | The Hon. Byron G. Cudmore | 12 | 4% |
| DGB | The Hon. David G. Bernthal | 8 | 3% |
| HAB | The Hon. Harold A. Baker | 21 | 7% |
| JAG | The Hon. John A. Gorman | 11 | 4% |
| JBM | The Hon. Joe Billy McDade | 56 | 19% |
| JES | The Hon. Jeanne E. Scott | 74 | 25% |
| MMM | The Hon. Michael M. Mihm | 41 | 14% |
| MPM | The Hon. Michael P. McCuskey | 62 | 21% |
| RM | The Hon. Richard Mills | 13 | 4% |
| CHE | The Hon. Charles H. Evans | 0 | 0% |

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 81 of 165

**Figure 5**
**Number of Documents With Social Security Numbers**
District Court of the Middle District of Alabama



| Initials | Judge | # of Docs | Percent |
|----------|-------|-----------|---------|
| CSC | The Hon. Charles S. Coody | 6 | 4% |
| ID | The Hon. Ira DeMent | 9 | 5% |
| MEF | The Hon. Mark E. Fuller | 34 | 20% |
| MHT | The Hon. Myron H. Thompson | 59 | 35% |
| SRW | The Hon. Susan Russ Walker | 2 | 1% |
| TFM | The Hon. Terry F. Moorer | 1 | 1% |
| WC | The Hon. Wallace Capel, Jr. | 1 | 1% |
| WHA | The Hon. W. Harold Albritton | 9 | 5% |
| WKW | The Hon. W. Keith Watkins | 46 | 28% |
| TMH | The Hon. Truman M. Hobbes | 0 | 0% |

Pages 10-84 of this document, which consisted of an Appendix listing redacted personal identifying information, have been removed from the Exhibit.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 83 of 165

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 84 of 165

# EXHIBIT E

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 85 of 165

United States District Court
for the District of Columbia
Washington, D C 20001

Chambers of
Chief Judge
Royce C. Lamberth
United States District Judge

January 28, 2009

Mr. Carl Malamud
President & CEO
Public. Resource.Org
1005 Gravenstein Highway North
Sebastopol, CA 95472

Dear Mr. Malamud,

This is in response to the your December 30, 2008 letter regarding the audit your organization conducted of our Court's database. Our Clerk's Office confirmed that the documents you cited included social security numbers that should have been redacted by counsel prior to filing. Those documents are no longer available for public viewing. Counsel for the parties have been notified to file redacted documents that are in compliance with the E-Government Act.

Thank you for bringing this to our attention. We appreciate your interest in our Court.

Sincerely,

Royce C. Lamberth
Chief Judge

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 86 of 165

# EXHIBIT F

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 87 of 165

JOSEPH I. LIEBERMAN, CONNECTICUT, CHAIRMAN

CARL LEVIN, MICHIGAN
DANIEL K. AKAKA, HAWAII
THOMAS R. CARPER, DELAWARE
MARK L. PRYOR, ARKANSAS
MARY L. LANDRIEU, LOUISIANA
BARACK OBAMA, ILLINOIS
CLAIRE McCASKILL, MISSOURI
JON TESTER, MONTANA

SUSAN M. COLLINS, MAINE
TED STEVENS, ALASKA
GEORGE V. VOINOVICH, OHIO
NORM COLEMAN, MINNESOTA
TOM COBURN, OKLAHOMA
PETE V. DOMENICI, NEW MEXICO
JOHN WARNER, VIRGINIA
JOHN E. SUNUNU, NEW HAMPSHIRE

MICHAEL L. ALEXANDER, STAFF DIRECTOR
BRANDON L. MILHORN, MINORITY STAFF DIRECTOR AND CHIEF COUNSEL

# United States Senate

COMMITTEE ON
HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

WASHINGTON, DC 20510–6250

February 27, 2009

The Honorable Lee H. Rosenthal
Chair, Committee on Rules of Practice and Procedure
Judicial Conference of the United States
Washington, D.C. 20544

Dear Judge Rosenthal:

I am writing to inquire if the Court is complying with two key provisions of the E-Government Act of 2002 (P.L. 107-347) which were designed to increase public access to court records and protect the privacy of individuals' personal information contained in those records.

As you know, court documents are electronically released through the Public Access to Court Electronic Records (PACER) system, which currently charges $.08 a page for access. While charging for access was previously required, Section 205(e) of the E-Government Act changed a provision of the Judicial Appropriation Act of 2002 (28 U.S.C. 1913 note) so that courts "may, to the extent necessary" instead of "shall" charge fees "for access to information available through automatic data processing equipment."

The goal of this provision, as was clearly stated in the Committee report that accompanied the Senate version of the E-Government Act, was to increase free public access to these records. As the report stated: "[t]he Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. ... Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information."

Seven years after the passage of the E-Government Act, it appears that little has been done to make these records freely available – with PACER charging a higher rate than 2002. Furthermore, the funds generated by these fees are still well higher than the cost of dissemination, as the Judiciary Information Technology Fund had a surplus of approximately $150 million in FY2006.[1] Please explain whether the Judicial Conference is complying with Section 205(e) of the E-Government Act, how PACER fees are determined, and whether the Judicial Conference is only charging "to the extent necessary" for records using the PACER system.

In addition I have concerns that not enough has been done to protect personal information contained in publicly available court filings, potentially violating another provision of the

---

[1] Judiciary Information Technology Fund Annual Report for Fiscal Year 2006

E-Government Act.[2] A recent investigation by Carl Malamud of the non-profit Public.Resource.org found numerous examples of personal data not being redacted in these records. Given the sensitivity of this information and the potential for indentify theft or worse, I would like the court to review the steps they take to ensure this information is protected and report to the Committee on how this provision has been implemented as we work to increase public access to court records.

I thank you in advance for your time and I look forward to your response.

Sincerely,

Joseph I. Lieberman
Chairman

---

[2] Section 205(c)(3) requires that rules be developed to "protect privacy and security concerns relating to electronic filing of documents and the public availability under this subsection of documents filed electronically."

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 89 of 165

# EXHIBIT G



RECEIVED
CH DATE 3/31



# JUDICIAL CONFERENCE OF THE UNITED STATES

WASHINGTON, D.C. 20544

THE CHIEF JUSTICE
OF THE UNITED STATES
*Presiding*

JAMES C. DUFF
*Secretary*

March 26, 2009

Honorable Joseph I. Lieberman
Chairman
Committee on Homeland Security
  and Governmental Affairs
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

We are responding on behalf of the Judicial Conference and its Rules Committees to your letter to Judge Lee H. Rosenthal dated February 27, 2009. Your letter raises two questions about the Judiciary's compliance with the E-Government Act of 2002: the first involves the fees charged for Internet-based access to court records, to which Director Duff responds; and the second relates to the protection of private information within these court records, to which Judge Rosenthal responds. The Judiciary welcomes the opportunity to address these issues.

<u>User Fees Necessary to Support PACER</u>

You inquired whether the Judiciary's Public Access to Court Electronic Records (PACER) system complies with a provision of the E-Government Act that contemplates a fee structure in which electronic court information "is freely available to the greatest extent possible." We assure you that the Judiciary is charging PACER fees only to the extent necessary. As described below, many services and documents are provided to the public for free, and charges that are imposed are the minimum possible only to recover costs. As such, we believe we are meeting the E-Government Act's requirements to promote public access to federal court documents while recognizing that such access cannot be entirely free of charge.

There are high costs to providing the PACER service. This fact raises an important question of who should pay for the costs — taxpayers or users. Congress initially answered the question in our 1991 appropriations act when it required that improved electronic access to court information be funded through reasonable fees paid by the users of the information, and not through taxes paid by the general public. That requirement is the basis for the current Electronic Public Access (EPA) program, and for the fees charged for access to federal court documents through the PACER system.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 90 of 165

The PACER user population includes lawyers, *pro se* filers, government agencies, trustees, bulk collectors, researchers, educational institutions, commercial enterprises, financial institutions, the media, and the general public. The fees are the same for all users of the system. The program does not, however, provide free access to every individual, law firm, or corporation (most notably data resellers and credit reporting firms) that is interested in obtaining vast amounts of court data at no cost.

As noted above, Congress mandated 18 years ago that the Judiciary charge user fees for electronic access to court files as a way to pay for this service. Since that time, various legislative directives have amended the mandate, mostly to expand the permissible use of the fee revenue to pay for other services related to the electronic dissemination of court information, such as the Case Management/Electronic Case Files (CM/ECF) system[1] and an Electronic Bankruptcy Noticing (EBN) system.[2] Your letter correctly notes that the E-Government Act shifted emphasis by providing that fees "may," rather than "shall," be collected, and "only to the extent necessary." It did not, however, alter Congress's policy that the EPA program recoup the cost of services provided through a reasonable fee. Indeed, the Conference Report on the Judiciary Appropriations Act of 2004, adopted two years after the E-Government Act, included the following statement: "[t]he Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs."[3] Consistent with that directive, the Judicial Conference increased the EPA fee by one cent per page accessed.

The Judiciary takes its responsibility to establish the EPA fee very seriously. Since well before the E-Government Act, it has been the Judicial Conference's policy to set the electronic public access fee to be commensurate with the costs of providing and enhancing services related to public access. In fact, prior to the one-cent per-page increase in 2004, the Conference had a history of lowering the fee. As a result, PACER is a very economical service:

- The charge for accessing filings is just eight cents per page (as opposed to the fees for using commercial services such as Westlaw or Lexis, which are much more);

---

[1]  CM/ECF, the primary source of electronic information on PACER, was developed and is maintained with EPA fees. This system provides for electronic filing of all documents in all 94 district courts and all 90 bankruptcy courts, and currently is being implemented in the courts of appeals.

[2]  The EBN system is funded in its entirety by EPA fee revenue. It provides access to bankruptcy case information to parties listed in the case by eliminating the production and mailing of traditional paper notices and associated postage costs, while speeding public service. Available options include Internet e-mail and fax services, and Electronic Data Interchange for large volume notice recipients. Over 20 million bankruptcy notices were transmitted through the EBN program in fiscal year 2008.

[3]  *See* H.R. Rpt. No. 108-401, 108th Cong., 1st Sess., at 614 (adopting the language of H.R. Rpt. No. 108-221, 108th Cong., 1st Sess., at 116).

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 91 of 165

- There is a $2.40 maximum charge for any single document, no matter its length; and

- At federal courthouses, public access terminals provide free PACER access to view filings in that court, as well as economical printouts (priced at $.10 per page).

In addition, contrary to the notion that little has been done to make court records freely available, the Electronic Public Access (EPA) program *does* provide a significant amount of federal court information to the public for free. For example, through PACER:

- Free access to all judicial opinions is provided;

- Parties to a court case receive a free copy of filings in the case;

- If an individual account does not reach $10 annually (which translates into access to at least 125 pages), no fee is charged at all – in 2008, there were over 145,000 accounts in this status; and

- Approximately 20 percent of all PACER usage is performed by users who are exempt from any charge, including indigents, academic researchers, CJA attorneys, and *pro bono* attorneys.[4]

Nonetheless, the fact remains that the EPA program does require funding, and Congress has never provided appropriations for its support. If the users, the largest of which are finance and information management corporations, are not charged for the services they receive, the Judiciary cannot maintain PACER or other public access facilities unless Congress annually provides taxpayer-funded appropriations to support the program.

Additionally, a misconception about PACER revenues needs clarification. There is *no* $150 million PACER surplus; the figure referenced in your correspondence was a FY 2006 balance of $146.6 million in the much larger Judiciary Information Technology Fund (JITF). The JITF finances the IT requirements of the entire Judiciary and is comprised primarily of "no-year" appropriated funds which are expected to be carried forward each year. While fee

---

[4]  In addition to these examples, the EPA program provides free access to court case information through VCIS (Voice Case Information System), an automated voice response system that provides a limited amount of bankruptcy case information directly from the court's database in response to touch-tone telephone inquiries. The Judicial Conference also recently attempted to expand free PACER access through a pilot project that provided PACER terminals in Federal Depository Libraries. The purpose of the pilot was to provide access to individuals who would be unlikely to go to the courthouse, have ready access to the Internet, or establish a PACER account. Unfortunately, after only 11 months, the pilot had to be suspended pending an evaluation and an investigation of potentially inappropriate use.

collections from the EPA program are also deposited into the JITF, they are used only to fund electronic public access initiatives and account for only a small portion of its balance.[5]

Finally, the Judiciary is making a serious effort to implement the requirements of the E-Government Act. Section 205(d) directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filings, decisions and rulings in each case to be obtained from the docket sheet of that case." In reality, the Judiciary has done much more than "explore" such technology — *we have designed and now implemented in all courts a system that provides nearly one million PACER users with access to over 250 million case file documents at a reasonable fee, and frequently free of any charge at all.* The EPA program was developed as an alternative to going to the courthouse during business hours and making copies at the cost of 50 cents a page.

In contrast, very few state courts have electronic access systems, and none provides as much information as PACER. Many state courts charge several dollars for a single records search. We receive frequent inquiries from state court officials and court administrators from other countries about PACER, which is viewed as an electronic public access model. Taxpayers, who incur none of the expenses associated with PACER, and users of the system, who enjoy rapid access to a vast amount of docket information, are well served by PACER. The PACER system is an on-going success story and the Judiciary remains committed to providing a high level of electronic public access to court information.

Private Information in Electronic Court Records

The Judicial Conference and its Rules Committees share your commitment to protecting private information in court filings from public access. Over a decade ago, before electronic filing was adopted in the federal district and bankruptcy courts and well before enactment of the E-Government Act of 2002, the Conference began developing a policy to protect private information in electronic case files while ensuring Internet-based public access to those files. That policy became effective in September 2001. Changes to the Federal Appellate, Bankruptcy, Civil, and Criminal Rules, largely incorporating the privacy policy and addressing other rules' aspects of protecting personal identifiers and other public information from remote electronic public access, became effective in December 2007, under the E-Government Act and pursuant to the Rules Enabling Act process.[6]

The Judicial Conference has continued to examine how the privacy policy and rules are working in practice. Two Conference committees are reviewing the rules, the policy, and their implementation. The Administrative Office of the United States Courts has also continued

---

[5]    The carryover JITF balances (including the portion attributable to EPA fee collections) have been substantially reduced since FY 2006 in order to meet the Judiciary's IT requirements.

[6]    Fed. R. App. P. 25(a)(5); Fed. R. Bankr. P. 9037; Fed. R. Civ. P. 5.2; and Fed. R. Crim. P. 49.1.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 93 of 165

to reinforce effective implementation. The Federal Judiciary has been in the forefront of protecting privacy interests while ensuring public access to electronically filed information.

In late 1999, a few federal courts served as pilot projects to test electronic filing. In 2009, the Judiciary's CM/ECF system has become fully operational in 94 district courts and 93 bankruptcy courts, and it will soon become operational in all 13 courts of appeals. As courts and litigants have acquired experience with nationwide electronic filing, new issues have emerged on how to balance privacy interests with ensuring public access to court filings.

The Judiciary-wide privacy policy was adopted in September 2001 after years of study, committee meetings, and public hearings. The policy requires that court filings must be available electronically to the same extent that they are available at the courthouse, provided that certain personal identifiers are redacted from those filings by the attorney or the party making the filing. The personal identifiers that must be redacted include the first five digits of a social-security number, financial account numbers, the name of a minor, the date of a person's birth, and the home address in a criminal case. These redaction requirements were incorporated into the Federal Rules amendments promulgated in December 2007 after the public notice and comment period prescribed under the Rules Enabling Act. These rules, which also address other privacy protection issues, meet the requirements of the E-Government Act.

The 2001 Conference policy and the 2007 privacy rules put the responsibility for redacting personal identifiers in court filings on the litigants and lawyers who generate and file the documents. The litigants and lawyers are in the best position to know if such information is in the filings and, if so, where. Making litigants and lawyers responsible to redact such information has the added benefit of restraining them from including such information in the first place. Moreover, requiring court staff unilaterally to modify pleadings, briefs, transcripts, or other documents that are filed in court was seen to be impractical and potentially compromising the neutral role the court must play. For these reasons, the rules clearly impose the redaction responsibility on the filing party. The Committee Notes accompanying the rules state: "The clerk is not required to review documents filed with the court for compliance with this rule. The responsibility to redact filings rests with counsel and the party or non-party making the filing."[7] The courts have made great efforts to ensure that filers are fully aware of their responsibility to redact personal identifiers. Those efforts continue.

The reported instances of personal identifier information contained in court filings is disturbing and must be addressed. The Rules Committees' Privacy Subcommittee, which developed and proposed the 2007 privacy rules, is charged with the task of examining how the rules have worked in practice, what issues have emerged since they took effect on December 1, 2007, and why personal identifier information continues to appear in some court filings. The

---

[7]     Fed. R. Civ. P. 5.2 (Committee Note).

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 94 of 165

Privacy Subcommittee, which includes representatives from the Advisory Rules Committees as well as the Court Administration and Case Management Committee, will consider whether the federal privacy rules or the Judicial Conference privacy policy should be amended and how to make implementation more effective. The subcommittee will review empirical data; the experiences of lawyers, court staff, and judges with electronic court filings; the software programs developed by some district and bankruptcy courts to assist in redacting personal identifier information; and other steps taken by different courts to increase compliance with the privacy rules.

While this work is going on, the Judiciary is taking immediate steps to address the redaction problem. Court personnel have been trained in administering the privacy policy and rules; additional training is taking place. On February 23, 2009, the Administrative Office issued a written reminder to all Clerks of Court about the importance of having personal identifiers redacted from documents before they are filed and of the need to remind filers of their redaction obligations. Court clerks were directed to use a variety of court communications, such as newsletters, listservs, continuing legal education programs, and notifications on websites administered directly by the courts, to reach as many filers as possible, as effectively as possible. Plans are underway to modify the national CM/ECF system to include an additional notice reminding filers of their redaction obligation. In addition, all the courts have been asked to provide information on their experience with the privacy policy and rules. Early responses have included some promising approaches that the Privacy Subcommittee will consider for possible national adoption.

The Privacy Subcommittee does not underestimate the difficulty or complexity of the problems. Court filings can be voluminous. Some cases involve hundreds or even thousands of pages of administrative or state-court paper records that cannot be electronically searched. Redacting personal identifier information in certain criminal proceedings may interfere with legitimate law enforcement prosecutions. Erroneously redacting information can affect the integrity of a court record. The propriety of court staff changing papers filed in private civil litigation is an ongoing concern. Internet access to court filings present other privacy and security issues besides the redaction of the personal identifiers specified in the 2007 rules, and these issues need to be studied as well.

The resolution of these privacy issues will involve important policy decisions that require careful and comprehensive consideration and input from the bench, bar, and public. The Judicial Conference and its Rules Committees look forward to continuing this dialogue with you.

\*　　\*　　\*

If we may be of assistance to you in either of these areas, or on any other matter, please do not hesitate to contact the Office of Legislative Affairs in the Administrative Office at 202-502-1700.

Sincerely,

Lee H. Rosenthal
Chair, Standing Committee on
Rules of Practice and Procedure

James C. Duff
Secretary, Judicial Conference
of the United States

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 97 of 165

# EXHIBIT H

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 98 of 165

AN APPEAL TO THE COURT

BEFORE THE U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT

RICHARD H. CHAMBERS U.S. COURT OF APPEALS BUILDING

JUNE 23, 2010, PASADENA, CALIFORNIA

1   Chief Judge Kozinski and Honorable Members of the Court,

2   Thank you for this opportunity to appear before you today.

3   My name is Carl Malamud, and I am President of Public.Resource.Org, a 501(c)(3) nonprofit corporation with a charter of making government more widely available.

4   We were responsible for placing a 50-year archive of decisions from the Court of Appeals on the Internet for use at no charge and with no restrictions on use, an archive which we then supplemented with 281 volumes of the first series of the Federal Reporter, as well as the Federal Cases.

5   We were also responsible for conducting audits of Court of Appeals opinions and PACER documents for violations of the privacy rules of the Judicial Conference.

6   Since January, we have worked with co-convenors at major law schools around the country—including Stanford, Berkeley, Harvard, and Yale—to conduct a series of 15 workshops under the theme of "Law.Gov."

7   Law.Gov is an idea, an idea that the primary legal materials of the United States could be made more readily available.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 99 of 165

8  The basic proposition we have examined is bulk access via the Internet to primary legal materials at all levels of government and across all branches.

9  This is not about the creation of a single repository or web site, it is about the standards governmental institutions should individually strive for, allowing for-profit and non-profit uses to thrive, without artificial barriers to access.

10  Law.Gov has been strictly nonpartisan. The chief executives of both the Federalist Society and the American Constitution Society have participated in Law.Gov workshops. This open process has included strong participation from industry, including the CEOs of LexisNexis, Fastcase, and Justia.

11  This national conversation has also had strong participation from government, including the Law Librarian of Congress, the Archivist of the United States, the Chairman of the Administrative Conference of the United States, White House officials and members of Congress, and officials from all three branches of state governments.

12  Perhaps most importantly, this dialogue has had the enthusiastic backing of law librarians across the country, with 195 librarians volunteering to help conduct a National Inventory of Legal Materials and 5 past presidents of the American Association of Law Libraries participating in the workshops.

13  The Law.Gov workshops concluded last week at the Harvard Law School, where we reached consensus upon 10

basic principles that will form the basis for a report to be issued this fall.

14      Officials from the Executive and Legislative branches have requested a copy of this report, and we would be pleased to offer a copy to you if it should please the Court.

15      On behalf of Public.Resource.Org, in cooperation with my colleagues at the Stanford, Berkeley, Harvard, and Cornell Law Schools, as well as other locations, I would like to make a second offer to the Court, and that is to furnish to you late this year or early next year with a disk drive.

16      The disk drive would contain the complete opinions of this Court from 1891 on, as well as all or most of the briefs and other relevant information.

17      Technically speaking, the opinions would be properly formatted in HTML with an accompanying PDF version, and all files would include proper metadata and other information conforming to standards and recommendations from groups such as the American Bar Association and the American Association of Law Libraries.

18      Working with law students and librarians, we would perform an extensive audit of the opinions to verify that the electronic and paper versions match.

19      The Court would be under no obligation to do anything with this disk drive, but if the Court is satisfied with the information furnished, you could consider digitally signing the data and perhaps offering the complete archive on the Court's web site.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 101 of 165

## CARL MALAMUD

20     I would like to thank you again for this opportunity to appear before you, and would be pleased to answer any questions.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 102 of 165

# EXHIBIT I

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 103 of 165

# STARS AND STRIPES.

Volume 68, No. 199   ©SS 2009   G          **MONDAY, NOVEMBER 2, 2009**          *stripes*.com          50¢



**ALEX GALLARDO**/Los Angeles Times

# PERSONAL MISSION

Doctor honors fallen son on first Iraq deployment **Page 5**

Navy Lt. Cmdr. Bill Krissoff stands in the study of his new home in San Diego County. Krissoff joined the Navy after his eldest son was killed in Fallujah, Iraq.

# Military slow to safeguard identities

BY CHARLIE REED
*Stars and Stripes*

YOKOTA AIR BASE, Japan — The military is playing catch-up on a year-old complaint that hundreds of thousands of officers' Social Security numbers have been floating around on the Internet.

In an October 2008 letter to the Defense Department and the Federal Trade Commission, Public. Resource.org detailed its discovery of roughly 232,000 military officers' Social Security numbers in government and commercial databases, available to anyone with an Internet connection.

The nonprofit group, devoted to making public records available online, found the numbers in the Congressional Record. Copies are available online and in print at libraries throughout the United States.

## 232,000

Number of military Social Security numbers found on the Internet by a nonprofit in 2008

Carl Malamud, the founder and president of Public.Resource.org, estimates that 500,000 officers' Social Security numbers were printed in the Congressional Record between 1971 — when the military began using them to identify troops — and 1996. Moreover, digitized versions of the federal publication have been available online for years.

But his complaint, addressed to military Inspector General Gordon Heddell, did not reach the Defense Privacy Office until August. The office is now in the process of ensuring the numbers had been printed, both online and in print, director Samuel Jenkins said.

**SEE IDENTITIES ON PAGE 4**

# Abdullah withdraws from Afghanistan runoff

BY DIANNA CAHN
*Stars and Stripes*

KABUL
Abdullah Abdullah, the chief rival to Afghan President Hamid Karzai, said Sunday he was withdrawing from the presidential runoff scheduled for Saturday because he did not believe free and fair elections were possible.

Abdullah said the widespread fraud in the Aug. 20 presidential election had marred the process and he did not believe the situation had improved.

"The first election was full of fraud and the Electoral Complaint Commission just threw out a small amount of the fraudulent votes, not all of them," Abdullah said in Dari at a morning news conference. He was referring to the United Nations-backed commission that threw out close to a million Karzai votes as forgeries, reducing Karzai's showing to 48 percent versus Abdullah's 27 percent and forcing a runoff.

"I've always wanted a stable Afghanistan,

a peaceful Afghanistan and also I wanted the election to be clean fair and clear," Abdullah said. "But it wasn't what I'd hoped. I don't think it is a good idea to participate in the election because it will be just like the previous one."

Abdullah's decision undermined hopes of western leaders that a runoff election could restore legitimacy to the Afghan presidency, which had been badly marred by the acknowledgement of ballot-stuffing and voter fraud in the Aug. 20 vote.

**SEE RUNOFF ON PAGE 2**



Pentagon tells KBR to cut workers in Iraq or face fines **Page 3**

Game 3 course reversed when replay gives A-Rod a homer **Back page**



Two reservists earn title of 'Best Medics in the Army' **Page 5**

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 104 of 165

# New warships meet Navy's need for speed

**By David Sharp**
*The Associated Press*

BATH, Maine — The Navy's need for speed is being answered by a pair of warships that have reached freeway speeds during testing at sea.

Independence, a 418-foot warship built in Alabama, boasts a top speed in excess of 45 knots, or about 52 mph, and sustained 44 knots for four hours during builder trials that wrapped up this month off the Gulf Coast. The 378-foot Freedom, a ship built in Wisconsin by a competing defense contractor, has put up similar numbers.

Both versions of the Littoral Combat Ship use powerful diesel engines, as well as gas turbines for extra speed. They use steerable waterjets instead of propellers and rudders and have shallower drafts than conventional warships, letting them zoom close to shore.

The ships, better able to chase down pirates, have been fast-tracked because the Navy wants vessels that can operate in coastal, or littoral, waters. Freedom is due to be deployed next year, two years ahead of schedule.

Independence is an aluminum, trihulled warship built by Austal USA in Mobile, Ala. The lead contractor is Maine's Bath Iron Works, a subsidiary of General Dynamics.

Lockheed Martin Corp. is leading the team that built Freedom in Marinette, Wis. It looks more like a conventional warship, with a single hull made of steel.

The stakes are high for both teams. The Navy plans to select Lockheed Martin or General Dynamics, but not both, as the builder. The Navy has ordered one more ship from each of the teams before it chooses the final design. Eventually, the Navy wants to build up to 55 of them.

Speed has long been relished by Navy skippers. Capt. John Paul Jones, some-



DENNIS GRIGGS, COURTESY OF THE U.S. NAVY/AP

The littoral combat ship Independence is shown underway during builder's trials on July 12. Officials say the Independence, a 418-foot ship built in Alabama, traveled in excess of 45 knots, which equates to nearly 52 mph, and sustained 44 knots during a four-hour, full-speed sprint.

times described as father of the U.S. Navy, summed it up this way in 1778: "I wish to have no connection with any ship that does not sail fast; for I intend to go in harm's way."

Eric Wertheim, author and editor of the U.S. Naval Institute's "Guide to Combat Fleets of the World," said speed is a good thing, but it comes at a cost.

"This is really something revolutionary," Wertheim said. "The question is how important and how expensive is this burst of speed?"

Early cost estimates for Littoral Combat Ships were about $220 million apiece, but

costs spiraled because of the Navy's requirements and its desire to expedite construction. The cost of the ships is capped at $460 million apiece, starting in the new fiscal year.

Both ships are built to accommodate helicopters and mission "modules" for either anti-submarine missions, mine removal or traditional surface warfare. The modules are designed to be swapped out within 24 hours, allowing the ships to adapt quickly to new missions.

While they're fast, they aren't necessarily the fastest military ships afloat. The Navy used to have missile-equipped hy-

drofoils and the Marines' air-cushioned landing craft is capable of similar speeds, Wertheim said. And smaller ships are capable of higher speeds.

Nonetheless, the speed is impressive, especially considering that other large naval vessels have been cruising along at a relatively pokey 30 to 35 knots for decades.

Loren Thompson, a defense analyst at the Lexington Institute, noted that Independence sustained 44 knots despite a 30-knot headwind and 6- to 8-foot seas in Alabama's Mobile Bay. "For a ship of this size, it's simply unheard of to sustain that rate of speed for four hours," he said.

# Identities: Some Social Security numbers still found online

**IDENTITIES, FROM PAGE 1**

"We're at the beginning stages of this," Jenkins said. "We're taking this very seriously and aggressively pursuing action."

Military officials could not explain why it took nearly a year to address the complaint.

Malamud, however, said he acted immediately when his group discovered the problem in 2008. He notified the Government Printing Office, which prints the Congressional Record and publishes it online, and the three major commercial databases that publish online versions of the federal publication: W.S. Hein, LexisNexis and Westlaw.

Malamud has not conducted a follow-up audit.

When contacted by Stars and Stripes after the newspaper discovered officers' Social Security numbers were still available on HeinOnline.org, W.S. Hein acknowledged that it had received the complaint from Malamud but had yet to redact its catalog.

"We have tried some redacting software ... but it is not that accurate and it requires a great deal of manual intervention," company President Kevin Marmion said in an e-mail Friday to Stars and Stripes. The problem, he said, is that Hein's versions are scanned copies of the original documents

and were not manually typed into the database like most other digitized editions.

"We are currently redacting Social Security numbers from another online project that has more recent Social Security numbers in it and the Congressional Record will follow," Marmion said.

LexisNexis spent seven months redacting the numbers from its online databases, completing the task in 2008, company spokesman Jorge Martinez wrote in an e-mail to Stars and Stripes.

Westlaw immediately took down its database last October following Malamud's complaint, according to its parent company, Thomson Reuters.

After manually redacting the information it was put back online within a day, and the company now scans all Congressional Record content for Social Security numbers and other sensitive

information before posting it in its database, company spokesman John Shaughnessy wrote in an e-mail to Stars and Stripes.

But even after a database is scrubbed there is the potential to miss information, Malamud said.

An oversight was responsible for the 2,700 Social Security numbers he found in 2008 in the GPO's online archive of the Congressional Record from the mid-1990s. The agency, which has since removed them, had redacted most of the Social Security numbers in the late 1990s under the direction of the Senate, GPO spokesman Gary Somerset said in an e-mail to Stars and Stripes.

Malamud said there needs to be a process to ensure the material has been removed from the public files. He has urged the military to inform the affected officers.

Jenkins, with the Defense Privacy Office, said it would be too difficult to contact individuals and that his office is instead considering posting a notice on its Web site directing them to closely monitor their credit.

Credit monitoring is provided by the DOD only to those who can prove their credit already has been hurt by documents the military published, Jenkins said.

And questions still linger about

how to remove the Social Security numbers in print editions of the Congressional Record held by many of the 1,250 libraries around the country that participate in the Federal Depository Library Program.

Jenkins said his office is committed to redacting the records but has yet to develop a plan for the massive undertaking.

"This is an ongoing process," he said.

The information became part of the Congressional Record because the military needs Senate approval to officially promote officers. Generals and admirals typically appear before the Senate before they rise in rank, though most promotions are approved en masse through a list provided by the military.

Before 1997, the list included officers' names, ranks and full Social Security numbers. From then until last year, it included only the last four digits of the Social Security numbers along with the corresponding names and ranks and is still available through the GPO's Web site. This year, the numbers were completely removed from the process, according to the GPO.

Said Pentagon spokesman Lt. Col. Les' Melnyk: "It was appropriate to provide [the full Social

## Social Security number use

In the Congressional Record:

■ Before 1997: Officers' names, ranks and full Social Security numbers

■ 1997-2008: Name, rank and the last four digits of a Social Security number

■ After 2008: Officers' Social Security numbers completely struck from use

— Government Printing Office

Security numbers] when they were provided. We're now taking steps to alleviate the possibility that [ID theft] could happen."

Jenkins said the military had not received any reports of fraud as a result of the Congressional Record, but media reports from 1999 indicate that identity thieves successfully obtained credit cards for scores of high-level military officers using Social Security numbers culled from the Congressional Record.

Stars and Stripes reporter Jeff Schogol contributed to this story. E-mail Charlie Reed at: reedc@pstripes.osd.mil

> *"We have tried some redacting software ... but it is not that accurate."*
>
> **Kevin Marmion**
> President, W.S. Hein

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 105 of 165

# EXHIBIT J



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

Public Works Projects for the Internet

October 5, 2008

Mr. Marc Groman, Esq.
Chief Privacy Officer
Federal Trade Commission
600 Pennsylvania Avenue, NW H–466
Washington, DC 20580

Hon. Gordon S. Heddell
Acting Inspector General
Department of Defense
400 Army Navy Drive
Arlington, VA 22202–4704

**Summary of Complaint:**

LexisNexis and Thomson Westlaw permit unfettered access to 308,085 social security numbers of 232,471 military officers promoted between 1985 and 1996. LexisNexis and Westlaw should be required to either redact or control access to the data.

The Department of Defense and the United States Senate are the original publishers of this data and should take steps to mitigate the damage caused by these actions.

Dear CPO Groman and Inspector General Heddell:

This complaint before the Federal Trade Commission and the Inspector General of the Department of Defense requests a series of actions be promptly taken to mitigate the damage from a long-term and still ongoing breach of the privacy of 232,471 military officers promoted between 1985 and 1996.

On November 16, 2007, Public.Resource.Org completed a harvest of 5,177,003 pages of government documents from Government Printing Office (GPO) servers, including the Congressional Record from 1995 to 2007. On April 21, 2008, we were contacted by a former officer who complained that his social security number was visible on the Internet in a Congressional Record page published by the U.S. Senate.

This turned out to be an outgrowth of a practice conducted from 1970 to 1996 whereby the U.S. Senate, to fulfill their constitutional requirement to provide advice and consent of executive nominations, printed the name and social security number of officers in the Congressional Record. Before 1970, the military had not yet switched identification numbers over to social security numbers, and after 1996 a heightened sense of privacy led to the redaction of all but the last four digits of the identifiers.

We investigated the matter, and determined that 2,728 social security numbers were still visible on the government web sites, for the most part in the 1995 and 1996 databases. In some cases, the text files had been redacted but the PDF file corresponding to the same page had not been redacted, leading us to believe that somebody had been aware of the problem but had simply failed to finish the job. We referred the matter to the Inspector General of the Government Printing Office for further action on April 23, 2008, providing specific details on the offending data and recommending a series of corrective actions, including an IG investigation.

**Actions Taken by the Government Printing Office Were Not Sufficient**

The GPO took the matter seriously in some respects. While the Inspector General choose not to conduct an investigation, the staff of the Public Printer and the Superintendent of Documents did act, taking the two years of the Congressional Record offline and conducting a manual scan of all pages. On the question of the notification of the parties endangered by this breach, they deferred to the Congress, indicating they were only the printer and the U.S. Senate had published the pages.

Public.Resource.Org also briefed staff of the Committee on House Administration, the Senate Committee on Governmental Affairs, and the Joint Committee on Printing. With all three committees, as well as in conversations with GPO staff, we suggested strongly that this breach required that those affected be promptly notified of the breach, a standard "Best Current Practice" and in many cases required by law. We asked that the Senate do no less than they would have surely demanded in a similar situation with a private company or an executive branch agency such as the Veterans Administration.

At the time, we were simply asking that the 2,900 former officers who had their social security numbers spinning on the U.S. Senate web site for several years be notified. However, after we investigated the matter further and saw how broad the practice had been, we suggested that all officers be notified. In addition, we suggested that those that republish the data must be notified to stop the spread of this information.

A series of reasons have been presented to us as the rationale for taking no further actions. These reasons we have heard over and over include:

- "There is no evidence that this breach of privacy has been a problem since nobody has been complaining."

- "The officers all know about this already, it is common knowledge."

- "It wouldn't be possible to notify that many people."

- "If we try to notify people, it will leak to the media and the bad guys will find out."

- "This isn't a problem now that the on-line stuff has been fixed. You'd have to go to the library to copy pages now, there are easier ways to harvest SSNs."

**The Problem is Ongoing and Digital**

On a hunch, we went to LexisNexis to see how many social security numbers were visible on their service. As we suspected, a single one-line command let us immediately harvest a huge number of social security numbers. In many cases, the listings included the name, date of birth, and social security numbers, creating a one-stop shopping mall for identity theft.

As can be seen in Table 1 (next page), we were able to retrieve 308,085 numbers with this one command. When sorted, because some members were promoted more than once, our harvest yielded 232,471 unique numbers. The attached DVD has all 4,041 PDF pages of these numbers for your inspection. I trust you will be as horrified as I was paging through these files.

**Table 1**
Social Security Numbers of Military Officers Published by the U.S. Senate
(Retrievable from LexisNexis and Westlaw With A One-Line Command)



It is a well established principle of privacy protection that those who make social security numbers available, such as credit bureaus, must take steps to know their customer, validate the usage, and otherwise practice heightened security over this very sensitive information.

However, neither Westlaw nor LexisNexis takes any steps whatsoever to restrict access to this data. Both of the services are available for nonsecured access in law schools and libraries across the country. Federal law, best current practices, and the best interests of our military officers demand that Westlaw and LexisNexis take one of two steps:

- Redact the social security numbers.

*or*

- Implement significantly more stringent controls over access to this sensitive information.

### DoD and the U.S. Senate Are Remiss In Their Duty to Our Military Officers

As this situation has unfolded over the last few months of trying to get the government to act, we have had occasion to ask numerous former or current military officers who were promoted between 1970 and 1996 if they were aware of the practice of printing their social security numbers in the Congressional Record.

One officer said he was familiar with the practice. All the other officers had one of two reactions: "Lovely, I'm not surprised!" or "Oh, sh*t." Please pardon our language, but the latter response was received verbatim on numerous occasions. It is clear without a doubt that the vast majority of officers are not aware that they are at heightened risk of identity theft. It is also clear that when officers are notified of this information, they feel vulnerable and betrayed. They deserve better.

There are a series of concrete actions that the Department of Defense can take in conjunction with the U.S. Senate:

- Notify officers that they may be at heightened risk of identity theft.
- Offer credit counseling.
- Notify the credit bureaus of the breach and request heightened care.
- Apologize (a suggestion we heard from many of the officers we talked to).

In addition, I believe that it would be appropriate for the Secretary of Defense to request that the Superintendent of Documents notify the 1,249 members of the Federal Depository Library Program of the incident so that librarians across the country may take appropriate steps with their collections.

We realize these steps will cost money and require effort. However, these steps are necessary to remedy mistakes made in the past. It would not be right to simply continue to ignore this situation when a relatively modest effort would go a long way towards helping protect those who served our country so well during those 26 years.

I thank you for taking the time to consider this matter and hope to hear from you soon that steps are being taken in a timely and decisive manner.

Very truly yours,

**Carl Malamud**
Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.
Resource.Org, ou,
email=carl@media.org, c=US
Date: 2008.10.04 12:05:25 -07'00'

Carl Malamud
President & CEO
Public.Resource.Org

cc:    The Honorable Senator Dianne Feinstein
       The Honorable Congressman Robert A. Brady
       Edward A. Friedland, Deputy General Counsel, Thomson Corporation
       Ken Thompson, Global Chief Legal Officer, LexisNexis Group

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 110 of 165

# EXHIBIT K



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Public Works for a Better Government**

CONTAINS SENSITIVE MATERIALS—HANDLE WITH CARE

July 2, 2013

Office of Privacy, Governmental Liaison and Disclosure
Internal Revenue Service
Rebecca A. Chiaramida, Director
Room 7050 OS:P
1111 Constitution Ave. NW
Washington, DC 20224

U.S. Treasury Inspector General for Tax Administration (TIGTA)
U.S. Department of
Attn: Special Agent ████████████
P.O. Box 12398
Ogden, UT 84412

Dear Ms. Chiaramida and Special Agent ██████:

I am writing to inform you that the IRS web site has Social Security Numbers being displayed as part of your search application for Form 8871 and Form 887, covering political organizations filing under Section 527. The URL for this application on the irs.gov web site is:

http://forms.irs.gov/app/pod/basicSearch/search

The issue arises when Form SS–4, Application for Employer Identification Number is included with a Form 8871, Initial Notification of Section 527 Status. I am aware of the IRS position, as detailed in the December 19, 2012 notification on your web site, which reads:

> "Because the IRS is required to disclose approved exemption applications and information returns, exempt organizations should not include Social Security numbers on these forms. By law, with limited exceptions, the IRS has no authority to remove that information before making the forms publicly available. Documents subject to disclosure include attachments filed with the form and correspondence with the IRS about the filing."
> http://www.irs.gov/Charities–&–Non–Profits/Protect–Personal–Information:–Do–Not–Include–Social–Security–Numbers–on–Publicly–Disclosed–Forms

I disagree with the IRS position that you may not redact Protected Personal Information (PPI) before disclosing public filings as part of your commercial DVD subscription service. Irrespective of that, I think we can all agree that it is not proper for the United States government to be disclosing such information on your web site as such practices are prohibited under the Privacy Act of 1974 and the E-Government Act of 2002. These policies have been the subject of detailed guidance from the Office of Management and Budget and the President:

> "As is required by the Privacy Act, the Federal Information Security Management Act (FISMA), and other laws and policies, each agency must take appropriate steps necessary to protect personal information from unauthorized use, access, disclosure or sharing."
> Office of Management and Budget, M-05-08, Designation of Senior Agency Officials for Privacy
> http://www.whitehouse.gov/sites/default/files/omb/assets/OMB/memoranda/fy2005/m05-08.pdf

A very quick analysis of the government web site gives 10 examples of such information being disclosed. I have included the URL for the search result as a link, however please note that the IRS web site is broken and does not support permaURLs ("bookmarks") and instead requires the search to be re-executed.

| Organization | EID | Return | Date |
|---|---|---|---|
| ████████████ | █████████ | 8871 | 07/27/2002 |
| ████████████ | █████████ | 8871 | 09/08/2000 |
| ████████████ | █████████ | 8871 | 07/27/2002 |
| FRIENDS OF ████████ | █████████ | 8871 | 01/14/2003 |
| ████████████ | █████████ | 8871 | 03/06/2002 |
| ████████ CAMPAIGN FUND | █████████ | 8871 | 07/25/2002 |
| ████████████ | █████████ | 8871 | 08/11/2000 |
| ████████████ POLITICAL ACTION FUND | █████████ | 8872 | 10/20/2000 |
| ████████████ | █████████ | 8871 | 02/01/2001 |
| ████████████ | █████████ | 8871 | 08/10/2000 |

I hope you will take appropriate corrective action on these disclosures. While this report details only 10 such examples which I was able to find quickly using simple searches, the problem is more significant.

This assessment is because in the past we have been notified by organizations having hundreds of SSNs available in Section 527 reports. Because the IRS does not allow us to notify you when we find these problems, they don't fixed. For example, if you look at

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 112 of 165



m 887
(EID ██████ ), you will find ████████████ in that filing. If
you look at their subsequent filings, y ████████████████ 006.
Y ████ milar probl
████████ ) and the ████████████████████████
████████ ).

We were notified about the egregious ████████ breach on September 14, 2009
and promptly redacted the files. Why would ████████████████ web site
the home address and SSN of every single ████████████ when
we've known about this particular problem for over 5 years? Why is there no easy way
for people who find these problems to notify you?

We have the following recommendations to make on this issue:

Recommendation 1. While the IRS complies with the President's directive of appointing
a senior agency employee to handle privacy issues, it is exceedingly difficult to find
that employee and the only contact information is for U.S. Postal Service. At the very
least, you should have a fax number and an email address. It is not appropriate to hide
from the public for such an important task.

Recommendation 2. The IRS needs to take action about SSNs displayed on the
government web site. This is illegal and inappropriate. I believe you should pull the
entire site for now, but that is your decision to make.

Recommendation 3. The IRS needs to set up a mechanism for organizations such as
ours to notify you when systematic breaches are found. We have recommended that
the IRS join the privacy clearinghouse that GuideStar and Public.Resource.Org use to
exchange such information when we find disclosures.

Recommendation 4. The IRS really should strip out the SS-4 from filings. These are
optional attachments to the Form 8871 and 8872 and it would not be difficult to redact
this form as you do so many other forms that are not appropriate for disclosure.

Please don't hesitate to contact me if you have need for any additional information or if
we can provide any additional service.

Sincerely yours,



Digitally signed by Carl
Malamud
DN: cn=Carl Malamud,
o=Public.Resource.Org,
ou,
email=carl@media.org,
c=US
Date: 2013.07.02
08:44:16 -07'00'

Carl Malamud
Public.Resource.Org

CONTAINS SENSITIVE MATERIALS—HANDLE WITH CARE

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 113 of 165

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 114 of 165

# EXHIBIT L

# Congress of the United States
## Washington, DC 20515

July 15, 2013

Daniel Werfel
Acting Commissioner
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Dear Commissioner Werfel:

We are writing to express our serious concerns regarding reports that the Internal Revenue Service (IRS) permitted up to 100,000 Social Security numbers to be openly posted on government websites accessible to the public. Reports indicate that it wasn't until your agency was alerted earlier this month to the fact that a significant number of Social Security numbers were posted on IRS.gov that your agency removed public Web access to the records in question.

The American people are justifiably troubled by this further breach in privacy by your agency, based on the numerous concerns raised about the IRS over the past several weeks. These concerns form a consistent and disturbing pattern of mismanagement and unprofessionalism that is unbecoming of federal officials — especially those who are trusted to handle the sensitive, personal information of Americans. As such, we are seeking a full and accurate accounting of the exact circumstances surrounding the recent divulgence of Social Security numbers from individuals involved with Section 527 political organizations. We ask that you respond to the following questions:

- Who and what department within the IRS is responsible for maintaining the Section 527 database?

- What is the procedure for documenting and publishing the forms included in the database?

- It is our understanding that the IRS has taken the position that by law it cannot remove sensitive personal information before making it publicly available. How is this reconciled with the official statement of the Office of Management and Budget, which states: "As is required by the Privacy Act, the Federal Information Security Management Act (FISMA), and other laws and policies, each *agency must take appropriate steps necessary to protect personal information* from unauthorized use, access, disclosure or sharing" (Office of Management and Budget, M-05-08, Designation of Senior Agency Officials for Privacy).

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 116 of 165

- Is there a policy in place to address the situation when Social Security numbers are improperly disclosed on public filings? If not, will a policy be created in light of this situation? If so, will that policy be formulated by the IRS, or will another branch of government's oversight personnel be involved?

- Will the IRS be taking any actions to protect those individuals whose information was leaked? What is the potential risk for donors whose information was leaked, and will they be contacted regarding this issue? What recommendations would the IRS make for those individuals now at risk to actively protect themselves from identity theft or other types of fraud?

Thank you for your attention to this important matter. We look forward to your prompt response.

Sincerely,

Tom Latham

Pete Sessions

Marsha Blackburn

Gregg Harper

Rich Nugent

Virginia Foxx

Lee Terry

John Kline

Dave Loebsack

Jim Bridenstine

Andy Harris

Peter King

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 117 of 165

Jack Kingston

Chris Collins

Michael Turner

Leonard Lance

Markwayne Mullin

Gus Bilirakis

Steve Stivers

Steve King

Mike Simpson

Ron Kind

Mario Diaz-Balart

Billy Long

Steve Womack

Cory Gardner

Keith Rothfus

Matt Salmon

Austin Scott

Phil Gingrey

Ron DeSantis

Walter B. Jones

Bob Gibbs

George Holding

Sean Duffy

John J. Duncan, Jr.

Ken Calvert

Lynn Westmoreland

John Culberson

Jim Cooper

Scott Perry

Alan Nunnelee

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 119 of 165

John Shimkus

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 120 of 165

# EXHIBIT M

DAVE CAMP, MICHIGAN,
CHAIRMAN

SAM JOHNSON, TEXAS
KEVIN BRADY, TEXAS
PAUL RYAN, WISCONSIN
DEVIN NUNES, CALIFORNIA
PATRICK J. TIBERI, OHIO
DAVID G. REICHERT, WASHINGTON
CHARLES W. BOUSTANY, JR., LOUISIANA
PETER J. ROSKAM, ILLINOIS
JIM GERLACH, PENNSYLVANIA
TOM PRICE, GEORGIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
AARON SCHOCK, ILLINOIS
LYNN JENKINS, KANSAS
ERIK PAULSEN, MINNESOTA
KENNY MARCHANT, TEXAS
DIANE BLACK, TENNESSEE
TOM REED, NEW YORK
TODD YOUNG, INDIANA
MIKE KELLY, PENNSYLVANIA
TIM GRIFFIN, ARKANSAS
JIM RENACCI, OHIO

JENNIFER SAFAVIAN,
STAFF DIRECTOR

# Congress of the United States

## U.S. House of Representatives

### COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225-3625

Washington, DC 20515-6348

http://waysandmeans.house.gov

SANDER M. LEVIN, MICHIGAN, RANKING MEMBER
CHARLES B. RANGEL, NEW YORK
JIM MCDERMOTT, WASHINGTON
JOHN LEWIS, GEORGIA
RICHARD E. NEAL, MASSACHUSETTS
XAVIER BECERRA, CALIFORNIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL, JR., NEW JERSEY
JOSEPH CROWLEY, NEW YORK
ALLYSON SCHWARTZ, PENNSYLVANIA
DANNY K. DAVIS, ILLINOIS
LINDA SANCHEZ, CALIFORNIA

JANICE MAYS,
MINORITY CHIEF COUNSEL

July 23, 2013

Daniel Werfel
Principal Deputy Commissioner
Deputy Commissioner for Services and Enforcement
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Dear Mr. Werfel:

As the Chairmen of the Committee on Ways and Means Subcommittees on Oversight and Social Security, we are writing to inquire about recent reports that the Internal Revenue Service (IRS) accidently released thousands of Social Security numbers.

According to audits released by Public.resource.org, Social Security numbers were accidentally included on 990-T forms distributed by the IRS and posted on the agency's website on data for political nonprofits filing under Section 527 of the Internal Revenue Code. More than 2,000 Social Security numbers were released before the link was disabled. If true, these reports are especially concerning because the Committee's investigation of IRS targeting of Tea Party groups revealed that the IRS knew about this risk, but did not safeguard against it.

Documents received by the Committee include a speech delivered by then-Director of the Exempt Organizations Unit, Lois Lerner, to the Washington Non-Profit & Tax Conference on March 21, 2013. (See attached.) In the speech, Lerner acknowledges that Social Security numbers are at risk of inadvertent release under current agency practice, although she placed responsibility with applicants not the IRS. While I understand that the IRS makes approved applications for exempt status available for public examinations pursuant to Section 6104 IRC, it is incumbent on the IRS to do more to safeguard taxpayers from identity theft. According to the Taxpayer Advocate Service (TAS), it

received 26,354 identity theft cases between October 2012-March 2013. In the TAS Annual Report to Congress for 2012, the Taxpayer Advocate concluded that the IRS fails to help hundreds of thousands of identity theft victims, some of whom wait six months or longer for resolution. It is wrong for the IRS to at once fail to safeguard against a known identity theft risk and then fail to make its victims whole.

To assist the Committee in better understanding IRS's actions, we ask that you provide the following information by no later than August 6, 2013:

1. Since July 2008, how many individual Social Security numbers have been publicly released? Of these, how many individuals were victims of identity theft through tax fraud or otherwise?
2. In the attached speech Lerner seems to indicate that public admonitions not to include Social Security numbers and written notices on certain forms were the exclusive safeguards available to the agency to protect against identity theft. What other more robust safeguards has the IRS put in place? If there were regulatory or statutory impediments to implementing such safeguards did the IRS seek a rule or statutory change? If not, why not?
3. Are the above referenced audits of Public.resource.org materially accurate? If not, describe what the agency believes to be deficiencies in the reports.
4. To the extent the Public.resource.org reports are accurate, have you notified the affected taxpayers of their vulnerability to identity theft, not limited to tax fraud?

Please contact staff at: (202) 225-3625 if you have questions. Thank you in advance for your cooperation in this matter.

Sincerely,

CHARLES BOUSTANY, Jr., M.D.
Chairman
Subcommittee on Oversight

SAM JOHNSON
Chairman
Subcommittee on Social Security

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 122 of 165



*What follows are the March 21 remarks of Lois Lerner, Director, Exempt Organizations, as delivered to attendees of the annual Washington Non-Profit & Tax Conference.*

**Lerner:** These luncheon meetings are the best diet in the world for me because I can never eat before I give a talk. I would fall asleep halfway through the speech but enjoy your lunch.

My division headquarters moved to 900 North Capitol Street about a year and a couple of months ago into the new frontier that is known as NOMA. It's a little magical acronym that they put together to make us think it's a nicer place than it actually is. But they keep telling us the neighborhood's going to be better and I think that it probably will someday.

The one thing I like about it is we have much better office space than we had in our other office, so that's a plus, but there's no place to eat there. It's difficult to get a cab. I'm hearing today that there's a Starbucks but I haven't seen it yet, so I am going to take that news back.

In any event, we're at the corner of North Capitol and K Street. K Street is the dividing line. Nothing new has happened on K Street. It will eventually, but not in my area yet. So beyond my office, there are a lot of liquor stores right now and when the cab picked me up to come there, he had to go up a couple of blocks north before he could turn.

I thought, this just couldn't have happened if I had asked for it. I'm sitting at the traffic light and I'm looking at these signs that say in big, bold letters, "Owe the IRS? Pay without losing any of your money!" So if any of you would like the phone number to call, I'll give it to you afterwards because I haven't figured that one out yet myself.

3

IRSR0000005606

Before I start talking, my staff has asked me to ask you how many of you are signed up for our e-newsletter EO Update? Most of you. This is a good crowd. I was in Minneapolis and down in Florida last week before very big crowds and only a few hands went up. I think it's a really, really useful tool for practitioners and people who are working in this area. Usually you have to go online to sign up but today one of my staff people, Susan Ruth, is manning a booth here at the conference, so if you want to sign up for the EO Update, just go out and talk to Susan. She'll sign you right up and you'll be all set. As I said, it's a really good tool and you will appreciate it.

## The EO Workplan

Mostly I am going to talk about our workplan today and what is going on. I want to leave some time for questions at the end. Our workplan is really the tool that we use to be as transparent as possible with you. We ask for a lot of transparency from you and we want to be as transparent as we can.

So over the years, we've developed this workplan that lays out our projects, what we intend to do, what we're interested in, and I think it's been very well received by the sector. In fact, I think sometimes when we're late with it, we get a little bit of, hmm, what is going on, are they still going to do this? It does take a lot of people and a lot of time to put it together but we do think it's a really important piece of what we do.

So this year while we were putting it together, I'm thinking, gee, I think we've been a little remiss here in how we're doing this. We go out and we tell the sector that we're interested in this and we're going to do these projects and to you, it translates to, okay, for 2013, Lois's office is going to do X, Y and Z. So by 2014, she ought to be telling us what she found. That's not exactly how it works.

Most of my projects are very, very complex. They have lots of planning and lots of phases and almost never can we do the entire project within one calendar or fiscal year. And here's why. We start out by strategic planning. I've talked to you about that before. But then once we decide to do the project, we actually have to plan out how we're going to do it, who is going to do it, and how that is all going to work.

If we're going to have a questionnaire, we have to put people together to draft the questionnaire. If we are going to do exams, we need to put together statistical samples and we have to work with our research people to do that. We also sometimes have to do specialized training for our agents because they may be working in an area that we haven't looked at for a long time or we're trying to gather specific types of information and we want to be as consistent as we can on that.

We also have to gather data from inside the IRS and outside the IRS to put together case files so we can have a full picture of the organizations. We have to do some data analysis and issue identification and then we go ahead and conduct either a determination project or an examination project. And then when that's all done, we have to analyze the information and figure out how we're going to report that information out to you.

Add to that the fact that all the new projects have to be phased in to our already ongoing work. So it's pretty challenging and I don't think that we have done a good job explaining that to you, so what we're going to try to do going forward is give you a better sense of what we're going to accomplish in a particular year.

So, for example, maybe I announce that we're going to be looking at X issue, and in 2013 we might be developing the questionnaire. We will tell you in 2013, here's the larger issue. We're going to do a project in 2013, we'll be developing the questionnaire. Then the next year we'll tell you we're sending out the questionnaire and we're going to analyze it and report the results of our analysis. And then the following year we might say, we've done that and we're going to look at some organizations and do exams, and on and on and on.

I think chunking that out is going to make it less frustrating for you and for us because my folks work really,

4

IRSR0000005607

really hard and then they hear the sector saying, you aren't doing anything, we haven't heard anything about it, that's frustrating to you. On the other hand, from your perspective, well, gee, she told us four years ago she was going to do this and we haven't heard word one about it, did they forget? We didn't forget. It's just a lot of work and we're working on it.

## The Self-Declarer Project

My next topic is a very good segue into a project that's taking some time but you're going to see some results, and that is our 501(c)(4), (5) and (6) self-declarer project. We developed a project to look at these organizations. We've never taken a look at, in the same context, organizations that decide not to come in for recognition but instead self declare and start filing 990s.

Nothing wrong with that, it's just an area that we thought we ought to take a look at to make sure that they are doing things correctly, that they are self-declaring under the correct subsections, and that we understand better why they chose not to come in or if they're going to come in. Is there some kind of trajectory if an organization has been around a long time?

So, drum roll: this afternoon, Mr. Streckfus, at 2:00 pm, if you get the EO Update or you go on my website, you will see the (4), (5), (6) questionnaire. We're putting it up on the Web for all to see and we're doing this questionnaire slightly differently from past questionnaires.

We used to send the questionnaire out to you and you had to fill it out by hand. That was really terrible. It took you forever, it took us forever to analyze the results. We then went to sending a disk with the questionnaire and that was a little bit better but now we have a process whereby we can put the questionnaire up on the website, we can send you a PIN number so that only people with a PIN number can go in and fill out the questionnaire and we can get the results almost instantaneously.

But we want the rest of you who aren't getting that letter to know what's in the questionnaire so you can go to the website and there's also a non-fillable form so you know what we're asking. For those of you who get the EO Update, you'll get it directly. For those of you who don't, it's going on the website I think about 2:00 pm today. It's going to go to 1300 organizations, (4)s, (5)s and (6)s, who filed a 990 for tax year 2010 and 2011 indicating that they were an organization that did not come in for recognition. And we're asking lots of different things and I think you will find it very interesting.

How many of you have been involved with an organization that has received a compliance check questionnaire? Okay, not that many. We use the compliance check questionnaires because they enable us to gather lots of information either from a particular part of the sector or across the sector on a particular issue. They don't take the same kind of resources as an examination does but they give us a lot of information and they help us focus our resources for exam on the organizations that we really need to be looking at.

When we send them to organizations, the letter they get says, this is a questionnaire, it is not an exam. You don't have to fill it out. If you don't fill it out, we might refer you for exam, so we get about a 95% compliance rate [laughter]. I believe in carrots. I tell you that because that has been the case with every questionnaire we've used up to now and we've used many of them. The next project I am going to talk about, that's not what happened.

## The Group Ruling Questionnaire

The next project is the group ruling questionnaire, which we put out I think a month and a half ago. A couple of years ago our Advisory Committee to TEGE took on group rulings as its project. Group rulings allow a parent organization to come in, present the IRS with sort of a representative sample of what the subordinate

IRSR0000005608

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 126 of 165

organizations would look like. If we agree that they are exempt, we give the parent a group ruling and all the subordinates are also exempt by virtue of the parent's exemption and group ruling. The parent can add and subtract to that group ruling without having to come back to the IRS for permission to do so. This has gone on for many, many years.

In the context of automatic revocation, we saw some things that we thought were very disturbing. One was many, many, many subordinates in a group ruling being auto-revoked for failure to file for three years. Now, remember, the parent is responsible for general supervision and control of these organizations and in making sure that they follow these rules. So it was disturbing to us that there are all these subordinates not filing and losing their exemption.

The second thing that we saw that I thought was more interesting was that we've got about 4,000 non-church group ruling holders and about 220 of the parent organizations lost their exemption automatically because they didn't file for three years even though their subordinates were filing. So what's the impact on the subordinates?

The subordinates don't have their own exemption if they're a (c)(3). If they're a (c)(4), for example, they can hold themselves out, but the (c)(3) subordinates get their exemption by virtue of the parent having the group ruling. When the parent loses its exemption, the group ruling is dissolved. Even though the subordinates were doing what they were supposed to do, they find themselves in this very strange limbo land where they don't have exemption even though they've done everything right.

So, in light of those factors, we thought it's probably a good idea for us to put out a questionnaire to group ruling holders and find out what they're doing to meet their responsibilities as a parent, how they communicate to their subordinates, what kinds of things that they consider when allowing somebody to come into their ruling or go out of their ruling.

It's a quite extensive questionnaire and I think it's another one you might be interested in looking at. But what I found most interesting was we sent it out to about 2,000 central organizations, group ruling holders, not the subordinates, not churches, 2,000 parents received the questionnaire, were asked to fill it out with that same letter that we send to everybody. We said you don't have to, but if you don't, we might refer you for exam.

Out of those 2,000, 500 did not respond. That's a huge number, 25 percent, compared to the usual five percent. So we want to look behind that and we'll move to open exams for those organizations to see what lies behind their reluctance to fill out the questionnaire and also we'll end up gathering information that they could have given us on the questionnaires. So stay tuned for what we find in that area.

Just to manage expectations, for the responses to the questionnaire, we'll be able to analyze those pretty quickly, but the exams will take some time so you won't be hearing about the results of those for a couple of years.

## Auto-Revocation Update

Let's see what else there is. Some of you are really tired about hearing about the auto-revocation updates. I keep doing it because they do impact the rest of my work. As of March, we've had about 500,000 organizations that have shown up on the automatic revocation list for failure to file for three years. About 37,000 organizations have come back and requested reinstatement. What I find really interesting is about 44,500 private foundations were auto revoked for failure to file. That was a surprise to me. I did not expect that in the private foundation world. And about 400 of those have come back and regained their exemption.

So why is this important to you if you're not one of the people that is working with an organizations that has been automatically revoked? It's important because it has put some strain on our determinations process. In

6

addition to all the new organizations that are coming in and asking for recognition of their exemption, we have a significant number of really large organizations that have always had a filing requirement that are asking us for retroactive reinstatement.

Now, we put out two pieces of guidance when the automatic revocation came into play. We gave the small organizations that had to file a 990-N, and maybe really hadn't heard the news yet, a transition period where they could come in and pay us $100. If they met the criteria for exemption, we gave them retroactive recognition back to the date of their revocation. That was one-year only for those very small organizations.

In the other piece of guidance, we made it very clear that larger organizations that had had filing requirements and greater resources were going to have a much harder row to hoe in the context of getting retroactive reinstatement. We did not expect that we would get a lot of those requests, but we actually have because they need retroactive reinstatement not so much for the IRS but for many other reasons. So that has put a real strain on our resources. I know that you're all concerned that we're taking a very long time to deal with new applications, but that is one piece of the puzzle.

**Application Processing Backlog**

Another piece of the puzzle is our web page. How many of you go to look at the web page to see what's called "Where's my application?" to see where you might be? We put this web page out several years ago to try to give some sense of how long you might have to wait if you have an application pending. At that time, our process had two buckets. One was screening, which means if you come in and we look at your application and everything looks good to go, we approved it right away and that's great, you are okay.

If we can't do that because we need more information from you or we have to ask you some questions, then you have to get assigned to a revenue agent for more development on your case. Much of my staff was working on that piece and that was taking longer than it does now. What we've done is change the process to help move more cases out of the second bucket.

We have added an intermediate process. So as you go through screening, we might find that everything is okay except we need something that is missing in the documents in your application. Instead of having to assign that case out to a revenue agent to get that missing information, we hand it off to a lower level staff person who can reach out to you and as soon as the document comes in, they put it in the file and close the case, so you're then good to go.

Those screening cases I think accounted for about 70 percent of my closures last year and I believe the timeframe for those and don't quote me on this or hold me to this because I don't know the actual number but I think it was somewhere around 90 to 120 days. That's pretty good. That's a big piece of what we do.

The other piece is what is holding folks up and most people in this room probably are doing applications that go into those other categories. These are categories where for various reasons we need more information, perhaps the 1023 or 1024 wasn't filled out very well; it didn't have all the information we needed to make a decision.

Perhaps it's an issue that we have a focus group of people working on because it's a hard issue and it makes sense for us to have the same people doing it over and over again because then we're more consistent, there being a higher level of sophistication about the issues. So those kinds of things interfere with applications necessarily being processed as quickly as you might like. That's kind of the bad news part.

But the good news part is that page that we developed a couple of years ago to say, these are the buckets that you can fall into and here's about how long it takes, doesn't really make sense under our new process. So what we're doing right now is we're developing a new page to give you a better sense of where your application

7

IRSR0000005610

might really be. I can't give you specifics, but I can give you an overview. I think you're going to be probably pleased when you see what we've done. I think that hopefully will come out in the next month or two.

## Auto-Revocation Process Problems

A couple of other things that have happened in the automatic revocation process that I want to share with you because you may be dealing with it. One is what I call hijacked EINs. We have seen in this process large organizations, generally colleges and universities, but not always, that have other kinds of organizations in their ambit that hijacked the college and university or other organization's EIN and filed a 990-N with that EIN.

I have had some very high profile colleges come into me and say, I'm trying to file my 990 but it's bouncing back because somebody else has filed with my EIN already, and now everything in our system has been changed so that that EIN is reflecting the wrong name and address. That's not only a problem we have, but it's an IRS problem, and here's why.

You each have a Social Security number -- your Social Security number. Nobody else is supposed to use that Social Security number and you know if they do, there's a problem for you. It's the same with organizations. Their EIN is the same as their Social Security number. It's a unique identifier to each organization.

The problem is usually with small organizations, generally sororities and fraternities. In one case it was an ambulance society and they're just doing their little thing and they don't know better and they think, oh, we've got to fill this out, they want an EIN, I saw that on a piece of paper in the dean's office. I'll use it. No!

That is exactly what is happening. No one is doing anything with a bad motive, it's just kind of silly and creates lots of problems. If you have a client or an organization that is in that place, please contact my office. You can call the call site. They're going to contact my office anyway. We will work it through for you as quickly as we can. We don't want you to be in that situation.

In one case, it was very odd. I can't talk about names but the name that it got changed to was not even related to the educational organization. So our filing system, when you submit your tax forms with your Social Security number, the system is going to assume that that's really you unless there's something on there that tells us it isn't you.

The same thing happens with the EIN. When you submit something with an organization's EIN, and most of the time the name is somewhat close or it has that organization's name in it, my system is going to accept that. So if there is a problem, you need to let us know right away.

The system will in fact adjust the address because if you legitimately are sending in a form and you've changed your address, we should have the new address in our system. You file using your unique identifier so we think it's you. That's just the way automatic systems work.

I can't stress enough how if you have this problem don't roll your eyes and say, oh, I can't believe the IRS. It is the way it works. You need to come in and we'll fix it. Also, please take the opportunity to tell these small organizations what the EIN is for and how they're creating havoc.

The other thing that I learned just two days ago about self-declarers is a rule under automatic revocation, and this is the law, not me, if the organization is automatically revoked, the only way it can get its exemption back is to apply for reinstatement through the application process even if it didn't have to do that the first time. So those (c)(4)s, (c)(5)s, (c)(6)s, (c)whatevers that didn't have to apply but are holding themselves out, if they are auto-revoked, they now have to apply to come back in.

8

IRSR0000005611

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 129 of 165

Those group ruling subordinates that didn't have their own ruling but didn't file and got automatically revoked cannot just be pulled back into a group ruling. Instead, they have to come in and apply. I found this out by accident because somebody came to ask me a question and she said, she's a grantor, I want to grant some money to this new small organization but they're part of a group ruling and the group ruling parent has not yet sent in its annual list of whose in the group ruling, so you don't have anything on your record about this organization.

We got to chatting about it and she wanted to know their foundation status and other things. I asked her a few questions and she said, well, they had been automatically revoked. So I said, oh well, the group ruling parent can't take a sub that's been automatically revoked and bring it back into the group ruling and if you try to do that, when we look at the information that you're presenting us, we will see that it was automatically revoked and we will not include it on the group ruling roster, at which time she said, oh no, it wasn't part of the group ruling, it had its own (c)(3) status before it was automatically revoked and so it didn't want to go back into the IRS so we got a new EIN and asked the group ruling holder to bring it back inside the group ruling.

So all of you people who think that all EOs are really good and why do we even have my office, it's this kind of stuff that goes on. So these are people who are trying to circumvent the group ruling rules, while all of you are saying it's taking forever for my application to go through and these people are screwing around. That's going on and I don't know if it's purposeful, but I do know that it's important for people to understand getting a new EIN is not the answer. It's like getting a Social Security number, they're very easy to get. You can get one, we'll enter it in our system but when we actually start looking and you've got two EINs, and one of them is revoked, unless you came back in, the other is not going to be legitimate in terms of your status. So keep that in mind.

## Social Security Numbers

That reminds me that last year I was talking a lot about Social Security numbers on 990s. I won't give you the lecture again because I did it last year but basically *The Chronicle of Philanthropy* did a big study showing that a lot of Social Security numbers were on the 990s. We cannot redact Social Security numbers on the 990s unless they're on the Schedule B. Legally, the only think we can redact is Schedule B. We do have a process when we see them, we put them on disk and we sell them to folks [laughter] -- not the Social Security numbers, the 990s.

We do put a notice when we're selling them to purchasers of a disk saying there is personal information such as Social Security numbers on the disk, so you may want to redact them, before you make it public, but we don't have any control over their doing that. So that's a reminder. I don't think it's happening anymore. Most of the personal data was I think pre-2009. I don't think it's happening so much on the new 990 but just in case, do be careful.

For the instructions for tax year 2012 we have put a reminder notice on the 990, 990-EZ, 990-PF, 5227, 990-T, 1023, and 1024, and we'll be adding that wording to the heading of sections on all of those forms in 2013. We're trying to do our part. Just remind your clients this is something beyond our control and they're not going to want it out there for all to see.

## Interactive Form 1023

One of the other good things I need to talk about is another piece going back to the determination process because we are constantly trying to save time in our process and move more quickly. It's just really hard to do because we don't know what we're going to get in at the beginning of the year. I don't mean just numbers but types of applications.

9

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 130 of 165

Many of you over the years have heard me talk about Cyber Assistant, which was a tool that we were trying to design to make it easier for organizations to fill out their 1023 online in the hope that we would get better information in the 1023s and more cases could be screened out. We were also hoping ultimately that they could file electronically. That wasn't part of the first part but we really did want this interactive form that would make it easier for organizations to fill out the application form.

This was probably eight or nine years ago when we started down that road. Unfortunately, we ran into a whole bunch of IT problems with the product. It worked inside but it didn't work outside. It was going to cost an enormous amount of money to do it so we really haven't been focusing on that.

However, here's the good news. Last year my Advisory Committee decided to look at the 1023 as their project. If you haven't looked at that report, you might want to look at it. All very, very good ideas about making it electronic, having electronic filing, having approved ones electronically available, all kinds of records. I don't oppose any of those ideas but they all cost time and money. And so I don't know when those pieces are going to happen. But one thing they did say was make available the educational materials from when you were doing the Cyber Assistant. Is there some way we can post that educational material? So we said we will look into it.

Well, as you all know, the IT world moves very quickly and some things that were absolutely impossible or very costly four years ago, it's sort of like buying an iPhone or whatever. When it first comes out people run down to the store and pay a lot of money. A couple of years later, it's much more affordable. So the same thing happens in my world and we looked into it and for a much, much smaller cost, we were able to use that information. We're working with a vendor right now to put together an interactive 1023.

Our Advisory Committee has already reviewed it and made comments. It's looking really, really good. You know I hate to give you timeframes for when things are going to come out. But we're really shooting for this thing to come out in the summer. Don't hold me to the summer because my mantra is everything takes longer than you think, if anything can go wrong, it will, and everything is harder than you might imagine. But I really do think you're going to see this before the end of the fiscal year. I think it will be very helpful to you and very helpful to us. So thank you for that and now I will take questions.

**Attendee:** Do you see sequestration affecting your your group's ability to continue doing the job that it has been doing?

**Lerner:** The question is whether sequestration is going to affect our ability to do our work. I think sequestration is going to affect every government agency's ability to do its work. We will all be effected in different places but it is a huge cut in money that we all have to make which means I spend a lot of my day with other executives in the IRS looking at where we can save funding so that we can minimize the furlough days that our people will have to take and then there's other things as well, but we are each given a certain amount that we must cut from our budget. You may not know this but sequestration isn't just IRS you need to cut whatever the percentage is. It's each program within each agency that has to cut a particular percentage. So we will actually be cutting and we'll look at that and work with that and try to do the best we can.

**Attendee:** We have a subordinate that was automatically revoked. They've reapplied and been reinstated. Can you subsequently add them back to the group exemption?

**Lerner:** You can, but I will tell you one thing that we are doing. We are explaining in the letter to the subordinates, now that you have your own exemption, you don't have to be part of the group exemption for my purposes. You may want to be part of that group and retain your exemption. Are you willing to tell me what your group is or what kind of group it is?

**Attendee:** It's a medical association.

IRSR0000005613

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 131 of 165

**Lerner:** Okay, so they could still be part of your medical association without being a part of your group ruling. That may take away some headaches for you because you don't have to oversee whether they're filing and all that good stuff. And from their perspective, they're in the system; if they're (c)(3)s, they're on Pub 78 and all of that stuff, and we will communicate with them in the event there's another legal change that has implication for them.

So we're just letting people know that. It's obviously their choice but in many ways I think it benefits the parent because I have heard absolute horror stories when I go around and talk to group ruling holders who say: "Well, they won't listen to me." Then I say: "What do you want me to do about that?" The way I describe it is, they're like teenagers under 18 and so you're responsible. But once they have their own exemption, they're over 18 and you can kick them out of the house, or you can keep them in the house but you're no longer responsible.

**Attendee:** There was talk about doing away with group filings. Has there been any further developments?

**Lerner:** She's asking me about one of the recommendations in the ACT report that we should get rid of the ability for a group 990 filing. So, if you're in a group, the parent has to file. A parent can also file a group return on behalf of all the subordinates or some of the subordinates or it doesn't have to file a return on behalf of any subordinates.

Sometimes I think I don't know how these rules came about. They don't make any sense in our modern world, and I think that's what the ACT's recommendation was. In terms of the modern world we live in, more transparency and all of you having to fill out these 990s and explaining what is going on in a lot of detail in their organizations, why should a group ruling holder get a better deal than you have? It doesn't make sense for transparency. So that's one of the things we're looking at. I think we want to get more information about what is really going on behind the scenes and so we are using a questionnaire. So, in other words, a learning process.

**Attendee:** Would you talk about some of the questions on the self-declarer's questionnaire?

**Lerner:** No. It's a very broad questionnaire. You need to go look at it. It's big. It's a lot of things. As I said, one of the reasons we did this was because we were looking at some of these 990s and the activities of organizations that were filing under particular subsections. And it wasn't clear to us that they had really selected the right subsection, not that they couldn't be exempt, but that they were doing things that their chosen Code section wasn't the right Code section for them. We're also interested in why some choose to go ahead and apply and others don't. We also interested in, as I said, if you start out with not applying when you're pretty small and as you grow you decide you want to apply.

Just for informational purposes, the reason an organization might want to apply is to have reliance on the letter they get from the IRS. If they think they're doing everything right within their subsection, they don't need that. The only time they're going to need it is when the IRS comes knocking on your door and says, gee, we're auditing you and we have no clue why you think you're exempt because you're not.

You don't have any reliance, there's no letter to say I told the IRS and the IRS said you're good to go. That's the only distinction. I don't want to give the impression that you're bad if you don't apply and you're good if you do. The law allows for both, we're just curious about it. So it's a broad range of questions and these are all 990 filers so we're not talking about those who don't have to file.

**Attendee:** Do you have any issues with identity theft since the 990 is a public document. People know the EIN, the address, the board. Is there any thought maybe to redacting the EIN off the 990 before it's made public?

**Lerner:** The IRS has no authority under the statute to redact anything from the 990 except the Schedule B

11

IRSR0000005614

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 132 of 165

donor information. Technically, what we should be doing is redacting all of the identifying information and putting the Schedule B out. If somebody asks me for a Schedule B without the identifying information, I would give them a Schedule B with the amounts of the contributions and nothing else. But for our purposes, to avoid getting stuff out there that wasn't intended, because remember this is a process, we've got 1.5 million organizations filing and this stuff comes in, people are going through it, it's a very big process. To avoid protected information going out more often than we would like, which is really zero, we take the entire Schedule B off, but we have no authority to redact anything else. It would have to be a statutory change.

**Attendee:** \*\*\*

**Lerner:** She's asking if you are a group ruling holder, then once a year we send you a list of the information we have about your group. It's your job to say no, no, no, these guys aren't here any more and these are our new ones. And that's done with pen and paper, and she's asking me if there are any plans to make that electronic.

I would just say that there are plans for the IRS to make everything electronic; the question is when. Lots and lots of IRS people are chasing the same IT resources so I can't tell you when it's going to happen. I know it will make it easier for all of us. Would it help if we sent it to you on a disk? I don't know if we could do that. I will take that back and maybe have some discussions with others.

**Attendee:** Any update on the college and university final report?

**Lerner:** Thank you for asking that question, which I wanted to discuss. The question is, is there an update on the colleges and universities report? That's another one that's been going on for a while and you're thinking we're kind of snoozing, what the heck are you doing, taking so long?

We put out a questionnaire to about 400, 500 colleges asking about lots of things, their demographics, their endowments, their compensation packages, UBIT issues, and we got a lot of information and we put it out in a first report I think probably two and one half years ago about that, it might be longer. We also decided that we were going to do some examinations on two issues, one with UBIT, one with compensation. We always look at compensation, it's a continuing thing for us.

What we saw in the questionnaires was that most organizations said that they tried to use the rebuttable presumption to set their compensation and we heard that over and over again but we've also seen some very interesting comparable information as we go through this. So in the colleges and universities, I think we probably told everybody we're going to look behind the comparables. Are they really comparable? What are we seeing there?

In the UBIT area, we saw lots and lots of activities being characterized as unrelated by some colleges and universities and related by others. It doesn't mean one is right and one is wrong, but we wanted to look behind that and see what were the facts and circumstances, were these really related activities or if they were unrelated, how come nobody ever has to pay any taxes on them? So those are the two things we're going to be doing.

These are large organizations and they take a long time for us to get through the exams, but I am not going to predict today, but I can say I think you will be seeing some reporting out on this hopefully by the end of this fiscal year. We have a review process on this obviously but I don't have control over that, but we'll put something together soon. Anything else? Well, thank you very much. I appreciate the opportunity to speak to you. And please sign up for our EO Update.

IRSR0000005615

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 133 of 165

# EXHIBIT N

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 134 of 165



**COMMISSIONER**

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

September 16, 2013

The Honorable Tom Latham
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Latham:

I am responding to your letter dated July 15, 2013, in which you and several members of Congress expressed concern about Social Security Numbers (SSNs) posted on our publicly accessible Political Organization Filing and Disclosure (POFD) database. You asked for an accounting of the circumstances surrounding the divulgence of SSNs on the POFD database.

By way of background, there are statutory provisions which require the IRS to publicly disclose the filings of section 527 political organizations (Title 26 of the United States Code sections 527(k) and 6104). In order to satisfy these statutory provisions, and based on longstanding procedures, the filings of the 527 political organizations received by the IRS were posted to the POFD database available on our website, www.irs.gov.

The previous position of the IRS was that there was no authority to withhold information contained in these filings from the public. The Treasury Inspector General for Tax Administration (TIGTA) reached the same conclusion in a 2012 report on this issue (TIGTA Reference Number 2012-10-046).

However, given the ongoing problems with identity theft, we have revisited our earlier position. We now believe that our obligation to publicly disclose the filings of 527 political organizations under sections 6104 and 527 is limited to the information that the Internal Revenue Code (the Code) requires. Because we do not require 527 political organizations to provide SSNs under the Code, we have the authority to redact this information before the filings become publicly available.

In July, the IRS received specific information that some section 527 political organizations improperly included SSNs in their filings. Because of our concerns regarding taxpayer privacy and the prevention of identity theft, we temporarily removed public access to the POFD database with these filings.

This summer, we worked aggressively to review the filings in the POFD database. Our internal review indicates that, despite frequent and routine reminders from us to the public during our outreach speeches and through our electronic newsletter, *EO Updates*, some section 527 political organizations improperly included SSNs on their filings. Most of the issues with SSNs involved older paper, i.e., hard copy filings

from 527 political organizations. Our internal review indicates that there is very low risk of SSNs being improperly included in new paper filings and electronic filings from 527 political organizations.

To be clear, the IRS frequently reminds section 527 political organizations not to provide the SSNs of their contributors. In addition, the POFD electronic filing application does not allow the 527 filer to upload or include attachments. The electronic filer is prompted to complete each specific field, and no field exists that requests SSNs.

Please find below my responses to your questions based on the information we have gathered to date.

**Question 1: Who and what department within the IRS is responsible for maintaining the Section 527 database?**

The Tax Exempt and Government Entities Division is responsible for maintaining the POFD database.

**Question 2: What is the procedure for documenting and publishing the forms included in the database?**

We post electronic filings made by section 527 political organizations to the POFD database automatically and almost immediately after they complete their filings. We image paper filings in Ogden, Utah, and then load them onto the database.

**Question 3: It is our understanding that the IRS has taken the position that by law it cannot remove sensitive personal information before making it publicly available. How is this reconciled with the official statement of the Office of Management and Budget, which states: As is required by the Privacy Act, the Federal Information Security Management Act (FISMA), and other laws and policies, *each agency must take appropriate steps necessary to protect personal information* from unauthorized use, access, disclosure or sharing"? (Office of Management and Budget, M-05-08, Designation of Senior Agency Officials for Privacy).**

Your understanding of the historical position of the IRS is correct. As stated above, we now believe that our obligation to publicly disclose the filings of 527 political organizations under sections 6104 and 527 is limited to the information that the Code requires. Because we do not require 527 political organizations to provide SSNs under the Code, we have the authority to redact this information before the filings become publicly available.

Importantly, I note that our position that public access to the filings of exempt organizations as provided by the IRS under sections 6104 and 527 of the Code, including those filings that included SSNs, is not an unauthorized disclosure under section 6103, the Privacy Act, the E-Government Act of 2002 or FISMA.

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 135 of 165

**Question 4: Is there a policy in place to address the situation when SSNs are improperly disclosed on public filings? If not, will a policy be created in light of this situation? If so, will that policy be formulated by the IRS, or will another branch of government's oversight personnel be involved?**

As discussed above, and in the abundance of caution, we have temporarily removed the POFD database from our website. We anticipate re-launching the database this fall at a date to be determined. As noted above, our internal review indicates that there is a very low risk of SSNs being improperly included in new paper filings and electronic filings from 527 political organizations. Given the very low risk, the IRS will post filings made electronically by 527 political organizations on the database without review. In the short term, despite the very low risk, the IRS will review new paper filings made by 527 political organizations and redact any SSNs found. Reviewing new paper filings made by 527 political organizations is possible in part because of the relatively low number of these types of filings we receive annually.

As a longer term solution, moving forward, we will periodically conduct a statistically valid sample of all new filings (both electronic and paper) made by 527 political organizations to ensure that the risk of SSN inclusion remains low. Based on this review, the IRS will periodically reassess its decision.

**Question 5: Will the IRS be taking any actions to protect those individuals whose information was leaked? What is the potential risk for donors whose information was leaked, and will they be contacted regarding this issue? What recommendations would the IRS make for those individuals now at risk to actively protect themselves from identity theft or other types of fraud?**

We have sought to warn tax practitioners and exempt organizations about the risks of including SSNs on filings that will be made public and we will continue to do so. While we have no direct indication that anyone has fraudulently used the information for identity theft purposes, we have several places on our website where individuals can find information on steps to protect themselves. Additionally, we will continue to partner with exempt organizations and the public to minimize the risk of identity theft while meeting our important, statutory disclosure requirements for section 527 political organizations.

I am also writing to your colleagues. If you have any questions, please contact me or a member of your staff may contact Catherine Barré, Director, Legislative Affairs, at (202) 622-3720.

Sincerely,

Daniel I. Werfel
Acting Commissioner

# EXHIBIT O



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

## Public Works for a Better Government

July 7, 2014

Honorable John Koskinen, Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC 20224-0002

Dear Commissioner Koskinen:

You will find enclosed a USB Flash Drive containing 9,392 Form 990 information returns of exempt organizations purchased from the IRS that include Social Security Numbers (SSNs). The returns have all been redacted on the enclosed drive as well as on our copy of the data on our servers. We have also notified GuideStar, the Foundation Center, and the Economic Research Institute of these results.

Let me first state that I realize you have many fundamental and important issues to deal with since your very recent assumption of duties as Commissioner of the Internal Revenue Service. The Exempt Organizations group has had numerous problems, and I know you are dealing with those as well as severe budget constraints and numerous investigations. Let me also convey my personal thanks for your long record of integrity and competence in your decades of public service.

As you have seen with the recent issues of e-mail preservation, the proper use of Information Technology is a core issue at the Internal Revenue Service. The Exempt Organizations database is simply yet another example of that fundamental problem. However, the Exempt Organizations database is more than just another computer system, it is a vital source of market information for one of our most important economic sectors.

Under 26 USC §6104, Congress has mandated the "publicity of information required from certain exempt organizations," a mandate that dates back to 1958 (72 Stat. 1660). The Exempt Organizations database plays the same role for the nonprofit sector that the SEC EDGAR database plays for our public markets and the Patent database plays for our intellectual property marketplace. The information helps direct investment and makes the sector more accountable. The law requires that you distribute this database.

However, the law is also very specific that knowingly distributing a database that contains hundreds of thousands of Social Security Numbers is illegal. The IRS has chosen in the past to ignore the problem, although everybody I've talked to at the IRS, Treasury, and Congressional staff have readily acknowledged that the problem exists. I have heard a number of convoluted explanations as to why the IRS cannot deal with this massive privacy breach. None of those explanations are convincing.

For the last two years, I have spent considerable time working on this database, including personally processing 7,634,050 Form 990s on over 2,000 DVDs. For the last two years, I've worked on the privacy problems and have made considerable progress. However, despite an inordinate number of letters to you, your predecessors, their staff, your Inspector General, and open government staff at Treasury and the White House, the IRS has simply refused to take any steps to fix the exempt organizations database.

This is not a technology problem, this is a people problem, and I would strongly urge the IRS to reach out and ask for help. Chief Technology Officer Todd Park, Chief Information Officer Steven VanRoekel, Archivist of the United States David Ferriero, and numerous other officials are familiar with technology and are in a position to help you bring in outside resources.

The Exempt Organizations database is crying out for modernization. The issue of detection and redaction of SSNs is an interesting computer science problem and I'm sure you could some very talented assistance in academia. The President has directed you and all other agencies to move towards machine-processable data and to undertake a number of open government initiatives, and release of the e-file versions of the Form 990 is clearly covered under those directives.

There are some very simple steps you can take that would have an immense impact on our nonprofit sector:

- Clean up SSNs in your existing database and put procedures in place to screen incoming returns and outgoing data feeds for potential problems. Put in place a feedback loop so people can notify you when problems are found.

- Stop distributing the database as a series of DVDs for $2900 per year as low-resolution TIFF images. There is no excuse not to distribute the data in bulk online and certainly no excuse not to have PDF files for each return on the IRS web site for individual and bulk access.

- Because you need to stop selling the existing database while you clean it up, this is an ideal time to release e-file data for large organizations, a release that would be immensely popular and of great use to Internet services, charity sites, grant-giving foundations, and law enforcement personnel.

Please ask somebody to help you. The IRS can do amazingly good work and has some very talented and dedicated staff. I know you have severe resource constraints. But, tough times demand more action not less. You can help your staff in their mission by bringing in any number of outside resources that share your goal of a more effective and transparent nonprofit marketplace and begin playing offense instead of defense.

Please don't hesitate to contact me if I may provide you with additional information.

Best regards,


Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.Resource.Org, ou, email=carl@media.org, c=US
Date: 2014.07.07 07:56:20 -07'00'

Carl Malamud
Public.Resource.Org



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

### Public Works for a Better Government

July 7, 2014

Mr. J. Russell George, Inspector General
Treasury Inspector General for Tax Administration
1401 H Street, NW, Suite 469
Washington, DC 20005

Dear Mr. George:

You will find enclosed a USB Flash Drive containing 9,392 Form 990 information returns of exempt organizations purchased from the IRS that include Social Security Numbers (SSNs). The returns have all been redacted on the enclosed drive as well as on our copy of the data on our servers. We have also notified GuideStar, the Foundation Center, and the Economic Research Institute of these results.

I am writing to you because I believe distribution and sale of the Form 990 by the IRS with full knowledge that they contain a large number of SSNs is against the law. As Congressmen Boustany and Johnson stated in a July 23, 2013 letter to Mr. Werfel, Ms. Lois Lerner stated the following in a speech on March 21, 2013:

> *That reminds me that last year I was talking a lot about Social security numbers on 990s. I won't give you the lecture again because I did it last year but basically The Chronicle of Philanthropy did a big study showing that a lot of Social Security Numbers were on the 990s. We cannot redact Social Security numbers on the 990s unless they are on the Schedule B. Legally, the only thing we can redact is Schedule B. We do have a process when we see them, we put them on disk and we sell them to folks [laughter] -- not the Social Security numbers, the 990s.*

> *We do put a notice when we're selling them to purchasers of a disk saying there is personal information such as Social Security numbers on the disk, so you may want to redact them, before you make it public, but we don't have any control over their doing that. So that's a reminder. I don't think it's happening anymore. Most of the personal data was I think pre-2009.*

Let's unpack those statements. I spoke with Ms. Lerner and Mr. Joseph A. Grant, Deputy Commissioner of the Tax Exempt and Government Entities Division, on September 20, 2012 and we discussed at length the issue of ongoing release of SSNs. As you can also see from the enclosed audit, the problem continues to this day. Ms. Lerner's statement was not true and she knew that when she gave that speech. Ms. Lerner also states that a notice is furnished to purchasers of the disks warning them of SSNs. I've been purchasing these disks since 2008 and I have never seen such a notice. That statement is also not true.

Ms. Lerner goes on to state that the IRS cannot redact SSNs because under the law they do not have that authority. However, in my July 2, 2013 audit of the Section 527

database, I informed you of a large number of SSNs on the irs.gov web site, which resulted in a July 15, 2013 letter of inquiry to Acting Commissioner Werfel from 42 members of Congress. In his September 16, 2013 response, Acting Commissioner Werfel stated "we have the authority to redact this information before the filings become publicly available." That resulted in the December 6, 2013 changes to Section 3.20.13.3.2 of the Internal Revenue Manual with instructions to redact SSNs, but only for Section 527 political organizations.

The continued sale of the Form 990 with full knowledge that they contain SSNs is a clear violation of 26 USC §6103, which guards against the disclosure of confidential tax information. As IRS Publication 4761 ("Protecting Federal Tax Information for Government Employees") states, "the definition of return information includes...any information, besides the return itself, that IRS obtained from any source" and thus clearly includes any attachments to the Form 990, whether required or not.

IRS Publication 1075 ("Tax Information Security Guidelines") is explicit that Social Security Numbers are covered under the definition of Federal Taxpayer Information (FTI). Willful violation of these prohibitions by a federal employee is a felony under 26 USC §7213, punishable by a fine of up to $5,000 or up to five years in jail, or both.

I have heard a number of reasons advanced as to why the IRS does not reject returns with SSNs or redact them when they find them. One is Ms. Lerner's assertion that redaction would be altering a federal document which would be illegal. That is, of course, nonsense. A second is that if the IRS starts redacting returns, but misses some of the SSNs, that would somehow increase liability, and therefore a better solution is to ignore the problem altogether. A more practical solution would consist of 3 steps:

- When a return is received, if it obviously contains SSNs, reject the return as you would a return with a missing signature. Obvious examples are a set of Form W–2 or Form 1099 reports attached to the end of a return.

- Do a rudimentary scan of returns before distributing the monthly feeds. This won't catch all SSNs, but it will certainly find egregious breaches, such as the 275–page listing of scholarship winners, their home address, and their SSN published by a private foundation.

- Provide a place where individuals may notify the IRS when they see an SSN.

Continued distribution of the Exempt Organization database with full knowledge that it contains numerous privacy breaches is illegal and is exposing IRS staff to criminal liability. The practice must be stopped.

Please don't hesitate to contact me if I may provide you with additional information.

Best regards,



Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.Resource.Org, ou, email=carl@media.org, c=US
Date: 2014.07.07 07:56:20 -07'00'

Carl Malamud
Public.Resource.Org



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

## Public Works for a Better Government

July 7, 2014

Honorable David Ferriero
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Avenue, N.W.
Washington, D.C. 20408

Dear Archivist Ferriero:

You will find enclosed a USB Flash Drive containing 9,392 Form 990 information returns of exempt organizations purchased from the IRS that include Social Security Numbers (SSNs). The returns have all been redacted on the enclosed drive as well as on the copy of the data on our servers. We have also notified GuideStar, the Foundation Center, and the Economic Research Institute of these results.

I am providing this information to you for two reasons. First, because the Form 990 is a federal record and is ultimately stored in your facilities, it is important that you know that the information on some of these returns violates the provisions of 26 USC §6103 which prohibits the disclosure by federal employees of private information such as Social Security Numbers. I hope you will also consider the enclosed drive as a federal record and preserve it in the National Archives.

The second reason I am writing to you is that I believe the issues in the Exempt Organizations group at the IRS is indicative of a broader problem of records management in the federal government. Recent controversy over the preservation of email is only the tip of an iceberg that reaches into the overall information technology practices of the IRS. These practices are not atypical of other federal agencies and I believe they impact your ability to carry out your responsibilities under the Federal Records Act, the Administrative Procedures Act, and other relevant statutes.

The records management issues with the Exempt Organizations database start at the point of ingest, where low–resolution scans are made of incoming paper returns. E-filed returns are also immediately transformed into low–resolution bitmaps. It is unclear to me in examining the IRS Records Control Schedules if they are providing to you the electronic version of the e–filed information. It is also my understanding that the IRS maintains a 7–year archive of Exempt Organization returns.

Since e–filing for exempt organizations started in 2008, two questions come to mind. First, will the IRS be furnishing you e–filed returns in MEF format as part of the archiving process? Second, if you do receive e–file data, is there a procedure for Public.Resource.Org to obtain that information in electronic form for the 2008 releases, data that I believe you will be receiving shortly?

The system for processing the Exempt Organization returns is based on Windows XP, an unsupported operating system from Microsoft, with a complex Oracle application which is inappropriate for such a simple document processing task. The end result is that the records you are required to preserve may or may not be available. Likewise, as you saw with the recent email issue, existing procedures resulted in the destruction of federal records and a failure to notify you of that loss.

My point is that I believe the National Archives needs to reach beyond a narrow definition of records management and beginning providing advice and counsel on a broader basis, such as how agencies can preserve their email without relying on individuals to print out documents. Such a more expansive view of your role can be found in the actions of your predecessor, Archivist Robert D.W. Connor, who not only established the National Archives but also spent considerable time working across the entire government to change the way agencies managed records.

Today, the issue of records management is tied into the issue of appropriate use of Information Technology. We've seen countless examples of IT projects so poorly designed they don't meet the needs of the agencies in carrying out their mission. If the agency can't carry out their mission, they certainly are not managing their records properly, making your job impossible. You've seen those fiascos at Healthcare.Gov, we're seeing that now at the Veterans' Administration, and you experienced it personally with the Electronic Records Archives system at NARA.

Archivist Connor provided leadership across the government, going so far as to ask President Roosevelt to convene a meeting of the heads of all the agencies to discuss what in those days would be considered a technical and clerical set of tasks. Today, Information Technology has that same geeky feel, but the time is right to get even the most senior policy makers to understand that improper use of IT is crippling our civil service and making the job of the Archivist difficult if not impossible.

I would thus strongly encourage you to take a leadership role in IT reform, using your position to get your peers who head other agencies to take the issue seriously. For a start, perhaps you could reach out to Commissioner Koskinen, who I know would appreciate any help he can get in sorting through the Exempt Organizations database.

In particular, the Commissioner might find instructive your experience at the Office of the Federal Register, which was able to switch from an antiquated system for publishing the Official Journals of Government to a much nicer system that was created by volunteers as an open source project, and then hosted in the cloud until OFR developed the expertise to fully take the system over. The IRS could do the same thing.

Please don't hesitate to contact me if I may provide you with additional information.

Best regards,



Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.Resource.Org, ou, email=carl@media.org, c=US
Date: 2014.07.07 07:56:20 -07'00'

Carl Malamud
Public.Resource.Org



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Public Works for a Better Government**

July 7, 2014

Honorable Jacob J. Lew
Attn: Mr. Adewale Adeymo
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

Dear Secretary Lew:

You will find enclosed a USB Flash Drive containing 9,392 Form 990 information returns of exempt organizations purchased from the IRS that include Social Security Numbers (SSNs). The returns have all been redacted on the enclosed drive as well as on the copy of the data on our servers. We have also notified GuideStar, the Foundation Center, and the Economic Research Institute of these results.

It is imperative that the Department of the Treasury take immediate steps to stem the breach of Social Security Numbers available for sale from the IRS, a breach that affects schoolchildren, veterans, community leaders, and others whose personal identity information is being recklessly distributed by the government.

There are some simple steps that the IRS should take:

- Temporarily stop selling the existing backfile and clean it up. This is what the IRS did with the Section 527 Political Organizations database after we discovered similar issues. This is not hard and it needs to be done.

- Start screening incoming returns for obvious SSNs and issue a warning or reject a filing with suspected SSNs. Likewise, the outgoing monthly bulk feed needs to be screened for obvious errors.

- Nobody can find all problems and people will continue to screw up their filings, so the IRS needs to provide a feedback loop where groups such as mine as well as individuals who find problems can contact the IRS and let them know.

- The IRS could easily participate in the privacy clearinghouse that we maintain with our colleagues at other organizations that work with the bulk data.

While these simple steps can help deal with the privacy issues, I believe there is an opportunity here that you should seize. While the IRS pulls the existing backfile to be cleaned up, you can get the e-file version of the database ready for immediate release. Instead of continuing to play defense, this is an opportunity to do something positive.

Currently, the IRS requires e-filing for all large exempt organizations and makes it optional for smaller ones. Under your Fiscal Year 2015 Revenue Proposals, you have requested that the Congress authorize mandatory e-filing as well as the release of that information "in a machine readable format in a timely manner, as provided in

regulations." However, that proposal would have a 3-year transition period after enactment, and there would be additional delays based on notice and comment periods for the regulations. Your current plan does something in 5 years, but you could do that today. The data is public already and formatting the e-file data for release is trivial.

Based on my extensive experience examining the Form 990, I can tell you that there are far fewer SSN issues in the e-filed returns. That is because they are typically for larger organizations, the filing mechanism is more structured, and professionals are typically involved in the filing and provide a reality check. It is also much easier to find SSNs that are part of the returns, particularly those that are in the structured fields.

Your staff has explained their reluctance to release all e-file information today based on what they view as a possible consequence of smaller filers perceiving the e-file return as "more transparent" and therefore giving them a disincentive to e-file and instead submitting paper returns. I'm not sure I believe that this effect would be more than trivial, but an easy compromise is to only release the e-file information for the large filers who do not have the paper option.

Releasing the e-file information would be a huge hit on the net. Internet services such as LinkedIn and Google (as well as a raft of innovative startups who want to be the next LinkedIn or Google) would immediately be able to parse this information, which is based on the well-understood XML data format. State law enforcement officials have repeatedly asked for more efficient access to Form 990 information so they can more effectively monitor organizations in their jurisdictions. Many large foundations, including the Gates, Hewlett, Kellogg, Knight, and Rockefeller Foundations and the Carnegie Corporation have publicly called for the release of this information.

I've spent considerable time looking over the open government plans for agencies throughout the government, and it is my considered belief that the accomplishments and plans listed in the Treasury Open Government Initiative are, if you will permit me to be frank, overly modest and halfhearted. I think you can do much better, and release of e-file information in the Exempt Organizations database is a perfect example of how you could do better.

Please don't hesitate to contact me if I may provide you with additional information.

Best regards,



Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.Resource.Org, ou, email=carl@media.org, c=US
Date: 2014.07.07 07:56:20 -07'00'

Carl Malamud
Public.Resource.Org



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Public Works for a Better Government**

July 7, 2014

Mr. Todd Park
Chief Technology Officer and Special Assistant to the President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear Mr. Park:

You will find enclosed a USB Flash Drive containing 9,392 Form 990 information returns of exempt organizations purchased from the IRS that include Social Security Numbers (SSNs). The returns have all been redacted on the enclosed drive as well as on our copy of the data on our servers. We have also notified GuideStar, the Foundation Center, and the Economic Research Institute of these results.

I am writing to you today for two reasons. First, the IRS needs help. The Exempt Organizations database is a mess. It has huge privacy problems. The IRS is ignoring the President's open government directives, in particular the requirement for the distribution of machine-processable information and the requirement to distribute data in bulk using modern technologies. The Exempt Organizations database is based on low-resolution scans, no release of e-file information, and a shockingly bad IT code base of Windows XP and a custom Oracle application.

Your work on healthcare.gov was a real inspiration to those of us who keep a close eye on government IT. It was an amazing turnaround and you and your "surge" team should be congratulated and have the thanks of the American people. I know you have now deployed similar teams at other hot spots, such as the Veterans Administration.

However, it is important that we not wait until the moment of crisis to solve problems. There are festering IT situations throughout the government and you need to put in place a mechanism that solves these smaller problems, such as the current Exempt Organizations fiasco. The IRS needs outside help on this issue and I hope you can provide the Commissioner with some suggestions how he can obtain that help.

If you have a chance to talk with the Commissioner, I hope you will also use that occasion to remind him of the President's requirement for machine-processable data and how that applies to the release of e-file returns from Exempt Organizations. I know this is an important issue for you and the President and I hope you will take the time to explain why to the Commissioner.

The second reason I am writing to you is that in the course of the extensive privacy audit I've conducted, I've noticed that there is a real lack of OCR and redaction tools that operate at scale. The underpinnings are there in tools such as tesseract, pdftk, ImageMagick, exiftool, and other open source components. However, nobody has put

them together in a way that would be useful to an organization such as the Internal Revenue Service as they process several million returns.

The need for such tools goes far beyond the IRS, and a toolkit would be very useful to other components of the federal government that have to deal with similar issues. The Administrative Office of the U.S. Courts, for example, has an ongoing problem with redaction of personal information, and there are numerous other federal databases that would benefit substantially from industrial–scale OCR. Such a toolkit would also be extremely useful to state and local governments who are trying to prepare large databases for public release.

As you and your colleagues in the White House begin to deal with the era of "big data," including the excellent Big Data and Privacy Review you have recently concluded, it is important that we think about tools that help our government agencies move beyond open government plans and start dealing with the actual operational details of releasing and maintaining government databases.

Again, my hearty congratulations to you on the healthcare.gov turnaround.

Please don't hesitate to contact me if I may provide you with additional information.

Best regards,


Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.Resource.Org, ou, email=carl@media.org, c=US
Date: 2014.07.07 07:56:20 -07'00'

Carl Malamud
Public.Resource.Org



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Public Works for a Better Government**

July 7, 2014

President Barack Obama
Attn: Mr. John D. Podesta
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear President Obama:

I suspect I am not the first person who has a problem with the IRS who has decided to write to the President for help, but in this case I believe it is a problem we both share and would be grateful for a minute of your time. The immediate topic is the IRS Exempt Organizations database, but I believe the problems there are indicative of a much broader problem with how our government uses information technology.

Enclosed is a USB Thumb Drive which contains an audit I conducted of the IRS Exempt Organizations database, the annual reports of all nonprofit and political organizations. The audit contains evidence of several hundred thousand Social Security Numbers that are in the public reports sold by the IRS, personal privacy information of schoolchildren, veterans, community groups, and many others.

This audit is part of a 6–year effort to make this database better. In addition to redacting 9,392 returns with privacy breaches, we provided for the first time bulk access to 7,634,050 returns and have spent considerable time briefing administration and congressional officials about how this database could be made better.

While the IRS database is a bit of a disaster, by government standards it is definitely not an outlier. I worked closely with the House of Representatives on their database issues, including how they distribute video from hearings, and that system is also a bit of a disaster. We were able to make available for the first time an additional 14,000 hours of video from hearings, but we ultimately ran into an unhearing technical staff and capture by contractors that is unfortunately all too common in Washington.

Likewise, we spent considerable time working on the PACER database of U.S. Court fillings. While our work resulted in over 1 million cases becoming much more widely available using the RECAP system, it was been over the strong objections of the Administrative Office of the U.S. Courts (though our privacy audit received the thanks of the Judicial Conference and quite a few judges).

In the Executive Branch, we've had a few wins. With a little bit of assistance from me and heavy lifting from your staff at OSTP, the Federal Register and the Patent databases are both much more broadly available. But, as you experienced firsthand with healthcare.gov—and as I can tell you from my own work with NARA, the Smithsonian, the IRS, and numerous other agencies—there is a more fundamental problem.

The healthcare.gov system is perhaps an opportunity to learn. Only after the system was a total fiasco and became a nightly story on CNN was enough firepower brought to bear to begin solving the problem. We should all be immensely grateful to Mikey Dickerson and his team for their heroic effort (and I hope you will formally recognize their efforts as it was truly an amazing thing to fix that pile of spaghetti code).

Since you were elected, I've spent all of my efforts working on government IT, albeit from the outside. As such, I've paid very close attention to your open government initiatives, including your very impressive directives as well as initiatives such as 18F at GSA and your new team being assembled at OMB. I'm a big fan of Todd Park and Steve VanRoekel as well as their talented predecessors, Aneesh Chopra and Vivek Kundra.

However, if you will permit me to be frank, I don't think you are doing nearly enough. Inappropriate use of information technology is a $80 billion per year boondoggle in the federal government. Procurement is very, very broken. Because the tools we build for the civil service are so awful, bad IT has hobbled our entire federal government. You've seen firsthand how bad the computer tools you have to work with are, and you get nothing but the best in EOP. You can imagine how awful it is in the mission-oriented agencies, where dedicated public servants are forced to work with technology that is not just old but badly conceived and even more badly implemented.

I am reminded of the period after the Civil War when our federal bureaucracy was equally hobbled, in those days by the massive abuse of patronage and the lack of modern management methods in a bureaucracy that had ballooned. While there were many minor initiatives from a few dedicated staff in the agencies and at the White House, they weren't nearly enough. It was only after President Ulysses S. Grant created the U.S. Civil Service Commission that fundamental change started to take shape. After President Chester A. Arthur pushed for passage of the Pendleton Civil Service Reform Act and talented public servants like Theodore Roosevelt joined the Commission, a fundamental change started to spread throughout the entire federal bureaucracy.

Open government plans and directives are a start, but my experience working with government IT for several decades has convinced me that you need to do much more. I believe you will need the equivalent of the U.S. Civil Service Commission, to bring in people with the stature of Theodore Roosevelt and arm them with big sticks. Reform of how we procure and use technology is the most pressing issue when it comes to the effectiveness of our government and it must be addressed. The incremental steps are not enough, we need a total reboot of the system.

Best regards,



Digitally signed by Carl
Malamud
DN: cn=Carl Malamud,
o=Public.Resource.Org,
ou,
email=carl@media.org,
c=US
Date: 2014.07.07 07:56:20
-07'00'

Carl Malamud
Public.Resource.Org

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 150 of 165

# EXHIBIT P



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Public Works for a Better Government**

March 30, 2015

HONORABLE LEE H. ROSENTHAL
United States Courthouse
515 Rusk Street, Room 11535
Houston, Texas 77002

    RE: Ongoing Privacy Breaches by the United States Courts

Dear Judge Rosenthal:

In 2008, I sent to your attention 3 audits of privacy violations in the proceedings of
United States Courts:

- On May 3, 2008, I notified you of a large number of Social Security Numbers in the
  opinions of the U.S. Court of Appeals. A redacted copy of that audit is viewable at
  this URL: https://public.resource.org/scribd/7512579.pdf

- On October 3, 2008, I notified you of a preliminary audit of privacy violations in 12
  U.S. District Courts. A redacted copy of that audit is viewable at this URL: https://
  public.resource.org/scribd/7512580.pdf

- On October 24, 2008, I notified you of the completed audit of privacy violations in
  32 U.S. District Courts. A redacted copy of that audit is viewable at this URL:
  https://public.resource.org/scribd/7512583.pdf

In addition to my communications directly with you, I sent the audit results 3 times to
the Chief Judges of selected U.S. District Courts. Some of those communications can
be found at the following URL: https://public.resource.org/uscourts.gov/

You took a number of actions in response to these audits:

- On July 16, 2008, you acknowledged the audit of the U.S. Court of Appeals. A copy
  of that letter is viewable at this URL: https://public.resource.org/scribd/
  7512576.pdf

- On March 31, 2009, you responded to a formal inquiry from the United States
  Senate in a joint letter with Mr. Duff. A copy of that letter is viewable at this URL:
  https://public.resource.org/scribd/13838758.pdf

- On April 16-17, 2009, the subject was discussed at a meeting of the Advisory
  Committee on Appellate Rules. A copy of the minutes of that meeting may be
  found at the following URL: http://www.uscourts.gov/uscourts/RulesAndPolicies/
  rules/Minutes/AP04-2009-min.pdf

- On August 24, 2009, an extensive analysis of my audit results was conducted by
  the Administrative Office of the U.S. Courts. A copy of that analysis is viewable at
  this URL: http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/SSN
  %20Memo%20-%20082409.pdf

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 151 of 165

- On November 5-6, 2009, the matter was discussed by the Advisory Committee on Appellate Rules. A copy of the briefing materials can be found at the following URL: http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Agenda%20Books/Appellate/AP2009-11.pdf (See page 19.)

- On February 3, 2010, I met with you in chambers to discuss PACER and privacy issues.

- On January 6-7, 2011, the Privacy Subcommittee reported to the Committee on Rules of Practice and Procedure. A copy of those materials may be found at the following URL: http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Agenda%20Books/Standing/ST2011-01_Vol_II.pdf (See page 33 and page 350.)

Given the level of attention that this issue has received both inside the judiciary and in the mainstream press, I am very distressed to have to report to you a major privacy breach by the Administrative Office of the United States Courts and by several of the U.S. District Courts that were the subject of our audits.

Specifically, an unredacted version of my October 3, 2008 letter to you has been posted on the uscourts.gov web site. The unreacted version of the letter contains a 20-page list of case numbers along with the document containing SSNs and a listing of those SSNs. In other words, this document is a one-stop shopping center for identity theft and it has your name on it.

The document is posted in two places:

- The first page linking to one redacted version of the document is the 2008 Civil Rules Suggestions Page. I have attached a copy of that web page as Exhibit 1.

- In addition, the 2009 Appellate Rules Suggestion Chart links to a second copy of the unredacted document. I have attached a copy of that web page as Exhibit 2.

- Exhibit 3 contains one of the two copies of the unredacted document in question that I obtained from the uscourts.gov web site yesterday.

The uscourts.gov web site does not operate using modern technical standards, so I am unable to get the date created from the web server they run. However, by examining the Internet Archive's Wayback Machine, I can say with some confidence that the pages have been posted since at least September 27, 2012.

On a hunch, I pulled up some of the dockets mentioned in the letter. To my horror, it appears that the U.S. Courts simply failed to remove those offending documents. For example, you will find attached as Exhibit 4 an example containing several pages of unredacted privacy information from the U.S. District Court for the Northern District of Illinois. This is despite the fact that I sent 3 notifications by Federal Express to that court.

It has been almost 6 years since I notified the United States Courts of these privacy issues. That the specific documents that I flagged are still available for purchase on the PACER system is outrageous. It is particularly outrageous given the assurances given to the United States Senate. It is particularly outrageous given the aggressive and personal actions of retribution taken by the Administrative Office in response to the report of these privacy breach in the New York Times and other media publications.

As you know, Judge Rosenthal, I am a huge admirer of how you handled this situation in 2008, and I have expressed my admiration for your actions several times. You were quick to contact me and I was very impressed with your responsiveness. However, it is clear that the Administrative Office does not share your attitude, and their lax and complacent approach to privacy is truly distressing. Posting the unredacted letter on a public web site is personally embarrassing to me and I suspect it is embarrassing to you as well.

At this point, I have no alternative but to personally examine every document listed in that letter to determine which of those docket items are still available on PACER. This will cost me hundreds of dollars in PACER fees and I respectfully submit that the U.S. Courts should not charge me for this access. If appropriate, please consider this letter an application for a PACER Fee Exemption.

I would also like to respectfully submit that the U.S. Courts should take 3 actions with the utmost urgency:

- First, the offending letter should be removed from the uscourts.gov web site and tools such as Google Webmaster Tools should be used to try and remove copies of the document from search engine caches.

- Second, the U.S. Courts should immediately examine every document listed in both the October 3 and October 24 audit and determine if those items are still visible on PACER. If they are, the Court Clerks should be commanded to immediately remove those documents from view. and the filing attorney in each case should be subjected to appropriate disciplinary action.

- Third, given the long-term nature of this particular breach, I believe it is imperative that the Administrative Office of the U.S. Courts notify all the parties involved, including the attorneys on both sides of the case, the plaintiffs and defendants, and (most importantly) any individuals whose privacy was breached in these actions. I believe the Administrative Office of the U.S. Courts should also offer free credit monitoring services to all those individuals.

I am sorry to have to write to you today with this unpleasant news, and I do hope we will have the opportunity to meet again in the future. I very much enjoyed my visit with you earlier and remain eager to assist the United States Courts as it faces the challenges of the Internet.

Respectfully yours,



Digitally signed by Carl
Malamud
DN: cn=Carl Malamud,
o=Public.Resource.Org,
ou,
email=carl@media.org,
c=US
Date: 2015.03.30
05:55:57 -07'00'

Carl Malamud
Public.Resource.Org

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 153 of 165

# EXHIBIT 1

Web Page
2008 Civil Rules Suggestions

CONTAINS CONFIDENTIAL
INFORMATION

# 2008 CIVIL RULES SUGGESTIONS

| 08-CV | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|-------|----------------------------------------|------------|--------------|--------|
| **08-CV-A** | B. Sachau | 07/30/08 | Rules 30, 33 & 36 | 11/08 – Advisory Committee considered and declined to take action |
| **08-CV-B** | Dean Michael Moffit | 08/19/08 | Pleadings Standards | 10/09 – Advisory Committee considered; consolidated into ongoing Twombly & Iqbal study |
| **08-CV-C** | Kenneth A. Lazarus, Esq. and Professor Paul Rothstein | 10/27/08 | Rules 8, 12, 16 & 37 | 11/08 – Advisory Committee retained on agenda; consolidated into ongoing Twombly & Iqbal study<br><br>10/09 – Advisory Committee considered |
| **08-CV-D** | Public.Resource.org (Carl Malamud) | 10/30/08 | Privacy Rules | Pending consideration |
| **08-CV-E** | Akua Asamoah | 12/05/08 | New Form/Form Revision | Pending consideration |

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 155 of 165

# EXHIBIT 2

Web Page
2009 Appellate Rules
Suggestions

CONTAINS CONFIDENTIAL
INFORMATION

# APPELLATE RULES SUGGESTIONS

## 2009 APPELLATE RULES SUGGESTIONS CHART

| 09-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| 09-AP-A | ABA Council of Appellate Lawyers (Bennett Evan Cooper and Steven Finell) | 02/17/09 | Rule 29 | Pending |
| 09-AP-B (08-AP-007) | Daniel Rey-Bear | 03/20/09 10/14/09 | Rule 1(b) | Pending |
| 09-AP-C | Bankruptcy Rules Committee | 09/09 | Consider possible FRAP amendments in the light of project to revise Part VIII of the Bankruptcy Rules | Pending |
| 09-AP-D | John Kester | 12/10/09 | Implications of Mohawk Industries, Inc. v. Carpenter | Pending |

## 2008 APPELLATE RULES SUGGESTIONS CHART

| 08-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| 08-AP-A | B. Sachau | 08/27/08 | Rule 29 | Pending |
| 08-AP-B | Public.Resource.Org (Carl Malamud) | 10/30/08 | Privacy Rules | Pending |
| 08-AP-C | Honorable Frank H. Easterbrook | | Rule 26 | Pending |
| 08-AP-D | Peder K. Batalden | | Rule 4 | Pending |
| 08-AP-E | Public Citizen Litigation Group | | Rule 4 | Pending |
| 08-AP-F | Members of the Seventh Circuit Bar Association | | Rule 4 | Pending |
| 08-AP-G | Appellate Committee | | Form 4 | Pending |
| 08-AP-A (2) | Honorable Mark R. Kravitz | | Rule 3 | Pending |
| 08-AP-B (2) | Honorable Alan D. Lourie | | Rule 28.1 | Pending |

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 157 of 165

## 2007 APPELLATE RULES SUGGESTIONS CHART

| 07-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| **07-AP-A** | Robert Kantowitz | 08/29/07 | Rule 32.1 | unknown |
| **07-AP-B** | Kay Sieverding | 11/20/07 | Electronic Case Filing and Habeus Corpus Rules | unknown |
| **07-AP-C** | Criminal Rules Committee | 06/05/08 | Rules 4 & 22 | Closed |
| **07-AP-D** | Stephen P. Stoltz | 05/06/08 | Rule 26 | Closed |
| **07-AP-E** | M. Miller Baker | 05/29/08 | Rule 4 | Pending |
| 07-AP-F | Honorable Jerry E. Smith | - | Rule 35 | Pending |
| 07-AP-G | Forms Working Group (Honorable Harvey E. Schlesinger) | 11/07 | Form 4 | Pending |
| 07-AP-H | Appellate Rules Committee | 04/08 | Warren v American Bankers Insurance of Florida (2007) | Pending |
| 07-AP-I | Honorable Diane P. Wood | 04/08 | Rule 4 | Pending |
| 07-AP-B (2) | Civil Rules Committee | 04/07 | Court Request for Relief | Closed |
| 07-AP-D (2) | Subcommittee on Time Computation | 03/07 | Define "State" | Closed |
| 07-AP-E (2) | Mark Levy | 11/07 | Bowles v. Russell (2007) | Pending |

## 2006 APPELLATE RULES SUGGESTIONS CHART

| 06-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| None | - | - | - | - |

## 2005 APPELLATE RULES SUGGESTIONS CHART

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 158 of 165

| 05-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| 05-AP-A | Roy H. Wepner | 01/26/05 | Rule 35 & 40 | unknown |

### 2004 APPELLATE RULES SUGGESTIONS CHART

| 04-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| 04-AP-A | Standing Committee – Style Subcommittee | 02/03/04 | Rules 27 a& 28.1 | unknown |
| 04-AP-B | Dennis R. Cookish | 04/13/04 | Rule 12 | unknown |
| 04-AP-C | Professor Phillip A. Pucillo | 06/07/04 | Rule 4 | unknown |
| 04-AP-D | Committee on Court Administration and Case Management of the Judicial Conference of the United States (Honorable John W. Lungstrum) | 08/02/04 | Electronic Case Filing | unknown |
| 04-AP-E | Gary Bowden | 10/13/04 | Form 4 | unknown |

### 2003 APPELLATE RULES SUGGESTIONS CHART

| 03-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|---|---|---|---|---|
| 03-AP-A | Honorable Jon O. Newman | 01/08/03 | Rule 4 | unknown |
| 03-AP-B | Professor Joseph R. Weeks | 03/19/03 | Require written explanations for dispositions | unknown |
| 03-AP-B (Addendum) | Tom G. Glass | 05/05/03 | Required written explanations for dispositions | unknown |
| 03-AP-C | Professor Phillip A. Pucillo | 08/14/03 | Rule 4 | unknown |
| 03-AP-D | Mark D. Stern | 11/18/03 | Procedures for filing briefs | unknown |

### 2002 APPELLATE RULES SUGGESTIONS CHART

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 159 of 165

| 02-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|-------|------------------------------------------|------------|--------------|--------|
| None  |                                          | -          | -            | -      |

## 2001 APPELLATE RULES SUGGESTIONS CHART

| 01-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|-------|------------------------------------------|------------|--------------|--------|
| 01-AP-A | Brian Wolfman | 03/01/02 | Rule 3 | Closed |

## 2000 APPELLATE RULES SUGGESTIONS CHART

| 00-AP | NAME OF INDIVIDUAL AND/OR ORGANIZATION | DATE REC'D | RULE OR FORM | STATUS |
|-------|------------------------------------------|------------|--------------|--------|
| 00-AP-A | Jason A. Bezis | 01/28/00 | Rules 26 & 45 | unknown |
| 00-AP-B | Honorable Gino J. Agnello | 04/11/00 | Rule 4 | unknown |
| 00-AP-C | Stuart Buck | 09/14/00 | Rule 22 | unknown |
| 00-AP-D | Honorable Michael Boudin | 11/17/00 | Rule 29 | unknown |

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 161 of 165

# EXHIBIT 3

Unredacted Letter
Downloaded From 2 Locations
on the Uscourts.Gov Web Site on
March 30, 2015

CONTAINS CONFIDENTIAL
INFORMATION

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 162 of 165



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

Public Works Projects for the Internet

October 3, 2008

**08-AP-B**

The Honorable Lee H. Rosenthal
Chair, Committee on Rules of Practice and Procedure
Judicial Conference of the United States
Washington, D.C. 20544                                            **08-CV-D**

Dear Judge Rosenthal:

I would like to thank you for your letter of July 16, 2008 on the subject of personal
identifiers in appellate opinions. Your kind words are very much appreciated and I am
pleased to report that the Clerks of the Courts of the Second, Fifth, and Ninth Circuits
wrote to me indicating they were in the process of redacting social security numbers.

One issue in regards to appellate opinions that I would like to bring to your attention is
the status of Alien Identification Numbers. It is the position of the Clerks of the Courts
that Alien Identification Numbers do not fall within the enumerated list of "individuals'
Social Security and taxpayer identification numbers, names of minor children, financial
account numbers, dates of birth, and, in criminal cases, home addresses." I do under-
stand that a literal reading of the list might preclude Alien Identification Numbers and
thus bring it to your attention in case the issue had not been previously considered.

I am also writing to you today to report on preliminary results of an audit of
documents submitted to the United States District Courts. A social security number
scan of these documents shows approximately 2,282 suspect documents in 32
different districts. The social security numbers are present in documents filed in
earlier years, but also in many documents filed in 2008. In some cases, it appears that
the social security numbers for attorneys and state employees are being disclosed.

While most documents contain the social security number for a single individual, we
have found lists of dozens of individuals. In some cases, the name, date of birth,
social security number, and even financial account numbers are present, making this
"one-stop shopping" for potential identity theft.

I have enclosed for your reference a DVD of the 2,282 suspect documents. You will
find attached to this letter as Appendix A a detailed analysis of 13 of the District
Courts based a systematic manual scan of the documents flagged by our program. We
will be completing the same detailed analysis of the remaining 19 districts for which
we have data, and would be happy to forward that information to you if you wish.

It is worth mentioning that the number of privacy incidents varies widely by district.
For example, we were unable to find any social security numbers for the Southern
District of Texas or the District of Oregon, and the District of Minnesota had only 6
cases with problems, all from 2005 and 2006.

After working with government data for two decades, I am always impressed by the impact the Internet has on the dissemination of public data. The process of learning how to disseminate public databases effectively is one of trial and error and of progressively perfecting the process. The rules and procedures to protect personal identifiers developed by the Committee on Rules of Practice and Procedure are, I believe, a very important step in this regard.

Based on our experience with scanning District Court documents, I hope you will permit me to offer three suggestions that might provide additional support to the goal of broad dissemination of public information while protecting the privacy of individuals.

First, there is no obvious way for a member of the public or a nonprofit research group such as ours to alert the Administrative Office of the Courts to privacy issues. No system is perfect, and the feedback from users of the system is an essential step in finding mistakes before they spread. Many organizations have found that appointing a Chief Privacy Officer provides a single point of contact for the public.

Second, when problems are found, there does not appear to be a systematic way of alerting the providers of legal information. Even though the social security numbers from appellate opinions were removed from court web sites, they are still present on West Law and Lexis Nexis. A notification mechanism when cases are withdrawn or changed would be extremely useful. Such a system should go beyond the commercial services to include the large number of nonprofit groups that disseminate the law. Our own computers at Public.Resource.Org, for example, serve 1 million unique visitors per month, and that number is far larger when we include other sites that copy our data.

Third, while the first line of defense for protection of privacy is with the lawyers who file documents in the PACER system, we must assume that no system is perfect. I have attached as Appendix B a simple one-line PERL program based on open source tools which we use to scan for social security numbers. We scan a database for potential hits and then look at each case manually. If we find a social security number, we use redaction tools to remove that information.

There are no doubt far more sophisticated tools available, but I offer this simple mechanism as an example and would be more than happy to discuss these tools with technical staff if that is useful.

Thank you again for your responsiveness and quick action on the matter of Appellate decisions. It is gratifying to see the commitment towards the protection of personal privacy, both in the Judicial Conference and in the day-to-day operations of the Clerks of the Court.

Very truly yours,

Carl Malamud
President & CEO
Public.Resource.Org

cc:     Mr. Peter McCabe, Esq.
       The Honorable James C. Duff

Case: 15-80056, 04/02/2015, ID: 9483978, DktEntry: 1-2, Page 164 of 165

Pages 14-44 of this document, which consisted
of Appendices listing redacted personal identifying
information, have been removed from the Exhibit.